Lynn Lincoln Sarko (*pro hac vice*)
T. David Copley
Gretchen Freeman Cappio (*pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Email: lsarko@kellerrohrback.com
Email: dcopley@kellerrohrback.com
Email: gcappio@kellerrohrback.com

Michael W. Sobol (*pro hac vice*)
Roger N. Heller (*pro hac vice*)
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
Email: msobol@lchb.com
Email: rheller@lchb.com

*Interim Co-Lead Plaintiffs' Counsel*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>Arizona THERANOS, INC.,<br>Litigation | **No. 2:16-cv-2138-HRH**<br>**(Consolidated with)**<br>**No. 2:16-cv-2373-HRH**<br>**No. 2:16-cv-2660-HRH**<br>**No. 2:16-cv-2775-HRH**<br>**-and-**<br>**No. 2:16-cv-3599-HRH**<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# **TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................. 1

II. JURISDICTION AND VENUE .......................................................... 4

III. PARTIES ............................................................................................ 5

IV. FACTUAL BACKGROUND ............................................................. 7

  A. Theranos ................................................................................. 7

  B. Walgreens Knowingly Ignored Repeated Red Flags About the
   Reliability of Theranos's Testing ........................................... 10

  C. Defendants Widely Marketed Theranos Testing as Accurate
   and Reliable .......................................................................... 14

  D. Defendants' Statements About Theranos Tests Were
   Knowingly False .................................................................... 21

  E. FDA, CMS, and Other Regulators Crack Down on Theranos ................. 25

  F. Defendants Continued to Fail to Protect Customers ................................. 33

  G. Defendants' Misconduct Has Significantly Harmed
   Consumers ............................................................................ 35

  H. Factual Allegations Regarding Plaintiffs ................................. 36

V. CLASS ACTION ALLEGATIONS ................................................... 50

VI. CAUSES OF ACTION ..................................................................... 54

  FIRST CAUSE OF ACTION (Arizona Consumer Fraud Act, A.R.S.
   § 44-1521, *et seq.*) (Against All Defendants) (On Behalf of
   Arizona Subclass Only) .......................................................... 54

  SECOND CAUSE OF ACTION (Fraud) (Against All Defendants) ................... 57

  THIRD CAUSE OF ACTION (Negligence) (Against All Defendants)
   .................................................................................................. 59

i

FOURTH CAUSE OF ACTION (Negligent Misrepresentation) (Against All Defendants) ............................................................... 61

FIFTH CAUSE OF ACTION (Breach of Contract) (Against Theranos and Walgreens) .......................................................................... 62

SIXTH CAUSE OF ACTION (Unjust Enrichment) (Against All Defendants) ............................................................................ 64

SEVENTH CAUSE OF ACTION (Aiding and Abetting Fraud) (Against Walgreens) ................................................................... 65

EIGHTH CAUSE OF ACTION (Civil Conspiracy to Commit Fraud) (Against All Defendants) ............................................................ 67

NINTH CAUSE OF ACTION (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)) (Against All Defendants) ............................................................................. 69

TENTH CAUSE OF ACTION Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) (Against All Defendants) ............................................................................. 72

ELEVENTH CAUSE OF ACTION (Violation of California Business & Professions Code Sections 17200, *et seq.*) (Against All Defendants) ............................................................................. 74

TWELFTH CAUSE OF ACTION (Violation of California Business & Professions Code Sections 17500, *et seq.*) (Against All Defendants) ............................................................................. 77

THIRTEENTH CAUSE OF ACTION (Violation of California Civil Code Section 1750 *et seq.*) (Against All Defendants) ............................. 78

FOURTEENTH CAUSE OF ACTION (California Civil Code §§ 1709- 1710 - Deceit) (Against All Defendants) ........................................ 81

VII.   PRAYER FOR RELIEF ................................................................... 82

VIII.  DEMAND FOR JURY TRIAL .......................................................... 83

# I.  INTRODUCTION

1.     Blood tests and other clinical lab tests ("test results") are an everyday and invaluable part of the practice of modern medicine. Test results can offer crucial details about an individual's health and doctors rely on test results to detect everything from cholesterol and glucose levels to infections, blood cell counts and cancer.

2.     Test results aid in the process of medical diagnosis and treatment decisions, and in some cases are a prerequisite for additional medical tests. Because test results are such a foundational part of medical treatment, test results that are unreliable or inaccurate can be catastrophic: serious conditions may go undetected, patients may not receive the treatments and medications that they need, and patients may be misdiagnosed and receive treatments or medications that they have no need for.  It is absolutely critical that consumers be able to rely on test results.

3.     This consumer class action is based on Defendants' promotion and sale of blood tests that were unreliable, Defendants' false and misleading promises that Theranos test results were reliable and accurate, and should be relied on by consumers and their medical providers in making health decisions, and on Defendants' long-standing concealment from customers of information demonstrating that such tests were not, in fact, reliable or accurate.  Defendants have failed to deliver the products and services they promised, and that their customers reasonably expected, and have endangered their customers' health and well-being, the very thing they promised to promote and protect.

4.     Theranos test results were marketed by Defendants as a "disruptive" technology in the blood testing and laboratory services business.  What allegedly made

Theranos's technology a breakthrough was its proprietary "Edison" blood testing devices. In contrast to the large needle and numerous tubes required in a typical venipuncture blood draw, Theranos's Edison devices were handheld devices, supposedly able to take a few drops of blood from a patient's finger placed into a nanotainer capsule, and reliably conduct hundreds of blood tests, all outside a lab.

5. Theranos sold its new "tiny blood test" at Wellness Centers at Defendant Walgreens Boots Alliance, Inc.-owned Walgreens pharmacies in Arizona and California, at a Capital BlueCross Capital Blue retail store in Pennsylvania, and at Theranos-owned Wellness Centers in Arizona and California. Theranos and Walgreens assured customers that these tests were highly accurate and reliable, industry-leading in quality, and that they had been developed and validated under, and were compliant with, federal guidelines, and encouraged customers to use the Theranos test results to make health and treatment decisions.

6. Defendants' promises and representations were false. For starters, the Edison devices did not work and Theranos's tests conducted on Edison were not accurate or reliable. While Defendants have long known this, it was confirmed publicly on May 18, 2016, when Theranos conceded that it had informed regulators that it had voided "all" blood-testing results from its proprietary Edison devices.[1]

7. Theranos also tested thousands of customers' blood on devices other than the Edison machine without explaining this fact to consumers, and in fact misled

---

[1] John Carreyrou, *Theranos Voids Two Years of Edison Blood-Test Results*, Wall St. J. (May 18, 2016) (Ex. A).

consumers to think that its Edison technology was being used. As Defendants knew, these non-Edison tests, too, lacked the accuracy and reliability that Defendants had promised and that the customers had reasonably expected and paid for. What Defendants knew was confirmed by, *inter alia,* numerous citations issued by the federal government regarding the non-compliance of Theranos's testing labs, Theranos's voiding of tests run on non-Edison devices from 2014 and 2015,[2] and by the fact that the government banned Ms. Holmes from owning or operating a blood-testing business for at least two years and revoked Theranos's license to operate a lab.

8. Many thousands of people, including Plaintiffs, believed Defendants' false representations and promises regarding the accuracy and reliability of Theranos's test results. For years, Defendants hid the truth about Theranos's unreliable, flawed testing from the public.

9. None of the consumers who obtained test results from Theranos received what they paid for and what they reasonably expected—*i.e.*, test results they could rely on. All of them received tests that they decidedly could not reasonably rely on given the numerous problems alleged herein that have come to light. Worse yet, as a result of the unreliable and inaccurate Theranos test results, many consumers have been subjected to unnecessary or potentially harmful treatments, and/or have been denied the opportunity to seek treatment for a treatable condition.

---

[2] In the Scottsdale Facility, for example, regulators found that Theranos used mis-programmed machines to evaluate blood coagulation tests, failed to properly gauge water purity in machines it used, and failed to meet laboratory quality standards.

10.     Plaintiffs, for themselves and all others similarly situated, (*i.e.*, the members of the Classes described and defined within this Complaint), bring this action for, *inter alia*, damages, restitution, other monetary relief, and an order enjoining Defendants from engaging in further deceptive representations, concealment and other unlawful acts, pursuant to the Arizona Consumer Fraud Statute, A.R.S. §§ 44-1521 *et seq.*; California Business and Professional Code §§17200, *et seq.*; California Business & Professional Code §§ 17500, *et seq.*; California Civil Code §§1750, *et seq.*; California Civil Code §§1709-1710; Civil RICO 18 U.S.C. §§ 1961-1968; and common law causes of action for fraud, civil conspiracy to commit fraud, negligent misrepresentation, unjust enrichment, and aiding and abetting.

## II.     <u>JURISDICTION AND VENUE</u>

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because at least one member of the Class is a citizen of a state that is different from Defendants and because, upon information and belief, the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest, and there are more than 100 members in the proposed Class and Subclasses.

12.     This Court has personal jurisdiction over Defendants because Defendants have conducted and continue to conduct business in the State of Arizona, and because Defendants have committed acts and omissions complained of herein in the State of Arizona.

13.     Venue as to Defendants is proper in this judicial district because a substantial part of the events and omissions giving rise to the claims alleged herein

occurred in this District. Venue is also proper because Defendants have conducted, and continue to conduct, business within this District.

### III.  **PARTIES**

14.     Plaintiff A.R. is a resident and citizen of San Jose, California and is using his initials to protect his privacy in this litigation.

15.     Plaintiff B.B. is a resident and citizen of Cuyahoga Falls, Ohio, and is using her initials to protect her privacy in this litigation.  In 2014, B.B. resided in Arizona.

16.     Plaintiff B.P. is a resident and citizen of Phoenix, Arizona and is using his initials to protect his privacy in this litigation.

17.     Plaintiff D.L. is a resident and citizen of Maricopa, Arizona and is using her initials to protect her privacy in this litigation.

18.     Plaintiff L.M. is a resident and citizen of Chandler, Arizona and is using her initials to protect her privacy in this litigation.

19.     Plaintiff M.P. is a resident and citizen of Scottsdale, Arizona and is using his initials to protect his privacy in this litigation.

20.     Plaintiff R.C. is a resident and citizen of Sun City West, Arizona and is using his initials to protect his privacy in this litigation.

21.     Plaintiff R.G. is a resident and citizen of Gilbert, Arizona and is using his initials to protect his privacy in this litigation.

22.     Plaintiff S.J. is a resident and citizen of Mesa, Arizona and is using her initials to protect her privacy in this litigation.

23.     Plaintiff S.L. is a resident and citizen of Chandler, Arizona and is using his

initials to protect his privacy in this litigation.

24. Defendant Theranos, Inc. ("Theranos" or the "Company") is based in Palo Alto, California. Theranos operates, or during the relevant time period operated, two laboratories: one in Newark, California, and another in Scottsdale, Arizona. Through Wellness Centers located predominantly in Walgreens pharmacies in Arizona and California, and also in Theranos-owned Wellness Centers in Arizona and California, Theranos sold testing services to individuals. Since it began offering testing services in 2013, Theranos has conducted 6.1 million diagnostic tests.

25. Defendant Walgreens Boots Alliance, Inc. ("Walgreens"), of Deerfield, Illinois, is a global pharmacy-led health and well-being enterprise, which, among other segments, operates the Walgreens retail pharmacy chain in the United States.

26. Defendant Elizabeth Holmes, a citizen and resident of California, is the founder of Theranos and at all relevant times has been Theranos's Chief Executive Officer. On information and belief, Ms. Holmes has had a primary role in, and in significant part has directed, Theranos's misconduct as alleged herein. Further, Ms. Holmes personally made material misrepresentations and omissions as alleged herein. On information and belief, Ms. Holmes has personally received millions, if not billions, of dollars in compensation as a result of the business and revenue generated through the misconduct alleged herein.

27. The true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names. Each of the Defendants designated herein as a DOE

is legally responsible in some manner for the unlawful acts referred to herein. Plaintiffs may seek leave of Court to amend this Complaint to reflect the true names and capacities of the Defendants designated herein as DOES when such identities become known.

28. Based upon information and belief, Plaintiffs allege that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

## IV. FACTUAL BACKGROUND

### A. Theranos

29. Theranos was founded in 2003 by Elizabeth Holmes, then a sophomore at Stanford studying chemical engineering, who dropped out a few months later to focus on the Company. Ms. Holmes, the Company's CEO, has maintained that she developed the idea for the Company as a result of her self-professed phobia of needles.[3] According to published reports, Theranos initially focused on development of a hand-held device that would use a tiny needle to obtain a small drop of blood for analysis. By 2008, the project had grown into what is now known as the Edison device.

---

[3] Marco della Cava, *Change Agents: Elizabeth Holmes Wants Your Blood*, USA Today (Jul. 26, 2014), http://www.usatoday.com/story/tech/2014/07/08/change-agents-elizabeth-holmes-theranos-blood-testing-revolution/12183437/ (last visited Nov. 8, 2016).

30.     In contrast to the large needle and numerous tubes required in a typical venipuncture blood draw, Theranos's Edison device was designed to eliminate the need for laboratories altogether.  The concept was that a nanotainer containing a few drops of blood from a finger stick would be placed into a cartridge which would, in turn, be placed into a proprietary Edison device (which Theranos executives have never allowed to be photographed), where a button pushed by a staff person would generate results that automatically would be transmitted to Theranos's databases.  This concept would have enabled Theranos to conduct all testing outside of the laboratory in the Wellness Centers and thus – according to Defendants – revolutionize testing by significantly reducing the time and costs involved.

31.     Neither Ms. Holmes nor the other Defendants ever explained to the public the science or technology underlying the Edison device, claiming a need to protect Theranos's intellectual property. Despite the industry practice for companies to publish their results and allow for peer review by experts in the field when launching a new medical product, Theranos has still never published its data or allowed for peer review.[4] One writer described Ms. Holmes's explanation of what Theranos does as "comically vague" after she explained "[a] chemistry is performed so that a chemical reaction occurs and generates a signal from the chemical interaction with the sample, which is translated

---

[4] John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, Wall St. J. (Oct. 16, 2015) (Ex. B).

into a result, which is then reviewed by certified laboratory personnel."[5]

32.    Despite limited scientific information, based on Defendants' representations people believed that Theranos's Edison technology was a true disruptive technology breakthrough. Holmes was hailed as the next Steve Jobs, and by 2014, Theranos was valued at $9 billion – approximately the same as each of its two largest and long established competitors in the medical testing industry.[6]

33.    By way of example, Defendants advertised the Theranos "tiny blood test" technology as follows:



34.    By 2011, Theranos was in talks with both Safeway and Walgreens to offer Theranos testing in their stores. In 2013, Theranos entered into a partnership agreement

---

[5] Ken Auletta, *Blood, Simpler*, The New Yorker (Dec. 15, 2014), http://www.newyorker.com/magazine/2014/12/15/blood-simpler (last visited Nov. 8, 2016).

[6] Steve Denning, *Is Theranos Too Good To Be True?*, Forbes (Feb. 13, 2016), http://www.forbes.com/sites/stevedenning/2016/02/13/is-theranos-too-good-to-be-true/#47de558857f8 (last visited Nov. 8, 2016).

9

with Walgreens, under which Walgreens invested $140 million in Theranos, and

Theranos agreed to operate clinics, which it called "Wellness Centers," at Walgreens

Pharmacies in Arizona and California.  Following the launch of the partnership in 2013,

Theranos and Walgreens planned to build Theranos Wellness Centers in more than 8,200

Walgreens stores nationwide.[7]



http://www.wsj.com/articles/walgreen-terminates-partnership-with-blood-testing-firm-theranos-1465777062

**B.**  **Walgreens Knowingly Ignored Repeated Red Flags About the Reliability of Theranos's Testing**

35.     Before entering into the partnership with Theranos, Walgreens's Chief

Medical Officer neither reviewed Theranos's technology nor independently validated or

---

[7] Press Release, Theranos, Inc., *Theranos Selects Walgreens as a Long-Term Partner Through Which to Offer Its New Clinical Laboratory Service* (Sept. 9, 2013), https://news.theranos.com/2013/09/09/theranos-selects-walgreens-as-a-long-term-partner-through-which-to-offer-its-new-clinical-laboratory-service/ (last visited Nov. 8, 2016).

verified the accuracy, reliability, or results of the tests.[8]   Nevertheless, and despite the

fact that Walgreens executives had expressed doubts about the reliability of Theranos

tests and the quality of its equipment and/or facilities, Walgreens said it was confident in

the data before introducing the services.[9]

36.     In fact, although a Johns Hopkins University scientist had requested, on

Walgreens' behalf, that Theranos provide his researchers with an Edison device so that

they could verify the technology for Walgreens, and Ms. Holmes initially agreed to

provide one, the device was never provided.[10]   Instead, Walgreens got a prototype which

the Johns Hopkins team tried to evaluate, but the prototype was useless when evaluating

the accuracy and reliability of the tests because it produced results such as "low" or

"high" rather than numeric values that could be compared to other labs' tests.  As a result,

there was no way to compare results from the prototype Edison device to the results of

other commercially-available tests.[11]

37.     In the summer of 2011, just after Theranos and Walgreens signed their

initial letter of agreement, Walgreens sent a delegation, including its finance chief,

internal auditor, and lab experts from a consulting firm called Collaborate, LLC, to a

meeting at Theranos headquarters in Palo Alto, the purpose of which was to gain a

[8] *Pressure is Mounting on a Startup That Has Tried to Shake Up the Lab-Test Market,*
Economist (Apr. 23, 2016), http://www.economist.com/news/business/21697273-
pressure-mounting-startup-has-tried-shake-up-lab-test-market-blood-sports (last visited
Nov. 22, 2016).
[9] *Id.*
[10] Christopher Weaver and John Carreyrou, *Craving Growth, Walgreens Dismissed Its
Doubts About Theranos*, Wall St. J. (May 25, 2016) (Ex. C).
[11] *Id.*

firsthand view of the Theranos business and its capabilities.[12]

38.     At that meeting, however, the consulting lab experts were chaperoned during the entire visit, including during visits to the restroom, and were not allowed access to Theranos's lab area or Edison technology.  Despite the lack of access, Walgreens did discover problems with Theranos's information management systems meant to keep track of patients.[13]

39.     According to published reports, throughout the process, Walgreens executives nevertheless looked the other way.  They did not press for further verification, and instead went ahead with the Theranos business relationship, despite their concerns about the reliability of Theranos's facilities and tests.  Walgreens apparently was afraid that Theranos would respond to its questions by choosing another retail chain to work with as a partner.[14]

40.     Thereafter, later in 2011, Collaborate, LLC, issued a report concluding that Walgreens needed more information to assess the proposed partnership with Theranos.[15]

41.     Similarly, in October 2012, Walgreens sent two executives and a retired Quest Diagnostics Corp. executive to Theranos to review quality-control data. According to reports, the retired Quest executive stated that they were not allowed inside Theranos's lab, and while they were led to believe the data they reviewed was from an Edison

---

[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

12

device, Theranos did not confirm that it was.[16] Walgreens continued to work on the partnership agreement despite the lack of access to the technology and despite its concerns about the reliability of Theranos's facilities and tests. According to published reports, Walgreens executives were privy to information that Safeway, Inc. had also agreed to host Theranos testing sites at some of its stores. According to reports, Safeway dissolved its partnership with Theranos before it began hosting Theranos testing sites in Safeway stores due, in part, to its due diligence that raised questions about the accuracy of Theranos's testing. For example, the unreliability of Theranos tests became apparent after Safeway employees in Pleasanton, California had their blood tested by both Theranos and another conventional lab, and the test results differed significantly.[17]

42. In response to pressure from Theranos, and despite its concerns, Walgreens ceded even more control over the Wellness Centers to Theranos in the final agreement reached between Walgreens and Theranos, and Walgreens gave up the right to review Theranos's clinical data or financial records.

43. Under the Theranos/Walgreens joint venture agreement, Theranos opened 40 Wellness Centers within Walgreens pharmacy stores in Arizona, and one in a pharmacy in California, to sell the majority of its tests.[18]

---

[16] *Id.*

[17] John Carreyrou, *Safeway, Theranos Split After $350 Million Deal Fizzles*, Wall St. J. (Nov. 10, 2015) (Ex. D).

[18] James B. Stewart, *A Marriage Gone Bad: Walgreens Struggles to Shake Off Theranos*, N.Y. Times (Apr. 21, 2016), http://www.nytimes.com/2016/04/22/business/a-once-avid-ally-walgreens-is-struggling-to-shake-off-theranos.html (last visited Nov. 8, 2016).

## C.   Defendants Widely Marketed Theranos Testing as Accurate and Reliable

44.     Despite the known lack of hard data about the technology and known (but concealed from the public) reliability problems and concerns about the Theranos tests, Defendants widely marketed the tests as being reliable and encouraged consumers to use the test results to make decisions about their health and treatment.  Defendants' representations in this regard were pervasive such that Plaintiffs and the entire Class, as well as medical providers in all relevant geographic areas, were exposed to them. Defendants designed their representations and marketing in order to give the impression to consumers and medical providers that Theranos testing was reliable and accurate and should be used in making health decisions.

45.     When the Theranos-Walgreens partnership was publicly announced, Defendants' press release stated that the deal would offer consumers access to "less invasive and more affordable clinician-directed lab-testing, from blood samples as small as a few drops, or 1/1000 the size of a typical blood draw." Defendants' press release touted Theranos's "CLIA-certified laboratory services," and promised that its "proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results."  It stated,"[t]his is the next step in Walgreens' efforts to transform community pharmacy, giving our patients and customers convenient access to the comprehensive care they need, right in their communities."[19]

---

[19] Press Release, Theranos, Inc., *Theranos Selects Walgreens as a Long-Term* Partner *Through Which to Offer Its New Clinical Laboratory Service*,  (Sept. 9, 2013), https://news.theranos.com/2013/09/09/theranos-selects-walgreens-as-a-long-term-

Ms. Holmes told The New Yorker that Theranos "ha[s] data that show you can get a perfect correlation between a finger stick and a venipuncture for every test that we run."[20]

46.     Defendants' advertisements for Theranos were rampant, including in Arizona. In addition to the advertisements and disclosures in the Walgreens stores and Theranos Wellness Centers, Defendants ran commercials on television, had billboards along the main interstate in Phoenix, and had advertisements in the Phoenix Sky Harbor International Airport.[21]

47.     Defendants' sales materials highlighted the proprietary technology and described its offerings as a "tiny blood test," and a "new way" of testing. The materials repeatedly referenced a smaller sample size and depicted the nanotainer. Additionally, the materials assured that Theranos was "industry leading in quality and its tests were highly accurate and developed and validated under and to Federal guidelines."

48.     Thousands of consumers, including Plaintiffs, believed Defendants' representations, and used Theranos to perform testing services, including many who went to Walgreens locations to obtain Theranos testing services.

49.     Walgreens and Theranos jointly marketed Theranos's testing services to customers. Upon information and belief, marketing decisions about the representations

partner-through-which-to-offer-its-new-clinical-laboratory-service/ (last visited Nov. 16, 2016).
[20] Ken Auletta, *Blood, Simpler*, The New Yorker (Dec. 15, 2014), http://www.newyorker.com/magazine/2014/12/15/blood-simpler (last visited Nov. 8, 2016).
[21] Seung Lee, *Arizona: Where Theranos Still Has a Friend*, Newsweek (Jun. 14, 2016) http://www.newsweek.com/arizona-where-theranos-still-has-friend-469942 (last visited Nov. 8, 2016).

that Plaintiffs and Class members saw were made in California and Arizona, and

Defendant Theranos maintained its website from California.

50.    According to reports, prior to October 2015, promotional materials

promised that "usually only three tiny micro vials" of blood would be collected "instead

of the six or more large ones," because "many" of Theranos's tests required no more than

"a few drops of blood."  Theranos reportedly deleted the highlighted portions of the

materials below in mid-2015 to supposedly improve its "marketing accuracy," after it

moved away from Edison testing following a surprise inspection by the FDA:[22]



51.    On another webpage advertisement to Walgreens customers, Defendants

[22] John Carreyrou, *Hot Startup Theranos Dials Back Lab Tests at FDA's Behest*, Wall St. J. (Oct. 16, 2015) (Ex. E).

stated that smaller samples directly benefited patients by dramatically reducing the time it takes to analyze samples because its technology enabled a "more timely diagnosis to support better, more informed treatment."[23]

52.     Defendants offered a variety of testing directly to consumers:



---

[23] Walgreens website, *Theranos, the Lab Test, Reinvented*, http://www.walgreens.com/pharmacy/lab-testing/home.jsp (last visited May 22, 2016); https://web.archive.org/web/20160407050109/http://www.walgreens.com/pharmacy/lab-testing/home.jsp (last visited Aug. 15, 2016).

17

theranos

MD CONNECT · OUR LAB · PROVIDERS · TESTS · CENTERS · COMPANY · NEWS · LOGIN

Our Lab

Guest Stories

## Our lab extends our mission to make actionable health information accessible at the time it matters.

We lead the industry in transparency and quality, advocate for FDA regulation of lab tests, work to reduce Medicare and Medicaid rates, and promote transparency in pricing.

53.     As in the above example, Defendants represented that Theranos test results could be relied on by consumers and their doctors in making health decisions, that they provided "actionable health information at the time it matters" to consumers, and that they "lead the industry in transparency and quality."

54.     Defendants advertised that the Theranos testing labs were accurate and "validated," and compliant with federal regulations or law.  For example:



55.     Defendants' advertising served another purpose as well: to lobby the State of Arizona to pass a law allowing consumers to purchase a blood test without a healthcare provider's order. Theranos's lobbying and advertising efforts were successful and the bill was signed in April 2015, despite opposition from the Arizona Medical Association. At the bill's signing, Ms. Holmes stated that "Theranos is about access – eliminating the need for painful needles and vials of blood, replacing that with tiny samples taken in convenient locations at convenient hours of operation, always for a fraction of the cost charged elsewhere – to build a health care system in which early detection and prevention become reality. That is why we worked to pass this law; it is why we believe Arizona's law can and should serve as a model for the nation for direct

access testing."[24] The law also allowed laboratories to provide blood test results directly to patients, bypassing involvement by doctors, who are trained to question unusual results.

56.     Defendants established numerous Theranos Wellness Center facilities inside select Walgreens retail stores, including 40 such locations in Arizona and one such location in California. *See* Ex. F.  At each of these Wellness Centers, and at the other facilities where Theranos tests were offered, consumers could choose from a wide selection of Theranos tests with or without the guidance of a health care provider. The Theranos "direct testing menu" identifies more than 200 different medical tests and combinations of tests (panels). *See* Ex. G. To obtain one or more of these testing services, the consumer only needed to complete a one-page "Theranos direct testing order form." *See* Ex. H. The testing services were marketed and sold directly to consumers, as explained in the pamphlet "a guide to direct testing."  *See* Ex. I.

57.     The Theranos testing order form and guide to direct testing pamphlet, which Plaintiffs and the Class were all exposed to, contained further representations and promises that Theranos tests were reliable and could and should be used in medical treatment decisions and other health decisions.  For example, the testing order form encouraged consumers to consult with their doctors for "interpretation of the test results." The guide to direct testing  touted that the Theranos tests would allow consumers to "own

---

[24] Press Release, Theranos, Inc., *Theranos Founder and CEO Elizabeth Holmes Speaks at Arizona Bill Signing*, (Apr. 6, 2015), https://news.theranos.com/2015/04/06/theranos-founder-and-ceo-elizabeth-holmes-speaks-at-arizona-bill-signing/ (last visited Nov. 22, 2016).

your own health like never before," allow consumers to "get vital information about their health when it matters most" and allow them to "become better informed earlier" and enable them to "work with their physician to be proactive and address potential problems sooner." The guide also stated that consumers could use Theranos test results to monitor their vital health issues such as "monitor[ing their] thyroid, blood glucose, sexual health, and more," and directed consumers to consult with their physicians using the test results once they received them.

58. Defendants knew and intended for consumers to rely on their representations, knew that, by the very nature of blood tests and also based on Defendants' representations, consumers who purchased and submitted to Theranos blood testing would reasonably expect the test results to be reliable, and knew that the Theranos partnership with Walgreens, a well-established pharmacy entity, and the presence of Wellness Centers in Walgreens stores, would further lead customers to believe that the Theranos tests were reliable and trustworthy.

**D. Defendants' Statements About Theranos Tests Were Knowingly False**

59. Defendants' pervasive promises to customers that the Theranos tests were accurate and reliable were knowingly false. In fact, Theranos's testing services—including both the tests conducted using the Edison device and the other tests performed with other devices—were decidedly inaccurate and/or unreliable. Defendants knew this to be the case, and yet concealed that material information from consumers for years.

60. Theranos' tests were not fit for their ordinary purposes and the purposes for which they were sold by Defendants.

61.     *Any* consumer who had a Theranos test could not reasonably rely on the results of such tests in light of the litany of problems that have now come to light.

62.     First of all, when the Theranos and Walgreens Wellness Centers opened, the Edison devices were not yet beyond the prototype stage.

63.     As Theranos knew and Walgreens knew or reasonably should have known at the time, Theranos did not have the necessary FDA approval, known as a CLIA waiver, to use the Edison device for conducting on-site blood testing at the Wellness Centers, with the sole exception of a single test (Herpes Simplex HSV-1), for which the Company obtained approval in July 2015.[25] Theranos sought FDA approval for more than 120 of its tests, none of which have been approved at this time.[26]

64.     Despite Defendants' representations to the public about the centrality of the nanotainer and Theranos's proprietary technology, by the end of 2014, Theranos was using its proprietary Edison devices and nanotainers for only 15 out of 205 tests.[27] By June 2015, Theranos had stopped using the Edison device altogether.[28] In a report

[25] Press Release, Theranos, Inc., *Statement from Theranos* (Oct. 28, 2015), https://news.theranos.com/2015/10/28/statement-from-theranos-3/ (last visited Nov. 22, 2016); Lauren F. Friedman, *Controversial Multibillion-Dollar Health Startup Theranos Just Got a Huge Seal of Approval from the US Government* (Jul. 2, 2015), http://www.businessinsider.com/theranos-gets-fda-approval-2015-7 (last visited Nov. 8, 2016).

[26] Roger Parloff, *A Second FDA Approval Frees Theranos To Do a Blood Test Outside Lab*, Fortune (Jul. 16, 2015), http://fortune.com/2015/07/16/fda-clears-theranos-to-do-test-outside-lab/ (last visited Nov. 8, 2016).

[27] John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, Wall St. J. (Oct. 16, 2015) (Ex. B).

[28] Beth Mole, *Theranos Throws in the Towel on Clinical Labs, Officially Pivots to Devices*, Ars Technica (Oct. 5, 2016), http://arstechnica.com/science/2016/10/theranos-

detailing objectionable conditions at Theranos dated September 16, 2015, the FDA

informed Theranos that, among other things, the agency considered the nanotainer

devices to be uncleared medical devices being shipped in interstate commerce between

California, Arizona, and Pennsylvania.[29]

65.     Thousands of consumers arrived at the Wellness Centers expecting a finger

prick, but instead they received conventional venous blood draws. Defendants knew that

customers were receiving venous blood draws and therefore knew, or should have

known, that Theranos was not in fact using its finger prick Edison devices. At no point

did Defendants disclose to consumers that the blood draw would be anything other than

the minimal blood draw they were advertising.

66.     Because Theranos did not have FDA approval to conduct tests on the

Edison device outside of a laboratory setting (with the limited exception for HSV-1 noted

above), when Defendants drew blood at the Wellness Centers, the samples obtained then

had to be couriered to one of two centralized labs, either in Newark, California, or

Scottsdale, Arizona.  The proprietary Edison devices were only located in the Newark

laboratory.  Accordingly, all the finger stick blood samples were analyzed at the Newark

facility, with the potential exception of samples that Theranos, remarkably, diluted in

---

throws-in-the-towel-on-clinical-labs-officially-pivots-to-devices/ (last visited Nov. 8, 2016).

[29] Department of Health and Human Services Form FDA-483 (inspection report) (Sept. 16, 2015), http://www.fda.gov/ucm/groups/fdagov-public/@fdagov-afda-orgs/documents/document/ucm469395.pdf (last visited Nov. 8, 2016).

order to run them on conventional machinery.[30]

67. The Scottsdale Lab only performed analyses on venipuncture tests. Over 90 percent of Theranos's testing was done at its Scottsdale lab. Theranos has also disclosed that it outsourced certain "highly complex" tests to third-party, university-affiliated labs, despite its statements that it was able to run all of the over 200 tests it offers on its Edison devices.

68. In the context of a regulated laboratory, Theranos did not need FDA approval to perform testing using the Edison devices (because they were not selling the Edison devices), so long as Theranos's lab operations were in compliance with federal guidelines and met proficiency testing and other safeguards; however, the blood labs Theranos used failed to comply with such testing and guidelines according to published reports.

69. Defendants' statements to customers—that testing was accomplished through proprietary analysis, which was accurate and compliant with federal regulations and guidelines—were false, both as to the Edison tests and the other Theranos tests. Simply put, consumers did not receive what they paid for and what they reasonably expected, when they obtained testing services from Defendants. None of them could reasonably rely on the accuracy of the test results they received, in light of the litany of problems that have come to light.

---

[30] John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, Wall St. J. (Oct. 16, 2015) (Ex. B).

**E.    FDA, CMS, and Other Regulators Crack Down on Theranos**

70.    In March 2014, a former Theranos employee alleged to New York State's public-health lab that the company may have manipulated the proficiency testing process, in part by intentionally excluding data that showed Theranos's technology to be unreliable.[31]  The lab responded that the practices described would be a "violation of the state and federal requirements," and forwarded the allegations to the Centers for Medicare and Medicaid Services.[32]

71.    In April 2015, Arizona Department of Health Services inspectors identified multiple deficiencies at Theranos's Scottsdale laboratory, including issues with Theranos's proficiency testing.[33]

72.    In September 2015, a former Theranos lab employee filed a complaint with CMS alleging that Theranos instructed lab employees to keep testing patients with the Edison devices despite indications of "major stability, precision and accuracy" problems with those devices.[34]

73.    As discussed above, in October 2015 the FDA released inspection reports of Theranos declaring the nanotainer to be an "uncleared medical device." The investigation also found deficiencies in Theranos's processes for handling customer

---

[31] John Carreyrou, *Theranos Whistleblower Shook the Company—And His Family*, Wall St. J. (Nov. 16, 2016) (Ex. J).
[32] John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, Wall St. J. (Oct. 16, 2015) (Ex. B).
[33] Ken Alltucker, *Arizona Inspectors Find Theranos Lab Issues*, AZ Central (Nov. 30, 2015), http://www.azcentral.com/story/money/business/consumers/2015/11/27/arizona-inspectors-find-theranos-lab-issues/76021416/ (last visited Nov. 16, 2016).
[34] John Carreyrou, *U.S. Probes Theranos Complaints*, Wall St. J. (Dec. 20, 2015) (Ex. J).

complulaints, monitoring quality and vetting suppliers.[35]

74.     In January 2016, the Centers for Medicare and Medicaid Services (CMS) cited the Newark lab for multiple serious deficiencies.  Among other things, the report stated that in October 2014, 29 percent of quality control checks performed on the Edison devices produced results outside the acceptable range and that in February 2015, quality checks on an Edison test measuring a hormone affecting testosterone levels failed 87 percent of the time.

75.     The letter from CMS, dated January 25, 2016, noted that, based on a December 2015 survey, Theranos was found to be out of compliance with five CLIA Condition-level requirements, at least one of which posed "immediate jeopardy to patient health and safety," meaning the condition had "already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public."[36]

76.     Inspection reports found that Edison devices in the lab often failed to meet the Company's own accuracy requirements, including a test to detect prostate cancer.  In one report, inspectors found that 81 of 81 final patient results of a blood clotting test

---

[35] *Id.*

[36] Carolyn Y. Johnson, *Deficiencies at Theranos "Pose Immediate Jeopardy to Patient Health,"* The Washington Post (Jan. 27, 2016), https://www.washingtonpost.com/news/wonk/wp/2016/01/27/regulators-find-deficiencies-at-theranos-that-pose-immediate-jeopardy-to-patient-health/ (last visited Nov. 8, 2016).

reported to patients on the blood thinner Warfarin were not accurate.[37]

77.    In addition, the FDA observed that there were no quality audits being performed at the Newark lab, in contravention of FDA regulations.[38]

78.    At the very time that Defendants were widely touting Theranos's compliance with federal regulations, Theranos had been repeatedly sanctioned by federal authorities for non-compliance, yet Theranos failed to disclose that fact.

79.    On March 18, 2016, Theranos received another letter from the Centers for Medicare and Medicaid Services (CMS) referenced "RE: PROPOSED SANCTIONS - CONDITIONS NOT MET IMMEDIATE JEOPARDY", which stated that the Company had not remedied the deficiencies identified by CMS in its January letter. Outlining Theranos's failures to meet quality-control standards, such as improper freezer temperatures, lack of proper documentation, improper equipment calibration, and unqualified personnel, CMS notified Theranos that it was out of compliance with accepted clinical laboratory standards, still had not established compliance with the CLIA requirements previously identified, and had not demonstrated that the laboratory had "abated immediate jeopardy." Notice of Sanctions pursuant to the Clinical Laboratory Improvement Amendments of 1988 (CLIA) was provided.[39]

---

[37] Andrew Pollack, *Report Shows Theranos Testing Plagued by Problems,* N.Y. Times (Mar. 31, 2015), http://www.nytimes.com/2016/04/01/business/report-shows-theranos-testing-plagued-by-problems.html?_r=0 (last visited Nov. 8, 2016).

[38] Department of Health and Human Services Form FDA-483 (inspection report) (Sept. 16, 2015), http://www.fda.gov/ucm/groups/fdagov-public/@fdagov-afda-orgs/documents/document/ucm469395.pdf (last visited Nov. 8, 2016).

[39] *See*, http://www.wsj.com/public/resources/documents/hhslettertheranos.pdf (last visited Aug. 15, 2016).

80.     As these reports indicate, Theranos's conventional laboratory operations in both Scottsdale and Newark were found to be flawed by government regulators. According to published reports, at Theranos's Scottsdale lab, the Company performed lab tests with certain Siemens lab equipment programmed to the wrong settings, and failed to adequately gauge the purity of the water input into Siemens lab equipment, which could affect the outcome of the results of testing run on such devices.

81.     A peer-reviewed study published March 28, 2016 by researchers at the Icahn School of Medicine at Mount Sinai showed that results for cholesterol tests done by Theranos differed enough from the two largest laboratory companies that it could negatively impact patient care.

82.     Regardless, Defendants continued to falsely market Theranos testing services as accurate and reliable, and continued to encourage consumers to use Theranos test results to make decisions about their health and treatment.

83.     In April 2016, Theranos revealed that it was under investigation by the U.S. Department of Justice as well as the Securities and Exchange Commission, and that the Department of Justice had requested documents. Walgreens and the New York State Department of Health also received subpoenas. Investigators are also examining whether Theranos misled government officials. [40]

84.     On June 30, 2016, members of the House Energy and Commerce Committee requested briefing from Theranos regarding Theranos's failure to comply

---

[40] Christopher Weaver, John Carreyrou, and Michael Siconolfi, *Theranos Is Subject of Criminal Probe by U.S.*, Wall St. J. (Apr. 18, 2016) (Ex. L).

with federal regulatory standards governing clinical laboratory testing, and the resulting

impact on patients nationwide.  The Committee expressed concern over "Theranos's

disregard for patient safety and its failure to immediately address concerns by federal

regulators," and requested "information about how company policies permitted

systematic violations of federal law."[41]

85.     On July 7, 2016, the Centers for Medicare and Medicaid Services issued a

33-page Notice to Theranos executives stating that it was revoking the CLIA certificate

of Theranos's Newark laboratory and banning the owners and operator(s) of Theranos,

including Elizabeth Holmes, from owning or running a lab for at least two years. Citing

deficiencies in Theranos's training of lab personnel, quality assurance, and procedures for

assessing the "patient impact" of its proficiency testing, among other shortcomings, CMS

also threatened to impose a monetary penalty of $10,000 per day for each day of non-

compliance.[42]

86.     As a result of revelations regarding problems with Theranos's technology

and laboratory standards, Theranos test results have lost all credibility within the medical

community. Geoffrey Baird, a pathology professor at the University of Washington,

reportedly said about Theranos: "I'm incredibly confused by what these people [at

---

[41] Committee on Energy & Commerce Democrats Press Release, *Democratic Committee Leaders Request Information from FDA and CMS on Theranos' Inaccurate Blood* Tests, (Jul. 26, 2016), http://democrats-energycommerce.house.gov/newsroom/press-releases/democratic-committee-leaders-request-information-from-fda-and-cms-on (last visited Nov. 22, 2016).

[42] http://online.wsj.com/public/resources/documents/r_Theranos_Inc_CMS_07-07-2016_Letter.pdf (last visited Nov. 22, 2016).

Theranos] are doing. No lab is run like this."[43]  Tim Hamill, medical director of UC San Francisco's clinical labs at China Basin and Parnassus reportedly stated: "The fact that there are so many [deficiencies identified by CMS] gives me the impression that these guys don't know what they're doing."[44]  Other doctors reportedly have "stopped steering patients to Theranos because of results they didn't trust."[45]  In the words of one Forbes reporter, "If there is working technology at Theranos . . . you wouldn't be able to tell."[46]

87.    Partner Fund Management, which invested $96.1 million in Theranos in early 2014, filed a shareholder suit on October 10, 2016. The lawsuit alleges that Ms. Holmes, Chief Operating Officer Sunny Balwani, and Theranos engaged in securities fraud, negligent misrepresentation and violations of the Delaware deceptive trade practices act, among other things. [47]

88.    In addition, Theranos whistleblower Tyler Schultz recently stepped forward

---

[43] Matthew Herper, *Something May Be Working At Theranos, But You Don't Know What It Is*, Forbes (Jun. 17, 2016), http://www.forbes.com/sites/matthewherper/2016/06/17/something-may-be-working-at-theranos-but-you-dont-know-what-it-is/#42ced77176a8.

[44] Nick Stockton, *Theranos's Lab Problems Go Way Deeper Than Its Secret Tech*, Wired (Apr. 27, 2016), https://www.wired.com/2016/04/theranos-lab-problems-go-way-deeper-secret-tech/ (last visited Nov. 16, 2016).

[45] John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, Wall St. J. (Oct. 16, 2015) (Ex. B).

[46] Matthew Herper, *Something May Be Working At Theranos, But You Don't Know What It Is*, Forbes (Jun. 17, 2016), http://www.forbes.com/sites/matthewherper/2016/06/17/something-may-be-working-at-theranos-but-you-dont-know-what-it-is/#42ced77176a8.

[47] Reed Abelson and Katie Benner, *Theranos Sued by Investor Who Accuses It of Securities Fraud*, N.Y. Times (Oct. 10, 2016), http://www.nytimes.com/2016/10/11/business/theranos-sued-by-investor-who-accuses-it-of-securities-fraud.html (last visited Nov. 8, 2016).

to provide a detailed account of his experience as a Theranos employee. Mr. Schultz was the first to report Theranos's fraudulent conduct to state regulators.[48]

89.     Mr. Schultz was employed by Theranos as an assay validation team member and was responsible for verifying and documenting the accuracy of tests run on Edison devices before they were deployed in the lab for use with patients.

90.     Mr. Schultz stated that he found the results varied widely when tests were rerun with the same blood samples. In order to reduce this variability, he states that Theranos routinely discarded outlying values from validation reports it compiled.

91.     For example, one validation report about an Edison test to detect a sexually-transmitted infectious disease said the test was sensitive enough to detect the disease 95% of the time. But when Mr. Shultz looked at the two sets of experiments from which the report was compiled, they showed sensitivities of 65% and 80%. Thus, if 100 people infected with the disease were tested only with the Edison device, as many as 35 of them would likely incorrectly get a result concluding they were disease-free.

92.     Mr. Schultz then moved to Theranos's production team, where he was responsible for quantifying how much patient tests should be allowed to vary during daily quality-control checks. Labs are permitted to set those parameters subject to them being within the bounds of accepted industry guidelines.

93.     Mr. Schultz observed that the Edison devices often failed Theranos's quality-control standards. Mr. Schultz further stated that Sunny Balwani, the No. 2

_____

[48] John Carreyrou, *Theranos Whistleblower Shook the Company–and His Family*, Wall St. J. (Nov. 16, 2016) (Ex. J).

executive at Theranos under Ms. Holmes, pressured lab employees to ignore the failures and run blood tests on the devices anyway, contrary to accepted lab practices.

94. Mr. Schultz also states that he informed Ms. Holmes of his concerns in early 2014.

95. Unsatisfied with the actions that Mr. Balwani and Ms. Holmes had taken, Mr. Schultz states that he anonymously emailed his complaint to New York officials who administered a proficiency-testing program in which Theranos was enrolled.

96. In April 2014, Mr. Schultz again informed Ms. Holmes of the quality-control failures. A few days later, Mr. Balwani responded to Mr. Schultz with the following email:

> We saw your email to Elizabeth. Before I get into specifics, let me share with you that had this email come from anyone else in the company, I would have already held them accountable for the arrogant and patronizing tone and reckless comments.

97. Mr. Schultz resigned from his position with Theranos shortly thereafter.

98. On November 8, 2016, Walgreens filed a lawsuit against Theranos in the District of Delaware, alleging that Theranos breached its contractual obligations by, *inter alia*, providing testing services to Walgreens customers that Theranos knew lacked accuracy or reliability, and by misrepresenting that its testing was reliable and accurate and concealing that the opposite was true.[49]

---

[49] Case No. 1:16-cv-01040-SLR (D. Del.), Dkt. 8.

**F.    Defendants Continued to Fail to Protect Customers**

99.    Defendants failed to disclose to consumers and to the public the known accuracy and reliability problems and concerns about Theranos tests, and in fact made false affirmative promises that stated and suggested that the tests were reliable.  These omissions and statements persisted from before the tests were first offered to the public all the way through the present.

100.    In fact, even after the damning CMS report became public in January 2016, Defendants still did not take immediate steps to protect the consumers who obtained testing services from Theranos. Walgreens, for its part, failed to take immediate action even at this stage and instead gave Theranos 30 days to resolve the critical issues CMS identified at the Newark lab, and closed only a single Wellness Center. Not only did Walgreens permit the remaining 40 Wellness Centers to remain open, it made no effort to notify prospective patients about potential concerns about the reliability of Theranos's testing. Nor did Walgreens notify patients who had previously received Theranos's tests at the Wellness Centers that their test results may not have been accurate or reliable.

101.    Because it had no choice due to regulatory action, Theranos has now completely voided tens of thousands of its tests results.  In many cases, it took months to inform customers and their doctors that the test results should not be relied on. The Wall Street Journal reported on Theranos sending so-called "corrected results" to some patients. Disturbingly, in some instances, the "corrected results" were even more

inaccurate than the initial inaccurate and unreliable results Theranos provided.[50]

102.    Even beyond the tens of thousands of completely voided Theranos tests, no consumer who had a Theranos test (regardless of whether Theranos has technically "voided" their test results) could reasonably rely on the results they received given the numerous compliance issues and the extensive list of other accuracy and reliability problems that have come to light.

103.    It was not until June 14, 2016, almost six months after CMS's report first became public, and well after Defendants were aware of reliability problems across the Theranos testing spectrum, that Walgreens announced it was ending its relationship with Theranos.[51] Days later, Theranos sent letters to providers encouraging them to direct patients to one of four Theranos-operated Wellness Centers in Arizona. The letters assured providers that Theranos was "*open for business*, confident in our technologies, and steadfast in our commitment to make lab tests fast, convenient, and affordable for everyone." (emphasis in original). The letters did not disclose CMS's sanctions, that Theranos no longer used the Edison device and finger prick tests, the other problems identified with both the Newark and Scottsdale testing facilities, that it had voided all Edison tests performed in 2014 and 2015 as well as other tests, or that its tests were inaccurate and unreliable.  To the contrary, Theranos continued to suggest that its test were accurate and reliable.  Nor was the material information that Defendants concealed

---

[50] Christopher Weaver, *Agony, Alarm and Anger for People Hurt by Theranos's Botched Blood Tests*, Wall St. J. (Oct. 20, 2016) (Ex. M).

[51] Michael Siconolfi, Christopher Weaver, John Carreyrou, *Walgreen Terminates Partnership With Blood-Testing Firm Theranos*, Wall St. J. (Jun. 13, 2016) (Ex. N).

available from Theranoss website that the letter asked providers to direct their patients to.

104.    Theranos has apparently not learned its lesson, despite endangering the health of thousands of patients. The Centers for Medicare and Medicaid Services banned Ms. Holmes from owning or operating a blood-testing business for at least two years and revoked Theranos's license to operate a lab in California. [52]  Yet Theranos and Ms. Holmes, apparently undeterred, are now developing a "miniLab" to run diagnostic tests on small amounts of blood. One doctor, after watching Ms. Holmes's presentation at the annual meeting of the American Association for Clinical Chemistry, noted that it was not clear how the Edison and miniLab differed, and that Ms. Holmes had not actually shown that the device could perform a large number of tests on a single drop of blood.[53] Theranos's deception and secrecy continues; the miniLab has not been evaluated by a third party and lacks FDA approval.

**G.    Defendants' Misconduct Has Significantly Harmed Consumers**

105.    As a direct result of Defendants' misconduct alleged herein, Plaintiffs and the other consumers who comprise the proposed Class and Subclasses in this case have been harmed in numerous respects, including but not limited to:  (a) paying—out-of-pocket, through health insurance, or through another collateral source—for Theranos tests that they cannot reasonably rely upon and/or have been voided; (b) paying for

---

[52] John Carreyrou, Michael Siconolfi, and Christopher Weaver, *Theranos Dealt Sharp Blow as Elizabeth Holmes is Banned From Operating Labs*, Wall St. J. (Jul. 8, 2016) (Ex. O).

[53] Abigail Tracy, *The Medical Community Isn't Letting Theranos Off the Hook*, Vanity Fair (Aug. 4, 2016), http://www.vanityfair.com/news/2016/08/theranos-interview-what-went-wrong (last visited Nov. 3, 2016).

subsequent, replacement testing services from other companies; (c) paying additional money to doctors or other health professionals as a result of the inaccurate and unreliable Theranos tests; (d) being subject to unnecessary or potentially harmful treatments, and/or being denied the opportunity to seek treatment for a treatable condition; and (e) severe emotional stress and anxiety associated with receiving the inaccurate and unreliable Theranos test results.

106.    Defendants have all benefited financially and otherwise from their misconduct alleged herein, including but not limited to from revenue that all of the Defendants have received for Plaintiffs' and the Class members' tests, and additional business that Walgreens has generated as a result of having Theranos testing facilities in its retail stores.

**H.    Factual Allegations Regarding Plaintiffs**

*Plaintiff A.R.*

107.    On or around June 19, 2015, Plaintiff A.R. purchased Theranos blood tests at a Walgreens Pharmacy in Palo Alto, California.  The tests that he purchased included tests regarding protein, blood sugar, cholesterol, and vitamin levels.  A.R. purchased Theranos tests to get accurate results about his health.   He trusted Theranos and Walgreens to provide reliable test results.

108.    A.R. had received orders from his medical care provider to have blood testing performed.  A.R. was referred to Theranos by his medical care provider.  In choosing to have his blood tested by Theranos, he relied on the representations in Defendants' materials regarding the accuracy and reliability of the test results.  He also

expected tests conducted at Walgreens to be trustworthy and reliable.

109. A.R. paid approximately $41.79 out of pocket for the Theranos tests.

110. When he purchased Theranos tests, one or more vials of blood were drawn from a vein in A.R.'s arm.

111. Having been led to believe the Theranos results were accurate, A.R. relied on them, using the results to make decisions concerning his health.

112. His Theranos tests indicated that his Vitamin D levels were low, his blood sugar was high, and his LDL (cholesterol) level was high, and medication was prescribed for him as a result.

113. The Theranos tests that A.R. purchased were not reliable.

114. After learning that his Theranos tests were not reliable, he revisited his doctor.

115. Plaintiff A.R. would not have purchased any Theranos tests if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.

116. In addition to the other harm described herein, Plaintiff A.R. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased.

**Plaintiff B.B.**

117. On or around October 3, 2014, Plaintiff B.B. purchased eight Theranos blood tests at a Walgreens Pharmacy in Gilbert, Arizona. The tests that she purchased included tests regarding her thyroid. B.B. purchased Theranos tests to get accurate

results about her health. She trusted Theranos and Walgreens to provide reliable test results.

118. B.B. had received orders from her medical care provider to have blood testing performed. B.B. was informed by her medical care provider that Theranos was the least invasive alternative for blood testing, and also that Theranos tests were cheaper and that the Walgreens locations provided extended hours for her to get tested. In choosing to have her blood tested by Theranos, she relied on representations in Defendants' materials (including on the Theranos and Walgreens websites, and in press releases) regarding the accuracy and reliability of the test results. She also expected tests conducted at Walgreens to be trustworthy and reliable.

119. B.B. paid approximately $81.04 out of pocket for the Theranos tests.

120. When she purchased Theranos tests, one or more vials of blood were drawn from a vein in B.B.'s arm. This was different from the less invasive test that she had expected based on the representations from Defendants that she saw.

121. Having been led to believe the results were accurate, B.B. relied on them, using the results to make decisions concerning her health.

122. The Theranos tests that B.B. purchased were not reliable.

123. After learning that her Theranos tests were not reliable, she had her blood retested multiple times by another company.

124. Plaintiff B.B. would not have purchased any Theranos test if she had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.

*Plaintiff B.P.*

125.     Beginning approximately in early 2014, Plaintiff B.P. purchased Theranos blood tests several times at a Walgreens Pharmacy in Ahwatukee Village, Phoenix, Arizona.  The tests that he purchased included tests regarding diabetes and cholesterol. B.P. purchased Theranos tests to get accurate results about his health.  He trusted Theranos and Walgreens to provide reliable test results.

126.     B.P. had received orders from his medical care provider to have blood testing performed.  B.P. was informed by his physician that Theranos was the cheapest and least invasive alternative for the tests.  In choosing to have his blood tested by Theranos, he relied on representations in Defendants' materials (including in the Walgreens store) regarding the accuracy and reliability of the test results.  He also expected tests conducted at Walgreens to be trustworthy and reliable.

127.     B.P. paid hundreds of dollars out of pocket for the Theranos tests.

128.     The first several times that B.P. underwent blood testing by Theranos, nanotainer technology was used to draw relatively small blood samples.  Starting in or around mid-2015, Theranos began collecting both nanotainer vials and one or more larger vials of blood from a vein in B.P.'s arm.  By around early 2016, Theranos collected one or more larger vials of blood from a vein in B.P.'s arm during each of his quarterly visits.

129.     Having been led to believe the results were accurate, B.P. relied on them, using the results to make decisions concerning his health.

130.     Based on his Theranos test results, his doctor diagnosed him with diabetes and high cholesterol, and prescribed certain medications.

131.   The Theranos tests that B.P. purchased were not reliable.

132.   After learning that his Theranos tests were not reliable, he had his blood tested by another company.  The results reflected that he is healthier than the Theranos tests had indicated.

133.   Plaintiff B.P. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.

134.   In addition to the other harm described herein, Plaintiff B.P. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased.

**Plaintiff D.L.**

135.   On or around June 1, 2015, and December 14, 2015, Plaintiff D.L. purchased Theranos blood tests at a Walgreens Pharmacy in Chandler, Arizona.  D.L. purchased Theranos tests to get accurate results about her health.  She trusted Theranos and Walgreens to provide reliable test results.

136.   D.L. had received orders from her medical care provider to have blood testing performed.  D.L. was informed by her physician that Theranos was the quickest and cheapest alternative for the tests.  In choosing to have her blood tested by Theranos, she relied on representations in Defendants' materials (including in the Walgreens store) regarding the accuracy and reliability of the test results.  She also expected tests conducted at Walgreens to be trustworthy and reliable.

137.   D.L. paid for the Theranos tests out of pocket and/or through her health

insurer.

138.    Each time she purchased a Theranos test, one or more vials of blood were drawn from a vein in D.L.'s arm.

139.    Having been led to believe the results were accurate, D.L. relied on them, using the results to make decisions concerning her health.

140.    Based on the results of her Theranos tests, D.L. tested positive for Sjogrens syndrome, which required her to seek treatment from her doctor, to be tested for food allergies, and to spend considerable time learning about Sjogrens syndrome and the impact her diagnosis would have on her lifestyle.

141.    The Theranos tests that D.L. purchased were not reliable.

142.    After learning that her Theranos tests were not reliable, she had her blood tested by another company and consulted with her doctor, who after reviewing the new test results has now confirmed that she does not have Sjogrens syndrome.

143.    Plaintiff D.L. would not have purchased any Theranos test if she had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.

144.    In addition to the other harm described herein, Plaintiff D.L. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests she purchased.

**Plaintiff L.M.**

145.    On or around October 5, 2015, Plaintiff L.M. purchased Theranos blood tests at a Walgreens Pharmacy in Chandler, Arizona.  The tests that she purchased

included tests regarding her thyroid. L.M. purchased Theranos tests to get accurate results about her health. She trusted Theranos and Walgreens to provide reliable test results.

146. L.M. had received orders from her medical care provider to have blood testing performed. L.M. was informed by her physician that Theranos was the cheapest alternative for the tests. In choosing to have her blood tested by Theranos, she relied on representations in Defendants' materials regarding the accuracy and reliability of the test results. She also expected tests conducted at Walgreens to be trustworthy and reliable.

147. L.M. paid approximately $59.34 out of pocket for the Theranos tests.

148. When she purchased Theranos tests, one or more vials of blood were drawn from a vein in L.M.'s arm. This was different from the less invasive test that she had expected based on the representations from Defendants that she saw.

149. Having been led to believe the results were accurate, L.M. relied on them, using the results to make decisions concerning her health.

150. Based on the results of her Theranos tests, L.M. was diagnosed by her physician as having Hashimoto's Disease, which was devastating to her and required lifestyle changes, medical appointments, and taking unnecessary medication.

151. The Theranos tests that L.M. purchased were not reliable.

152. In approximately March 2016, at her physician's direction, L.M. had her blood re-tested by a different testing company, repeating the same tests that Theranos had conducted. These results were dramatically different than the Theranos test results, and as per her physician invalidated the diagnosis of Hashimoto's Disease, meaning L.M. had

been needlessly pursuing a course of treatment for a condition she did not have.

153.   Plaintiff L.M. would not have purchased any Theranos test if she had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.

154.   In addition to the other harm described herein, Plaintiff L.M. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests she purchased.

***Plaintiff M.P.***

155.   On or around November 2015, Plaintiff M.P. purchased Theranos blood tests at a Walgreens Pharmacy in Tempe, Arizona. The tests that he purchased included STI panels. M.P. purchased Theranos tests to get accurate results about his health. He trusted Theranos and Walgreens to provide reliable test results.

156.   In choosing to have his blood tested by Theranos, he relied on representations in Defendants' materials (including at the Walgreens store and the information he viewed on the Theranos website) regarding the accuracy and reliability of the test results.  He also expected tests conducted at Walgreens to be trustworthy and reliable.

157.   M.P. paid for the Theranos tests out-of-pocket.

158.   The tests that M.P. purchased were not reliable.

159.   M.P. paid out-of-pocket to be retested with STI panels after learning that the Theranos tests were unreliable.

160.   Plaintiff M.P. would not have purchased any Theranos test if he had known

that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.

161.    In addition to the other harm described herein, Plaintiff M.P. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased.

### Plaintiff R.C.

162.    On or around February 2015, Plaintiff R.C. purchased Theranos blood tests at a Walgreens Pharmacy in Sun City West, Arizona.  The tests that he purchased included tests regarding his heart health.  R.C. purchased Theranos tests to get accurate results about his health.  He trusted Theranos and Walgreens to provide reliable test results.

163.    R.C. had received orders from his medical care provider to have blood testing performed to monitor his heart health.  In choosing to have his blood tested by Theranos, he relied on representations in Defendants' materials (including at the Walgreens store) regarding the accuracy and reliability of the test results.  He also expected tests conducted at Walgreens to be trustworthy and reliable.

164.    R.C. paid for the Theranos tests through Medicare.

165.    When R.C. purchased Theranos tests, Theranos used nanotainer technology to draw relatively small blood samples.  Unlike what had been advertised, however, the process was painful and was not quick as advertised. The phlebotomist struggled to secure enough blood from R.C.'s finger and had to repeat the painful process several times before collecting enough to test.

166. Having been led to believe the results were accurate, R.C. relied on them, using the results to make decisions concerning his health.

167. The Theranos tests that R.C. purchased were not reliable.

168. The results from his Theranos tests indicated that R.C. was in good health. Based on these results, his doctor recommended that R.C. maintain his current medication regime and to return in one year for repeat testing, and R.C. believed his current lifestyle and medication regimen was working for him and that he had been successful in getting his heart health under control.

169. Less than one month later, R.C. suffered a heart attack. R.C. was admitted to the hospital, had two stents placed, and had numerous follow up medical appointments. R.C. and his cardiologist were particularly concerned that R.C. had suffered a heart attack given that his blood panels came back clear (from his Theranos tests) less than a month prior. Additional blood work performed during his hospitalization strongly suggested that the near-contemporaneous Theranos blood tests were inaccurate.

170. Subsequently, as alleged above, Theranos voided the results of all of the "tiny" blood tests, which would have included R.C.'s tests.

171. Since his 2015 heart attack, R.C. has been receiving medical care using traditional blood testing procedures from companies other than Theranos.

172. Plaintiff R.C. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.

173. In addition to the other harm described herein, Plaintiff R.C. suffered

emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased.

### Plaintiff R.G.

174.    On or around September 10, 2015, Plaintiff R.G. purchased Theranos blood tests at a Walgreens Pharmacy in Gilbert, Arizona.  The tests that he purchased included tests regarding his sexual health.  R.G. purchased Theranos tests to get accurate results about his health.  He trusted Theranos and Walgreens to provide reliable test results.

175.    R.G. had seen and heard advertisements for Theranos that caused him to believe it was testing of the future.  In choosing to have his blood tested by Theranos, he relied on representations in Defendants' materials (including a billboard) regarding the accuracy and reliability of the test results.  He also expected tests conducted at Walgreens to be trustworthy and reliable.

176.    R.G. paid approximately $121.63 out of pocket for the Theranos tests.

177.    When he purchased Theranos tests, one or more vials of blood were drawn from a vein in R.G.'s arm.

178.    Having been led to believe the results were accurate, R.G. relied on them, using the results to make decisions concerning his health.

179.    The results from his Theranos tests indicated that he had tested positive for HIV (specifically, the HIV 1+2 Antigen/Antibody Combo was "reactive").

180.    After receiving the test results from Theranos, R.G., he was extremely concerned and visited his physician, began doing research about HIV/AIDS, and had his blood re-tested by two different companies.  These test results came back negative.

181. The Theranos tests that R.G. purchased were not reliable.

182. Plaintiff R.G. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.

183. In addition to the other harm described herein, Plaintiff R.G. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased.

**Plaintiff S.J.**

184. In or around July, 2015, Plaintiff S.J. purchased her first Theranos blood test and urinalysis at a Theranos Wellness Center co-located at a Walgreens retail store in Mesa, Arizona. The tests that she purchased were for a routine health check including diabetes and triglyceride levels. S.J. was referred to Theranos by her physician, based on plaintiff's financial needs and Theranos's reputation for affordable testing. S.J. trusted Theranos and Walgreens to provide reliable test results.

185. S.J.'s results from her first Theranos test indicated that she had diabetes, and S.J.'s physician immediately ordered her to be placed on diabetic medications.

186. S.J. firmly believed she did not have diabetes and obtained a re-test. For the re-test, she went back to the same Theranos Wellness Center co-located at a Walgreens retail store in Mesa, Arizona.

187. S.J. paid for all Theranos testing through Medicare.

188. Having been led to believe the lab results were accurate following two, similarly reported Theranos tests, S.J. and her physician relied on the results to make

decisions concerning her health, including a course of medications which ultimately made S.J. very ill. S.J. became so ill that she was treated at urgent care where she made the decision to cease all medications prescribed for diabetes.

189. Following her reaction to the diabetes medication, along with her original belief that she did not have diabetes, S.J. began seeing another physician who ordered repeat lab testing to be done at a non-Theranos facility. As S.J. originally believed, the results confirmed that S.J. in fact, did not have diabetes, and had been improperly diagnosed and treated.

190. The Theranos tests that S.J. purchased were not reliable.

191. Plaintiff S.J. would not have purchased any Theranos test if she had known that Theranos's tests were inaccurate or unreliable.

192. In addition to the other harm described herein, Plaintiff S.J. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests she purchased.

**Plaintiff S.L.**

193. On or about February 19, 2015, and October 5, 2015, Plaintiff S.L. purchased Theranos blood tests at a Walgreens Pharmacy in Chandler, Arizona. The tests that he purchased included tests regarding diabetes and his liver. S.L. purchased Theranos tests to get accurate results about his health. He trusted Theranos and Walgreens to provide reliable test results.

194. Prior to each visit, S.L. had seen and heard advertisements for Theranos that caused him to believe that Theranos test results would be as reliable as other labs'

results, and that Theranos was the cheapest and least invasive alternative option for blood testing. In choosing to have his blood tested by Theranos, he relied on representations in Defendants' materials (including on Theranos's website and in advertisements) regarding the accuracy and reliability of the test results. He also expected tests conducted at Walgreens to be trustworthy and reliable.

195. S.L. paid approximately $100 out of pocket for the Theranos tests.

196. When he purchased Theranos tests, one or more vials of blood were drawn from a vein in S.L.'s arm. This was different from the less invasive test that he had expected based on the representations from Defendants that he saw.

197. Having been led to believe the results were accurate, S.L. relied on them, using the results to make decisions concerning his health.

198. The results from his Theranos test indicated certain levels that were elevated from the prior year and that he was diabetic. His doctor ordered an ultrasound of the liver, and he took medication for diabetics.

199. The Theranos tests that S.L. purchased were not reliable.

200. At his doctor's direction, S.L. had his blood re-tested by another company and his results were in the normal range, including showing he was pre-diabetic, significantly different from his Theranos tests.

201. Plaintiff S.L. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.

202. In addition to the other harm described herein, Plaintiff S.L. suffered

emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased.

## V.     CLASS ACTION ALLEGATIONS

203.     Plaintiffs bring this action on behalf of themselves and proposed Class and Subclasses pursuant to Federal Rules of Civil Procedure Rule 23, defined as follows:

> **Class**:  All purchasers of Theranos testing services, including consumers who paid out-of-pocket, through health insurance, or through any other collateral source (collectively, "Purchasers").

> **Arizona Subclass**:  All Purchasers of Theranos testing services in Arizona.

> **California Subclass:**  All Purchasers of Theranos testing services in California.

204.     This action is brought as a class action and may properly be so maintained pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs reserve the right to amend or modify the Class and Subclass descriptions with greater specificity or further division into subclasses or limitation to particular issues, based on the results of discovery.  Excluded from the Class and Subclasses are Defendants, their affiliates, employees, officers and directors, persons or entities, and the Judge(s) assigned to this case.

205.     **Numerosity** – The members of the Class and Subclasses are so numerous that their individual joinder is impracticable.  On information and belief, there are at least thousands of members in each of the Class and Subclass.  The membership of the Class and Subclasses are determinable by objective criteria using Defendants' own records.

206.     **Common Question of Fact and Law** – There are questions of law and fact common to the Class and Subclasses.  These questions predominate over any questions

affecting only individual class members. These common legal and factual issues include, but are not limited to:

A. Whether Defendants marketed Theranos's testing services as being reliable;

B. Whether Defendants' representations regarding the reliability of Theranos's testing services were material;

C. Whether Theranos and Walgreens had contractual obligations with Plaintiffs and the Class regarding Theranos's testing services;

D. Whether Defendants were obligated to provide testing services and test results that were reliable;

E. Whether Theranos's testing services were reliable;

F. Whether Defendants had a duty to disclose to Plaintiff and the Class material information regarding the reliability of Theranos's testing services;

G. Whether Defendants concealed material information about the reliability of Theranos test results and/or about the compliance of Theranos's testing facilities and/or equipment;

H. Whether Defendants agreed to a partnership through which they would enter the market for direct-to-consumer testing by advertising, promoting, and selling products and services that consumers would use to make decisions about their health;

I. Whether Defendants together constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c);

J. Whether Defendants' conduct violates the laws as set forth in the causes of action;

K. Whether Plaintiffs and the Class have been harmed as a result of Defendants' conduct alleged herein;

L. Whether Defendants have been unjustly enriched as a result of their conduct alleged herein;

207. **Typicality** – The claims of the representative Plaintiffs are typical of the claims of the Class and Subclasses. Plaintiffs and the Class and Subclasses were subject to the same common pattern of conduct by Defendants, and the Plaintiffs, like the other members of the Class and Subclasses, have sustained damages arising from Defendants' violations of the law, as alleged herein.

208. **Adequacy** – The representative Plaintiffs will fairly and adequately represent and protect the interests of the Class and Subclass members and have retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation. There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class and Subclasses that would make class certification inappropriate. Counsel for the classes will vigorously assert the claims of all Class and Subclass members.

209. **Predominance and Superiority** – This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class and Subclasses predominate over the questions affecting only individual members, and a class action is superior to other available means for the fair

and efficient adjudication of this dispute.  The damages suffered by individual Class and Subclass members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendants' conduct.  Further, it would be virtually impossible for the class members to individually redress effectively the wrongs done to them.  Even if class members themselves could afford such individual litigation, the court system could not.  In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Plaintiffs anticipate no unusual difficulties in managing this class action.

210.    Plaintiffs contemplate the eventual issuance of notice to the proposed Class and Subclass members setting forth the subject and nature of the instant action.  Upon information and belief, Defendants' own business records and electronic media can be utilized for the contemplated notice.  To the extent that any further notice may be required, Plaintiffs would contemplate the use of additional media and/or mailings.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*)
### (Against All Defendants)
### (On Behalf of Arizona Subclass Only)

211.   Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

212.   Plaintiffs bring this claim on behalf of themselves and the Arizona Subclass.

213.   Defendants are "persons" within the meaning of A.R.S. § 44-1521(6).

214.   Theranos lab panels and blood tests sold in Arizona are "merchandise" within the meaning of A.R.S. § 44-1521(5).

215.   Defendants have engaged in deception, unfair acts or practices, fraud, false pretenses, false promises, misrepresentation, concealment, suppression and omission of material facts, as prohibited by A.R.S. § 44-1522(A).

216.   Defendants marketed and sold unreliable Theranos tests that they knew to be unreliable and/or which they failed to take sufficient steps to ensure the reliability of, and encouraged consumers to rely on such tests to make decisions about their health and treatment.

217.   Defendants knew that Plaintiffs and the Class would reasonably expect their Theranos tests to be reliable, given, *inter alia,* the nature and importance of blood testing, Defendants' representations, and the involvement of Walgreens.

218.   Defendants made material misrepresentations, false promises, and

omissions, including but not limited to:

A. False and misleading statements that Theranos tests were reliable;

B. False and misleading statements that Theranos's testing facilities and equipment were sufficient and complied with applicable laws and regulations;

C. False and misleading statements that Theranos's testing services were industry leading in quality;

D. False and misleading statements that Theranos's testing services were less invasive than traditional tests and/or were quicker than traditional tests;

E. False and misleading statements that Theranos's laboratory infrastructure minimized human error to produce high quality results;

F. Failure to disclose and active concealment of known material information about the unreliability of Theranos's testing services;

G. Failure to disclose and active concealment of known material information about the non-compliance of Theranos's testing facilities and/or equipment;

H. Failure to disclose and active concealment of the fact that Walgreens had agreed not to require or obtain objective proof that Theranos's testing services were reliable;

I. Failure to disclose and active concealment of the fact that Walgreens had agreed to conduct no oversight of Theranos's laboratory testing practices;

J. Failure to disclose and active concealment of the fact that Theranos employees were not adequately trained to perform their job functions without

endangering patients, as described in letters from CMS;

       K.     Failure to disclose and active concealment of the fact that Theranos manipulated its internal proficiency testing process; and

       L.     Failure to disclose and active concealment of the fact that Theranos's internal validation tests showed that Theranos's technology was unreliable.

219.    Defendants knew, or with reasonable care should have known, that their promises and representations were false and material, and that the facts they failed to disclose and concealed were material.

220.    Defendants had exclusive and superior knowledge regarding the material information that they concealed.

221.    Defendants' misrepresentations and omissions were pervasive.

222.    Defendants intended for Plaintiffs and Arizona Subclass members to rely on their misrepresentations, false promises, and omissions concerning Theranos testing.

223.    Plaintiffs and the Arizona Subclass members have reasonably relied on the false promises, material misrepresentations and omissions made by Defendants, including but not limited to by paying (out-of-pocket and/or through health insurance or another collateral source) for Theranos testing services, permitting Defendants to take blood samples from them, and relying on Theranos test results to make decisions about their health.

224.    Defendants' conduct was wanton and reckless, and Defendants demonstrated reckless indifference to the rights, health, and safety of Plaintiffs and

members of the Arizona Subclass.

225. As a result of the A.R.S. § 44-1522(A) violations described above, Plaintiffs and each and every Arizona Subclass member have suffered actual damages.

226. On behalf of themselves and Arizona Subclass members, Plaintiffs seek relief as prayed for below.

## SECOND CAUSE OF ACTION
### (Fraud)
### (Against All Defendants)

227. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

228. Plaintiffs bring this claim on behalf of themselves and the Class.

229. Defendants marketed and sold unreliable Theranos tests that they knew to be unreliable and/or which they failed to take sufficient steps to ensure the reliability of, and encouraged consumers to rely on such tests to make decisions about their health and treatment.

230. Defendants knew that Plaintiffs and the Class would reasonably expect their Theranos tests to be reliable, given, *inter alia*, the nature and importance of blood testing, Defendants' representations, and the involvement of Walgreens.

231. Defendants, who had or should have had superior knowledge regarding Theranos testing, were in a unique position to prevent harm to their customers. Instead, Defendants made false representations to Plaintiffs and the Class about Theranos tests and the accuracy and reliability of same, and concealed material information from them regarding the true nature of Theranos tests and Theranos's facilities and equipment.

232.    At all relevant times, Defendants had a duty to disclose all facts material to Plaintiffs' and the Class members' submission to Theranos testing, purchase of Theranos testing, and reliance upon Theranos test results.  Defendants have intentionally misrepresented, concealed, and otherwise not disclosed material facts as alleged herein.

233.    Defendants had exclusive and superior knowledge regarding the material information that they concealed.

234.    Defendants' misrepresentations and omissions were known by Defendants to be false, misleading, and material.  Walgreens also deliberately ignored and deliberately remained ignorant of material facts about Theranos testing.

235.    Defendants' misrepresentations and omissions were pervasive.

236.    Defendants intended for Plaintiffs and Class members to rely on their misrepresentations and omissions concerning Theranos testing.

237.    Plaintiffs and the Class members have reasonably relied on the misrepresentations and omissions made by Defendants, including but not limited to by paying (out-of-pocket and/or through health insurance or another collateral source) for Theranos testing services, permitting Defendants to take blood samples from them, and relying on Theranos test results to make decisions about their health.

238.    Plaintiffs and the Class were actually misled and deceived.  As a direct result of Defendants' conduct, they were induced to undergo blood draws they would not have undergone, to pay for Theranos products and/or services that they would not have purchased (out-of-pocket and/or through health insurance or another collateral source), and to rely on Theranos test results they would not have relied upon had they known the

truth, to make decisions concerning their health.

239. As a foreseeable and natural consequence of Defendants' conduct, Plaintiffs and the Class have suffered actual damages.

240. Defendants' misconduct alleged herein was intentional, deliberate, and willful.

241. On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## THIRD CAUSE OF ACTION
### (Negligence)
### (Against All Defendants)

242. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

243. Plaintiffs bring this claim on behalf of themselves and the Class.

244. Defendants, who had or should have had superior knowledge regarding Theranos testing, were in a unique position to prevent harm to their customers. Instead, Defendants made false representations to Plaintiffs and the Class about Theranos tests and the accuracy and reliability of same, and concealed material information from them regarding the true nature of Theranos tests and Theranos's facilities and equipment.

245. At all relevant times, Defendants had a duty to disclose all facts material to Plaintiffs' and the Class members' submission to Theranos testing, purchase of Theranos testing, and reliance upon Theranos test results.

246. At all relevant times, Defendants had a duty to provide Plaintiffs and the Class with testing that was safe, reliable, and compliant with applicable laws and

regulations.

247.    Defendants breached these duties by, *inter alia,* making material misrepresentations and omissions as alleged herein, and by promoting and selling tests that were unreliable, not safe for consumers to rely on, conducted in a manner that did not satisfy applicable laws, regulations, and/or standards for quality control, conducted in laboratories that did not meet applicable laws, regulations, and/or standards for safety and training, and conducted on inadequately maintained and calibrated equipment.

248.    At all relevant times, Walgreens had a duty to Plaintiffs and the Class to take reasonable steps to ensure that Theranos's testing was reliable and safe.

249.    Walgreens breached this duty and acted unreasonably by deliberately ignoring and deliberately remaining ignorant of material facts about Theranos testing, and by promoting Theranos tests to its patrons as reliable, less invasive, quicker than traditional testing methods, safe, and highly accurate, despite having doubts and concerns about the reliability of the tests, without requiring objective evidence from Theranos that the tests were reliable, and while maintaining no oversight of Theranos's testing services.

250.    Walgreens knew and expected that consumers would look to it for information concerning "care they need."  With full knowledge that consumers would rely on its endorsement of Theranos, Walgreens failed to take reasonable steps to prevent consumers from submitting to, paying for, and relying upon unreliable and unsafe Theranos testing services.

251.    By promoting the Theranos tests without adequately investigating the truth of promotional statements, and by permitting such tests to be conducted in Walgreens

clinics, despite having concerns and doubts about the reliability of Theranos tests, and after it had knowledge that the tests were in fact unreliable, Walgreens acted unreasonably under the circumstances.

252.    Plaintiffs and the Class were damaged as a direct and proximate result of Defendants' negligent conduct, including by submitting to blood draws they would not have undergone, paying for Theranos products and/or services that they would not have purchased (out-of-pocket and/or through health insurance or another collateral source), and relying on Theranos test results, they would not have relied upon had they known the truth, to make decisions concerning their health.

253.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)
### (Against All Defendants)

254.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

255.    Plaintiffs bring this claim on behalf of themselves and the Class.

256.    Defendants specifically and expressly misrepresented material facts to Plaintiffs and the Class, as alleged herein.

257.    Defendants knew, or in the exercise of reasonable diligence should have known, that their express representations regarding Theranos testing's accuracy, reliability, safety, speed, means of testing, and compliance with applicable laws and regulations, were false and misleading.  Defendants made such statements without

reasonable grounds for believing them to be true.

258.    Defendants' misrepresentations and omissions were pervasive.

259.    Defendants knew, or in the exercise of reasonable diligence should have known, that the ordinary consumer would rely on and be misled by Defendants' misrepresentations.

260.    Plaintiffs and the Class justifiably relied on Defendants' misrepresentations.

261.    As a result of Defendants' conduct, Plaintiffs and the Class have suffered actual damages.

262.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## FIFTH CAUSE OF ACTION
### (Breach of Contract)
### (Against Theranos and Walgreens)

263.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

264.    Plaintiffs bring this claim on behalf of themselves and the Class.

265.    To Plaintiffs and the Class, Defendants offered to provide accurate, reliable, test results using proprietary Theranos technology, in exchange for submission to blood draws and payment of financial compensation, paid out-of-pocket by the consumer and/or paid through the consumer's health insurance or other collateral sources.  Defendants assured customers that Theranos had the expertise and capability to provide accurate and reliable test results, and that Theranos's results were reliable, accurate, and of the highest

quality.

266. Defendants' promises and obligations were set forth in, among other places, the Theranos direct testing order form (*See* Ex. H), the Theranos guide to direct testing (*See* Ex. I), and in marketing materials and other statements by Defendants regarding Theranos's testing services that were pervasive. Defendants had express and/or implied contracts with Plaintiffs and the Class members.

267. Plaintiffs and the Class relied on Defendants' promises and covenants regarding Theranos blood testing in agreeing to have their blood tested by Theranos.

268. Plaintiffs and the Class members all accepted Defendants' offers, creating uniform or substantially similar implied and/or express contracts to perform testing and to provide reliable test results.

269. Plaintiffs and the Class performed all of their obligations under the contracts. They each submitted to blood draws performed by Defendants. They each paid money for Theranos test results offered by Defendants, either out of pocket or through their health insurance or other collateral sources.

270. Defendants breached their contracts with Plaintiffs and the Class by, *inter alia*: (1) failing to deliver testing services and test results that were reliable or of the accuracy or quality promised, leaving Plaintiffs and the Class with test results they could not reasonably rely upon; (2) conducting testing using traditional blood testing methodologies and equipment instead of the promised minimally invasive state-of-the art proprietary technology; (3) not ensuring that Theranos's equipment met its own and/or reasonable quality standards; (4) not ensuring that their services were tendered with

reasonable care and workmanlike effort, including by failing to comply with applicable laws, regulations, and standards for laboratory testing services; and (5) failing to timely notify customers of the test results' unreliability and known inaccuracies.

271. Each Class member did not receive the benefit of their bargain—including reliable test results from a company with the expertise and capability to provide accurate and reliable test results.

272. As a result of Defendants' breaches described above, Plaintiffs and the Class have suffered damages.

273. On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

### SIXTH CAUSE OF ACTION
### (Unjust Enrichment)
### (Against All Defendants)

274. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

275. Plaintiffs bring this claim on behalf of themselves and the Class, and as appropriate bring this claim in the alternative to their legal claims.

276. Defendants marketed and sold unreliable Theranos tests that they knew to be unreliable and/or which they failed to take sufficient steps to ensure the reliability of, and encouraged consumers to rely on such tests to make decisions about their health and treatment.

277. Defendants knew that Plaintiffs and the Class would reasonably expect their Theranos tests to be reliable, given, *inter alia*, the nature and importance of blood

testing, Defendants' representations, and the involvement of Walgreens.

278. Defendants made material misrepresentations and omissions, as alleged herein, that were known, or through reasonable care should have been known, by Defendants to be false and material, and were intended by Defendants to mislead Plaintiffs and the Class.

279. Defendants' misrepresentations and omissions were pervasive.

280. Plaintiffs and the Class were actually misled and deceived. They were induced by Defendants to, among other things, purchase and submit to testing which they would not otherwise have purchased or submitted to, and which is not reasonably reliable or of value in light of the numerous problems that have come to light.

281. Plaintiffs lost money as a result of Defendants' conduct.

282. Defendants were enriched by their conduct, including but not limited through revenues received from Plaintiffs' and the Class members' tests.

283. It would be inequitable and unjust for Defendants to retain the money that they have received by their conduct.

284. On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

**SEVENTH CAUSE OF ACTION**
**(Aiding and Abetting Fraud)**
**(Against Walgreens)**

285. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

286. Plaintiffs bring this claim on behalf of themselves and the Class.

287. Theranos committed fraud resulting in injury to Plaintiffs and the Class, as alleged herein. Walgreens' conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in, the commission of such fraud.

288. Walgreens knew, or knowingly and deliberately failed to discover, that Theranos's testing was not reliable, and that Theranos laboratories were not compliant with applicable laws and regulatory standards, and presented an immediate danger to patient safety. Walgreens had actual knowledge of measures that it could have taken to prevent Walgreens clinics and marketing from being used to perpetrate fraud, to provide consumers with accurate information, and to reduce the reach of Theranos's fraudulent conduct, but nevertheless knowingly and deliberately decided not to adopt such measures, and instead chose to maintain policies that enabled and assisted the fraud.

289. Before and during the commission of the fraud, Walgreens intended to aid and abet, and did substantially assist, Theranos in fraud perpetrated on Plaintiffs and the Class members by, *inter alia*, marketing, promoting, and otherwise treating Theranos's testing as reliable and compliant with applicable laws and standards, although Walgreens knew, or knowingly and deliberately failed to discover, that this information was false, by concealing material information about the reliability and safety of Theranos tests, by allowing Theranos tests to be sold and conducted in its pharmacies, and by making available Walgreens employees to facilitate the sale and conducting of Theranos testing services.

290. Walgreens' conduct alleged herein was knowing and intentional, and was carried out by Walgreens in order to benefit Walgreens, including in the form of ill-

gotten revenues. Upon information and belief, Walgreens received revenue from assisting in the perpetration of fraud by Theranos, including through sales of Theranos tests, and through increased sales of other Walgreens products to new and existing customers. Upon information and belief, Walgreens also benefited financially and reputationally as a result of being the first national retail store to provide direct-to-consumer testing services.

291. Plaintiffs and the Class incurred actual damage as a result of Walgreens' conduct in aiding and abetting fraud.

292. Walgreens' misconduct alleged herein was intentional, deliberate, and willful.

293. On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

**EIGHTH CAUSE OF ACTION**
**(Civil Conspiracy to Commit Fraud)**
**(Against All Defendants)**

294. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

295. Plaintiffs bring this claim on behalf of themselves and the Class.

296. Defendants agreed to a partnership through which they would enter the market for direct-to-consumer testing by advertising, promoting, and selling products and services that consumers would use to make decisions about their health, while knowing that the products and services provided were not as advertised and were unreliable, and that their promotions and other statements in marketing such products and services were

false and/or unproven.

297. The object of Defendants' conspiracy was to sell testing services to consumers, thereby becoming the primary participants in the new, profitable, national market for direct-to-consumer testing services, while concealing that Theranos's testing services were unreliable, unsafe, and should not be used by consumers to make decisions about their health.

298. In furtherance of the conspiracy, Walgreens, Theranos, and Elizabeth Holmes agreed to, and did, commit fraud, and other violations of law as described herein.

299. In furtherance of the conspiracy, Theranos and Holmes committed the acts alleged herein, including providing the unreliable test results to consumers and encouraging consumers to rely on those results, fraudulently concealing material facts, and falsely representing Theranos's testing services as reliable, revolutionary, minimally invasive, fast, compliant with applicable laws and regulatory standards, and accurate.

300. In furtherance of the conspiracy, Walgreens committed the acts alleged herein. Among other things, Walgreens deliberately ignored problems about the reliability of Theranos testing, and deliberately and knowingly concealed from Plaintiffs and the Class that it had identified numerous red flags about Theranos and Theranos testing, and that it had conducted a grossly inadequate investigation of Theranos. Walgreens further executed an agreement with Theranos to market and provide Theranos products and services to Walgreens customers, and endorsed and promoted misrepresentations about Theranos testing services with knowledge of their falsity and/or ignorance of their truth. Walgreens further deliberately prevented its staff from

conducting any oversight or review of Theranos's conduct, including but not limited to

toward Walgreens customers, despite having concerns and doubts about the reliability of

Theranos tests, in an effort to conceal the truth from Defendants' customers, and the

public, for as long as possible. Walgreens further agreed to provide space for Theranos

inside its stores to drive retail consumers toward its services, and agreed to make

available Walgreens employees who would facilitate the sale and performance of

Theranos testing services.

301. Elizabeth Holmes agreed to falsely promote Theranos testing as reliable

and compliant with applicable laws and regulations

302. As a result of the Defendants' conspiracy, Plaintiffs and the Class have

suffered actual damages.

303. Defendants' misconduct alleged herein was intentional, deliberate, and

willful.

304. On behalf of themselves and the Class, Plaintiffs seek relief as prayed for

below.

## NINTH CAUSE OF ACTION
### (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c))
### (Against All Defendants)

305. Plaintiffs incorporate the substantive allegations contained in all prior and

succeeding paragraphs as if fully set forth herein.

306. Plaintiffs bring this claim on behalf of themselves and the Class.

307. 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or

associated with any enterprise engaged in, or the activities of which affect, interstate or

foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

308.    Theranos, Walgreens, and Elizabeth Holmes are "persons" within the meaning of 18 U.S.C. § 1961(3).

309.    Theranos, Walgreens, and Elizabeth Holmes together constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and will be referred to herein as the Clinic RICO Enterprise.

310.    The Clinic RICO Enterprise engaged in and affected interstate commerce within the meaning of 18 U.S.C. § 1962(c), including but not limited to commerce on the internet, and between residents of California, Arizona, and Pennsylvania.

311.    The Clinic RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.  For example, Theranos advertised Theranos testing services as revolutionary and reliable, when in fact its laboratories were staffed by inadequately trained personnel, used improperly calibrated equipment, and its test results were unreliable.  Walgreens promoted and agreed to assist in promoting Theranos testing services to consumers, agreed to refrain from conducting any oversight or rigorous investigation regarding Theranos or its facilities and equipment, agreed to provide space for Theranos inside its stores to drive retail consumers toward its services, and agreed to make available Walgreens employees who would facilitate the sale and performance of Theranos testing services.  Elizabeth Holmes agreed to falsely promote Theranos testing as reliable and compliant with applicable laws and regulations.

312.     At all relevant times, Defendants operated, controlled, or managed the Clinic RICO Enterprise, and profited from the Clinic RICO Enterprise.  Defendants were responsible for the content of all marketing, advertisements, and other public-facing representations regarding Theranos, and for the material omissions alleged herein.

313.     The Clinic RICO Enterprise has had a common purpose: to sell Theranos testing services at Walgreens and Theranos clinics that could not have been sold had the true facts material to the transactions been disclosed.

314.     Defendants conducted and participated in the conduct of the affairs of the Clinic RICO Enterprise through a pattern of racketeering activity, beginning at the latest in 2013, and continuing until 2016, and consisting of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

315.     Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and caused to be transmitted, by means of mail and wire communications traveling in interstate commerce, writing(s), and/or signal(s), including the Theranos and Walgreens websites, online, mailed, televised, or other advertising, press releases, Theranos test results and other materials, and invoices for, and processing of, payments.

316.     The conduct alleged herein was part of a scheme that Defendants formulated to defraud Plaintiffs and the Class, to receive financial and other benefits, and to become the primary participants in the new, profitable, national market for direct-to-

consumer testing services. Defendants perpetrated this scheme with the specific intent to deceive and defraud Plaintiffs and the Class, and Defendants did deceive and defraud Plaintiffs and the Class.

317. These acts of racketeering spanned at least three years and are not isolated or long-ago completed events. Through the conduct of the Clinic RICO Enterprise, Defendants have fraudulently sold millions of unreliable and dangerous Theranos tests to consumers.

318. As a foreseeable and natural consequence of Defendants' scheme, Defendants injured Plaintiffs and the Class in the form of their submission to and payment, out-of-pocket and/or through their health insurance or other collateral sources, for testing services that were unreliable, did not hold the promised value and were dangerous when used for their advertised purposes, and by steps taken and not taken by Plaintiffs and the Class in reliance upon the test results.

319. Defendants' acts also present a threat of continued racketeering activity, including but not limited to insofar as the Clinic RICO Enterprise has not issued formal invalidation notices for all Theranos test results.

320. On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## TENTH CAUSE OF ACTION
### Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d)
### (Against All Defendants)

321. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

322.   Plaintiffs bring this claim on behalf of themselves and the Class.

323.   Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. 18 U.S.C. § 1962(d).

324.   For years, Defendants aggressively sought to induce and increase sales of Theranos testing services in an effort to bolster their revenues, augment profits, and increase their market share of the new, profitable, national market for direct-to-consumer testing services.  Finding it impossible to achieve their ambitious goals lawfully, Defendants resorted to cheating through their fraudulent scheme and conspiracy.

325.   Theranos, Elizabeth Holmes, and Walgreens objectively manifested an agreement to participate in the scheme to defraud consumers through the Clinic RICO Enterprise.  Theranos, Holmes, and Walgreens objectively manifested an agreement on the common purpose of the Clinic RICO Enterprise, deliberately and knowingly selling unreliable and dangerous lab tests to consumers while making false representations and material omissions regarding their accuracy, reliability, and compliance with applicable laws and standards.

326.   Further, Defendants objectively manifested an agreement to perpetrate this scheme through predicate acts amounting to a pattern of racketeering activity. Walgreens, Holmes, and Theranos agreed that some members of the Clinic RICO Enterprise would commit the predicate acts for the benefit of the Enterprise.  Defendants further agreed to commit predicate crimes and to aid and abet the commission of predicate crimes by other members of the Clinic RICO Enterprise.

327.   As a foreseeable and natural consequence of Defendants' conspiracy,

Defendants injured Plaintiffs and the Class in the form of their submission to and payment, out-of-pocket and/or through their health insurance or other collateral sources, for testing services that were unreliable and did not hold the promised value and were dangerous when used for their advertised purposes, and by steps taken and not taken by Plaintiffs and the Class in reliance upon the test results.

328. On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

### ELEVENTH CAUSE OF ACTION
### (Violation of California Business & Professions Code Sections 17200, *et seq.*)
### (Against All Defendants)

329. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

330. Plaintiffs bring this claim on behalf of themselves and the Class.

331. California's Unfair Competition Law ("UCL") defines unfair business competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.

332. Defendants' unlawful, unfair, and fraudulent business acts and practices are described throughout this Complaint and include, but are not limited to: (a) marketing and selling unreliable Theranos tests that they knew to be unreliable and/or which they failed to take sufficient steps to ensure the reliability of, and encouraging consumers to rely on such tests to make decisions about their health and treatment; and (b) material misrepresentations and omissions as alleged herein.

333. Defendants' conduct alleged herein constitutes unlawful, unfair, and fraudulent business practices.

334.    Defendants have violated the "fraudulent" prong of the UCL through their misrepresentations and omissions alleged herein.  Defendants' misrepresentations and omissions were pervasive.  Defendants' misrepresentations and omissions are likely to deceive and have a tendency to deceive reasonable consumers, and have deceived Plaintiffs and the Class.  The facts misrepresented and/or concealed by Defendants would be material to a reasonable consumer.

335.    Defendants had exclusive and superior knowledge regarding the material information that they concealed.

336.    Plaintiff and the Class reasonably relied upon Defendants' misrepresentations and omissions to their detriment.

337.    Defendants have violated the "unfair" prong of the UCL through their misconduct alleged herein, under both the Cel-Tech "tethering" test[54] and "balancing" test.

338.    Defendants' conduct alleged herein violates California public policy, including but not limited to as such policy is reflected in California's Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*), Cal. Civ. Code § 1710, Cal. Comm. Code §§ 2314-2315, and in California common law.

339.    Defendants' conduct alleged herein is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.  Defendants have engaged in a years-long, pervasive scheme of: (a) promoting and selling unreliable Theranos tests and

---

[54] *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999).

encouraging consumers to rely on those tests in making decisions about their health; (b) misrepresenting the reliability and other details about Theranos testing services; and (c) concealing from consumers material information about the reliability of Theranos tests and the compliance of Theranos with applicable laws and standards. This conduct is immoral, unethical, and unscrupulous. Moreover, Defendants' conduct is oppressive and substantially injurious to consumers. Among other things, as a direct result of Defendants' conduct alleged herein, Plaintiff and the Class have paid money and submitted to Theranos testing that was not only unreliable, but put their health at risk.

340. Defendants' conduct is also unlawful in that it violates Civil RICO (18 U.S.C. §§ 1961-1968); California's False Advertising Law, (Cal. Bus. & Prof. Code § 17500, *et seq.*), California's Consumer Legal Remedies Act, (Cal. Civ. Code § 1750, *et seq.*), statutory deceit, (Cal. Civ. Code § 1710), the Arizona Racketeering Act, (A.R.S. §§ 13-2301-04), and common law fraud, civil conspiracy to commit fraud, negligence, and negligent misrepresentation, which not only result in liability as to the individual causes of action, they also provide a basis for a finding of liability under California Business and Professions Code §§ 17200, *et seq.*

341. Furthermore, Defendants' conduct violates declared legislative policies as set forth by the federal government in 40 C.F.R. § 600.307(a)(ii)(A); 40 C.F.R. § 600.302-08(b)(4) and 16 C.F.R. § 259.2(a).

342. As a result of Defendants' violations of California's Unfair Competition Law, Plaintiffs and the Class have suffered actual damages, including the loss of money and/or property to Defendants in exchange for testing they would not, with knowledge of

the truth, have allowed to be performed, and which is unreliable, not worth the promised value, and dangerous.

343. Absent injunctive relief, Defendants' violations will continue to harm consumers.

344. Pursuant to California Business and Professions Code §§ 17200 and 17203, on behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## TWELFTH CAUSE OF ACTION
### (Violation of California Business & Professions Code Sections 17500, *et seq.*) (Against All Defendants)

345. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

346. Plaintiffs bring this claim on behalf of themselves and the Class.

347. California Bus. & Prof. Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

348. Defendants have committed acts of untrue and misleading advertising, by disseminating materially misleading and deceptive information, and omitting material information, as alleged herein, for purposes of inducing consumers to purchase and

submit to Theranos testing services.

349. Defendants' misrepresentations and omissions were pervasive.

350. Defendant's misrepresentations deceived, and have a tendency to deceive the general public regarding the reliability and value of Theranos tests. The misrepresentations and omissions by Defendants alleged herein were material in that a reasonable person would attach importance to them and would be induced to act on the information in making decisions.

351. Defendants had exclusive and superior knowledge regarding the material information that they concealed.

352. Plaintiffs and the Class reasonably relied on Defendants' misrepresentations and omissions to their detriment.

353. As a result of Defendants' violations, Plaintiffs and the Class have suffered actual damages, including the loss of money and/or property to Defendants in exchange for testing they would not, with knowledge of the truth, have allowed to be performed, and which is unreliable and dangerous.

354. Absent injunctive relief, Defendants' violations will continue to harm consumers.

355. On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

**THIRTEENTH CAUSE OF ACTION**
**(Violation of California Civil Code Section 1750 *et seq.*)**
**(Against All Defendants)**

356. Plaintiffs incorporate the substantive allegations contained in all prior and

succeeding paragraphs as if fully set forth herein.

357. Plaintiffs bring this claim on behalf of themselves and the Class.

358. Defendants are "persons" under Cal. Civ. Code § 1761(c).

359. Plaintiffs and the members of the Class are "consumers" under Cal. Civ. Code § 1761(d).

360. Plaintiffs and each Class member's purchase of Theranos tests constitute "transactions" under Cal. Civ. Code § 1761(e).

361. Theranos tests are "goods" and/or "services" under Cal. Civ. Code § 1761 (a-b).

362. Plaintiff and Class members purchased Theranos tests for personal, family, and household purposes within the meaning of California Civil Code § 1761(d).

363. As alleged herein, Defendants have engaged in unfair or deceptive acts or practices that violated California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.* by, among other things, representing that Theranos testing services have characteristics, uses, benefits, and qualities which they do not have; representing that Theranos testing services are of a particular standard, quality, and grade when they are not; and advertising Theranos testing services with the intent not to sell them as advertised.  Cal Civ. Code § 1770 (5), (7), and (9).

364. Defendants actively failed to disclose and concealed material facts about Theranos tests, and otherwise engaged in activities with a tendency or capacity to deceive, as described herein.

365. Defendants' misrepresentations and omissions were pervasive.

366. Defendants' CLRA violations materially affected the decisions of Plaintiffs and Class members. Plaintiffs and the Class members reasonably relied upon Defendants' material misrepresentations and omissions, and would not have purchased Theranos tests or submitted their blood for testing to Defendants had they known the truth.

367. As a result of the CLRA violations described herein, Plaintiffs and the Class have suffered actual damages.

368. On behalf of the Class, Plaintiffs seeks injunctive relief to enjoin the CLRA violations alleged herein. Plaintiffs also seek attorneys' fees and costs.

369. In accordance with California Civil Code § 1782(a), Defendants Theranos and Walgreens have been sent notice of their CLRA violations by certified mail, return receipt requested. Theranos and Walgreens have failed to provide appropriate relief for their CLRA violations within 30 days of these notification letters. This Consolidated Complaint differs from the original complaints filed in the underlying cases, so Interim Co-Lead Plaintiffs' Counsel is sending renewed notice to Defendants Theranos and Walgreens, and to Defendant Holmes, concurrent with the filing of this Consolidated Complaint. *See* Ex. P. If Defendants fail to provide appropriate relief within 30 days of such notice, Plaintiffs intend to amend the Consolidated Complaint as of right under Fed. R. Civ. P. 15(a)(1) to request actual and punitive damages for the CLRA violations alleged herein.

370. Venue is proper under California Civil Code § 1780(d) because Defendants do business in this county and a substantial portion of the transactions at issue occurred in

this county. Plaintiffs' declaration establishing that this Court has proper venue for this action is attached hereto. *See* Ex. Q.

## FOURTEENTH CAUSE OF ACTION
### (California Civil Code §§ 1709- 1710 - Deceit)
### (Against All Defendants)

371. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

372. Plaintiffs bring this claim on behalf of themselves and the Class.

373. California Civil Code § 1709 provides that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

374. California Civil Code § 1710 defines "deceit" as (1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, (4) A promise, made without any intention of performing it.

375. Defendants' material misrepresentations and omissions alleged herein constitute deceit under California Civil Code § 1710. Defendants' misrepresentations and omissions were pervasive. Plaintiffs and the Class have reasonably relied on the material misrepresentations and omissions made by Defendants. As a result, Plaintiffs and the Class have suffered actual damages.

376. Defendants' misconduct alleged herein was intentional, deliberate, and willful, and was perpetrated by Defendants with the intent to, *inter alia*, cause Plaintiffs and the Class to rely on Theranos's unreliable test results in making decisions about their health and treatment.

377. On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## VII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the Class and Subclasses, demand judgment against and general and special relief from Defendants as follows:

1. An order certifying that the action may be maintained as a class action under Federal Rule of Civil Procedure 23 as defined herein and appointing Plaintiffs and Interim Co-Lead Counsel to represent the defined Class and Subclasses;

2. An order permanently enjoining Defendants' misconduct alleged herein;

3. An order awarding Plaintiffs and the Class damages and restitution;

4. An order requiring Defendants to disgorge all profits and compensation improperly obtained by Defendants as a result of such acts and practices declared by this Court to be an unlawful;

5. An order requiring Defendants to pay punitive, exemplary, and treble damages;

6. An order requiring Defendants to pay attorneys' fees, costs, and expenses;

7. An order requiring Defendants to pay pre-judgment and post-judgment

interest; and

8.    Such other and further relief as the Court deems appropriate.

### VIII.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all claims so triable.

DATED this 22nd day of November, 2016.

By: *s/ T. David Copley*
Lynn Lincoln Sarko *(pro hac vice)*
T. David Copley
Gretchen Freeman Cappio *(pro hac vice)*
KELLER ROHRBACK L.L.P.
1201 3rd Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Email: lsarko@kellerrohrback.com
Email: dcopley@kellerrohrback.com
Email: gcappio@kellerrohrback.com

Mark D. Samson
Christopher Graver
KELLER ROHRBACK L.L.P.
3101 North Central Ave., Suite 1400
Phoenix, AZ 85012
Telephone: (601) 248-0088
Facsimile: (602) 248-2822
Email: msamson@kellerrohrback.com

Michael Walter Sobol (*pro hac vice*)
Roger N. Heller (*pro hac vice*)
LIEFF CABRASER HEIMANN
& BERNSTEIN LLP
Embarcadero Ctr West
275 Battery St, 29th Floor
San Francisco, CA 94111
Telephone (415) 956-1000
Facsimile: (415) 956-1008
Email: msobol@lchb.com
Email: rheller@lchb.com

*Interim Co-Lead Plaintiffs' Counsel*

Joseph G. Sauder
Joseph B. Kenney
MCCUNEWRIGHT LLP
555 Lancaster Avenue
Berwyn, PA 19312
Telephone: (610) 200-0580
jgs@mccunewright.com
mds@mccunewright.com
jbk@mccunewright.com

Laurence D. King
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, CA 94104
Phone: 415-772-4700
Fax: 415-772-4707
Email: lking@kaplanfox.com

Eric H Gibbs
GIRARD GIBBS LLP
505 14th St., Ste. 1110
Oakland, CA 94612
510-350-9710
Fax: 510-350-9701
Email: ehg@classlawgroup.com

Robert B. Carey
HAGENS BERMAN SOBOL SHARPIRO LLP
111 W. Jefferson St., Ste. 1000
Phoenix, AZ 85003
Phone: (602) 840-5900
Fax: (602) 840-3012
Email: rob@hbsslaw.com

Joel Grant Woods
GRANT WOODS LAW
Two Renaissance Square
40 N Central Ave., Ste. 2250
Phoenix, AZ 85004
602-258-2599
Fax: 602-258-5070
Email: gw@grantwoodspc.net

Marc A. Wites
WITES & KAPETAN, P.A.
4400 North Federal Highway
Lighthouse Point, FL 33064
Phone: (954) 570-8989
Fax: (954) 354-0205
Email: mwites@wklawyers.com

Stuart McKinley Paynter
PAYNTER LAW FIRM PLLC
1200 G St. NW, Ste. 800
Washington, DC 20005
Phone: 202-626-4486
Fax: 866-734-0622
Email: stuart@paynterlawfirm.com

*Additional Plaintiffs' Counsel*

1

## CERTIFICATE OF SERVICE

2

     I hereby certify that on November 22, 2016, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

3

4

5
                            By: s/ T. David Copley

6
                                    T. David Copley

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28