Lynn Lincoln Sarko (*pro hac vice*)
T. David Copley
Gretchen Freeman Cappio (*pro hac vice*)
KELLER ROHRBACK LLP
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Email: lsarko@kellerrohrback.com
Email: dcopley@kellerrohrback.com
Email: gcappio@kellerrohrback.com

Michael W. Sobol (*pro hac vice*)
Roger N. Heller (*pro hac vice*)
Melissa Gardner (*pro hac vice*)
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery St., 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
Email: msobol@lchb.com
Email: rheller@lchb.com
Email: mgardner@lchb.com

*Interim Co-Lead Plaintiffs' Counsel*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>Arizona THERANOS, INC., Litigation | **No. 2:16-cv-2138-HRH**<br>**(Consolidated with)**<br>**No. 2:16-cv-2373-HRH**<br>**No. 2:16-cv-2660-HRH**<br>**No. 2:16-cv-2775-HRH**<br>**-and-**<br>**No. 2:16-cv-3599-HRH**<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

                                                                          **Page**

I.      INTRODUCTION ........................................................................................ 1

II.     JURISDICTION AND VENUE ................................................................. 5

III.    PARTIES ................................................................................................... 5

IV.     FACTUAL BACKGROUND ..................................................................... 7

        A.      The Critical Importance of Reliable Blood Tests ......................... 7

        B.      The Edison Device and Its Premature Rush to Market ................. 8

        C.      Theranos and Walgreens Join Forces ......................................... 12

        D.      Defendants Intentionally Concealed the Truth From Consumers .............. 16

        E.      Defendants Falsely Promoted Theranos Testing as Reliable and Made
                Other Affirmative Misrepresentations ........................................ 21

        F.      Theranos Tests Were Unreliable and Dangerous ....................... 38

        G.      Defendants' Fraudulent Scheme Unravels .................................. 42

        H.      Defendants Continue to Fail to Protect Customers .................... 50

        I.      The Members of the Edison Subclass Were Subjected to Battery ............. 54

        J.      Defendants' Misconduct Has Significantly Harmed Consumers................ 62

        K.      Factual Allegations Regarding Plaintiffs .................................... 63

V.      CLASS ACTION ALLEGATIONS ........................................................ 86

VI.     CAUSES OF ACTION ............................................................................ 89

VII.    PRAYER FOR RELIEF ....................................................................... 127

VIII.   DEMAND FOR JURY TRIAL ............................................................. 127

# I.    **INTRODUCTION**

1.      Plaintiffs bring this Second Amended Consolidated Class Action Complaint against Defendants Theranos, Inc. ("Theranos"), Walgreens Boots Alliance, Inc. and Walgreen Arizona Drug Company (collectively, "Walgreens"), Elizabeth Holmes ("Holmes"), and Ramesh Balwani ("Balwani").

2.      This class action lawsuit concerns a massive fraud perpetrated on hundreds of thousands of consumers of Theranos testing services and the public, and battery committed by Walgreens and Theranos against tens of thousands of consumers subjected to so-called "tiny" blood draws under false pretenses.

3.      For years, Walgreens and Theranos marketed and sold blood testing services they knew were unreliable, not ready-for-market, and failed to meet even basic industry standards. Walgreens and Theranos sold these services and administered the corresponding blood draws primarily at numerous Walgreens pharmacies in Arizona and California, and also at a few Theranos-owned Wellness Centers.

4.      With respect to the "tiny" blood draws in particular, the subjects agreed to submit to these blood draws under false pretenses and substantially mistaken belief as to their essential nature and purpose. Defendants Walgreens and Theranos knowingly and intentionally concealed vital information from consumers, their doctors, and the public at large, including that the "Edison" "tiny" blood technology was, throughout the time the "tiny" blood draws were being administered, still in-development, not ready-for-market, and nowhere near in a position to serve the purpose of providing reliable blood test results. Walgreens and Theranos further embarked on a pervasive promotional campaign that misrepresented and clearly portrayed the "tiny" blood tests as being market-ready and serving the purpose of providing reliable blood test results. Simply put, the "tiny" blood draws that Theranos and Walgreens administered to these consumers were not intended by Theranos and Walgreens to provide, and could not serve the purpose of providing, reliable blood test results to the subjects (hereinafter, "legitimate blood testing").

5. With respect to both the Edison and non-Edison "tests," Defendants Walgreens, Theranos, Holmes and Balwani each concealed material information about the unreliability of all of the testing services, and about the grossly deficient nature of the testing facilities and equipment.

6. Walgreens and Theranos also made pervasive misrepresentations, including through their broad marketing campaign, falsely touting the services as being market ready and reliable, meeting the highest standards of reliability, industry-leading in quality, and developed and validated under, and compliant with, federal guidelines.

7. Walgreens and Theranos aggressively promoted and portrayed Theranos tests as being ready-for-market, and encouraged consumers and their doctors to use and rely on them in making important health and treatment decisions, including, but not limited to, regarding such critical health and treatment matters as cancer, HIV, diabetes, kidney disease, and heart disease.

8. In reality, as each of the Defendants contemporaneously knew but the consumers could not, Theranos tests were dangerously unreliable, had not been validated as advertised, and did not meet federal guidelines as advertised. Multiple regulatory investigations and many thousands of voided tests now confirm this.

9. With respect to the Edison technology in particular, each of the Defendants knew—throughout the time the "tiny" blood draws were being administered—that the Edison technology was still in development, not ready-for-market, and nowhere near in a position to serve, and was not intended by Walgreens and Theranos to serve, the purpose of legitimate blood testing that the subjects believed to be the purpose of their blood draws. Nevertheless, in a hurry to begin marketing and administering these "tiny" blood draws, and thereby assist in researching and developing the still-in-development technology, to advance the narrative that Theranos's "disruptive" technology had "revolutionized" the medical testing industry, and to woo and placate investors, potential investors, and co-investors by giving the false impression that they had a market-ready, breakthrough product, Walgreens and Theranos prematurely marketed, sold, and

administered, the "tiny" blood draws to tens of thousands of unwitting consumers who were, in essence, subjected to beta testing and product development research without their knowledge or consent—a course of conduct that would be wrong in any context but is shockingly improper and dangerous in the context of blood testing.

10. Defendants' scheme started to unravel when various governmental agencies and others began investigating Theranos's "tests" and facilities. After the Center for Medicare and Medicaid Services cited Theranos's Newark, California lab for numerous deficiencies in 2016, Theranos informed regulators that it voided "all" blood-testing results from the Edison devices.[1] Other investigations and reports have revealed numerous other serious deficiencies and problems regarding Theranos's tests (including beyond Edison), including the manipulation of test results, the dilution of blood samples used in testing, and deficiencies at both of Theranos's testing facilities. Numerous additional test results, in addition to the tens of thousands of voided Edison-device tests, have now been voided or belatedly "corrected" by Theranos, including results that were "corrected" several months (or even years) after the blood draws and tests were conducted and the results relied upon by the consumers. Defendant Holmes, Theranos's founder and CEO, was banned from owning or operating a blood-testing business for at least two years. Defendant Balwani, Theranos's second in command, was banned as well, and Theranos's license to operate a lab was revoked. Continuing the fallout, Walgreens sued Theranos for breach of contract, and Theranos, Holmes, and Balwani were all sued by multiple investors for misrepresenting and concealing the truth about Theranos's technology and testing, and in particular regarding the readiness of the Edison technology.

11. Before Defendants' scheme collapsed, hundreds of thousands of consumers, including Plaintiffs, were deceived by Defendants' misconduct and paid for and were subjected to Theranos "tests." Defendants have failed to deliver the products and services

---

[1] John Carreyrou, *Theranos Voids Two Years of Edison Blood-Test Results*, Wall St. J. (May 18, 2016) (Ex. 1).

they promised and that their customers reasonably expected, and have endangered their customers' health and well-being, the very thing they promised to promote and protect.

12.     None of the consumers who obtained test results from Theranos received what they paid for and what they reasonably expected.  None of them received tests that they could reasonably rely on given the numerous problems alleged herein that have come to light.

13.     Moreover, the tens of thousands of consumers who submitted to the "tiny" blood draws (i.e., involving the finger-stick devices), including Plaintiffs B.P., R.C., and S.J. did so under false pretenses and substantially mistaken about the essential nature and purpose of those blood draws, and were all victims of battery.

14.     Worse yet, as a result of the unreliable and inaccurate Theranos test results, many consumers have been subjected to unnecessary or potentially harmful treatments, and/or have been denied the opportunity to seek treatment for treatable conditions.

15.     As described in further detail below, Plaintiffs, for themselves and all others similarly situated, (i.e., the members of the Class and Subclasses described and defined herein), bring this action for, *inter alia*, damages, restitution, punitive damages, statutory damages, and other monetary relief, and requiring Defendants to provide adequate notice to their customers,[2] pursuant to the Arizona Consumer Fraud Statute A.R.S. §§ 44-1521 *et seq.*; California Business and Professional Code §§ 17200, *et seq.*; California Business and Professional Code §§ 17500, *et seq.*; California Civil Code §§ 1750, *et seq.*; California Civil Code §§ 1709-1710; Civil RICO 18 U.S.C. §§ 1962(c); and common law causes of action for fraud, negligent misrepresentation, unjust enrichment, aiding and abetting fraud, battery, and medical battery.

---

[2] Plaintiffs recognize that the Court dismissed their individual claims for injunctive relief in the form of notice to the Class, and also recognize the Court's instruction that all claims dismissed with prejudice do not need to be re-pled to be preserved for appeal (Dkt. 139 at 60; Dkt. 157 at 11).  Plaintiffs reserve all appeal rights, but also respectfully request that the Court consider this particular request for the provision of Class notice in light of the fact that there are numerous other victims of Defendants' practices who still, as of this filing, have not received notice and thus may still be relying on the unreliable test results.

## II. JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because at least one member of the Class is a citizen of a state that is different from at least one of the Defendants and because the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest, and there are more than 100 members in each of the proposed Class and Subclasses.

17.     This Court has personal jurisdiction over Theranos, Walgreens, Holmes, and Balwani because each of these Defendants has conducted business in the State of Arizona, and because each Defendant has committed acts and omissions complained of herein in the State of Arizona.

18.     Venue as to Defendants is proper in this judicial district because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District. Venue is also proper because Defendants have conducted, and continue to conduct, business within this District.

## III. PARTIES

19.     Plaintiff A.R. is a resident and citizen of San Jose, California and is using his initials to protect his privacy in this litigation.

20.     Plaintiff B.B. is a resident and citizen of Chandler, Arizona, and is using her initials to protect her privacy in this litigation.

21.     Plaintiff B.P. is a resident and citizen of Phoenix, Arizona and is using his initials to protect his privacy in this litigation.

22.     Plaintiff D.L. is a resident and citizen of Maricopa, Arizona and is using her initials to protect her privacy in this litigation.

23.     Plaintiff L.M. is a resident and citizen of Chandler, Arizona and is using her initials to protect her privacy in this litigation.

24.     Plaintiff M.P. is a resident and citizen of Scottsdale, Arizona and is using his initials to protect his privacy in this litigation.

25.     Plaintiff R.C. is a resident and citizen of Sun City West, Arizona and is using his initials to protect his privacy in this litigation.

26.     Plaintiff R.G. is a resident and citizen of Gilbert, Arizona and is using his initials to protect his privacy in this litigation.

27.     Plaintiff S.J. is a resident and citizen of Mesa, Arizona and is using her initials to protect her privacy in this litigation.

28.     Plaintiff S.L. is a resident and citizen of Chandler, Arizona and is using his initials to protect his privacy in this litigation.

29.     Defendant Theranos, Inc. ("Theranos") is based in Palo Alto, California. Theranos operates, or during the relevant time period operated, two laboratories: one in Newark, California, and another in Scottsdale, Arizona. Predominantly in Walgreens pharmacies in Arizona and California, and also in a few Theranos-owned Wellness Centers in Arizona and California, Theranos, along with Walgreens, sold blood and other clinical testing services to individuals.

30.     According to reports, since 2013, Theranos has conducted 6.1 million diagnostic tests.

31.     Defendant Walgreens Boots Alliance, Inc., of Deerfield, Illinois, is a global pharmacy-led health and well-being enterprise, which, among other segments, operates the Walgreens retail pharmacy chain in the United States. Defendant Walgreen Arizona Drug Company, an Arizona corporation, is a wholly-owned subsidiary of Walgreens Boots Alliance, Inc. involved in operating Walgreens retail stores in Arizona. Walgreens Boots Alliance, Inc. and Walgreen Arizona Drug Company are referred to collectively herein as "Walgreens." In numerous Walgreens pharmacies in Arizona and California, Walgreens, along with Theranos, sold blood and other clinical testing services to individuals. The vast majority of the services sold by Walgreens and Theranos, including the vast majority of the so-called "tiny" blood draws, occurred at Walgreens pharmacies.

32.     Defendant Elizabeth Holmes, a citizen and resident of California, is the founder of Theranos and at all relevant times has been Theranos's Chief Executive

Officer. Holmes has had a primary role in, and in significant part has personally directed, Theranos's misconduct as alleged herein. Further, Holmes personally made material misrepresentations and omissions as alleged herein. On information and belief, Holmes has personally received millions, if not billions, of dollars in compensation as a result of the business and revenue generated through the misconduct alleged herein.

33. Defendant Ramesh "Sunny" Balwani, a resident of California, is the former President and Chief Operating Officer of Theranos, and was Theranos's second in command, behind Defendant Holmes, before he resigned from Theranos in 2016 amid the various investigations. Balwani had a primary role in Theranos's misconduct alleged herein. Mr. Balwani personally directed misconduct alleged herein. Further, Balwani personally made material misrepresentations and omissions as alleged herein. On information and belief, Balwani has personally received millions of dollars in compensation as a result of the business and revenue generated through the misconduct alleged herein.

34. Each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.[3]

## IV. FACTUAL BACKGROUND

### A. The Critical Importance of Reliable Blood Tests

35. Blood tests and other clinical lab tests ("test results") are an everyday and invaluable part of the practice of modern medicine. Test results can offer crucial details about an individual's health, and doctors rely on test results to detect everything from cholesterol and glucose levels to infections, blood cell counts, and cancer.

36. Test results aid in the process of medical diagnosis and treatment decisions, and in some cases are a prerequisite for additional medical tests. Because test results are such a foundational part of medical treatment, test results that are unreliable or inaccurate

---

[3] The Court dismissed with prejudice Plaintiffs' claims to the extent they were based on an agency or joint venture theory of liability (Dkt. 139 at 55-56; Dkt. 141). Plaintiffs respectfully preserve any and all rights to pursue such claims and arguments on appeal.

can be catastrophic: serious conditions may go undetected, patients may not receive the treatments and medications that they need, and patients may be misdiagnosed and receive treatments or medications that they have no need for. It is absolutely critical that consumers be able to rely on test results.

37. As the Theranos "direct testing menu" (Ex. 2 hereto) reflects, the "tests" offered by Theranos and Walgreens at their Wellness Centers, including at Walgreens stores and in the Theranos-owned facilities, included more than 200 different medical tests and combinations of tests (panels). These included tests concerning critical medical and health issues including, but not limited to, cancer, heart disease, diabetes, kidney disease, auto-immune disorders, and viruses. *Id*.

## B. The Edison Device and Its Premature Rush to Market

38. Theranos was founded in 2003 by Elizabeth Holmes, then a sophomore at Stanford studying chemical engineering, who dropped out a few months later to focus on Theranos. As CEO, Holmes has maintained that she developed the idea for Theranos as a result of her self-professed phobia of needles.[4] According to published reports, Theranos initially focused on development of a hand-held device that would use a tiny needle to obtain a small drop of blood for analysis. By 2008, the project had grown into attempting to develop what is now known as the "Edison" device.

39. In contrast to the standard-sized needle and numerous tubes required in a typical venipuncture blood draw, Theranos claimed that its Edison device could eliminate the need for laboratories altogether. The Edison device (which Theranos never allowed to be photographed) was supposedly able to take a few drops of blood from a patient's finger placed into a "nanotainer" capsule, and reliably conduct hundreds of blood tests, all outside a lab. This concept would have enabled Theranos to conduct all testing outside of

---

[4] Marco della Cava, *Change Agents: Elizabeth Holmes Wants Your Blood*, USA Today (July 26, 2014), available at http://www.usatoday.com/story/tech/2014/07/08/change-agents-elizabeth-holmes-theranos-blood-testing-revolution/12183437/ (last visited Oct. 20, 2017).

the laboratory in the Wellness Centers and thus—according to statements made by Theranos, Walgreens, Holmes, and Balwani—revolutionize testing by significantly reducing the time and costs involved.

40.     Neither Holmes nor any of the other Defendants ever explained to the public the science or technology underlying the Edison device, and they, in fact, refused to provide any meaningful explanation based on the claimed need to protect Theranos's intellectual property.  Despite the industry practice for companies to publish their results and allow for peer review by experts in the field when launching a new medical product, Theranos has still never published its data or allowed for peer review.[5]  One writer described Holmes's explanation of what Edison does as "comically vague" after she explained, "[a] chemistry is performed so that a chemical reaction occurs and generates a signal from the chemical interaction with the sample, which is translated into a result, which is then reviewed by certified laboratory personnel."[6]

41.     Despite the fact that the Edison technology was, to put it generously, still in development and not ready-for-market, and nowhere near in a position to serve the purpose of legitimate blood testing, Theranos and Walgreens prematurely rushed the "tiny" blood "tests" to market.

42.     In connection with the launch of Theranos testing to the consumer public, Theranos and Walgreens embarked on a large-scale media campaign designed to, *inter alia*, let the medical profession and the consuming public know that the Edison technology was revolutionary and ready for public use for the full range of medical testing offered.  In a September 8, 2013 interview with the *Wall Street Journal*, for example,

---

[5] John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, Wall St. J. (Oct. 16, 2015) (Ex. 3).

[6] Ken Auletta, *Blood, Simpler, One woman's drive to upend medical testing*, The New Yorker (Dec. 15, 2014), available at http://www.newyorker.com/magazine/2014/12/15/-blood-simpler (last visited Oct. 20, 2017).

Holmes boasted that Theranos was able to "run any combination of tests, including sets of follow-on tests" quickly from a single tiny blood sample.[7]

43.    Various press releases and other statements to the media during that time period trumpeted the same themes.  For example, a September 9, 2013 joint press release by Theranos and Walgreens stated: "For the first time, Theranos is introducing CLIA-certified laboratory services with the ability to run its tests on micro-samples.  Theranos's proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results.  Test results are available to physicians in a matter of hours, enabling fast diagnoses to help informed treatment choices. . . .  For the past 10 years, Theranos has worked relentlessly to reach a point at which we could help make actionable information accessible to physicians and patients at the time it matters most."[8]  A second joint press release by Theranos and Walgreens, issued on November 13, 2013 and excerpted below, included many of the same themes.[9]

44.    Theranos's website similarly claimed, at around this same time, that its "laboratory can perform your tests quickly and accurately on samples as small as a single drop."

45.    In a recorded interview with Medscape's Eric J. Topol, M.D., Holmes reaffirmed her claims that Theranos tests were validated, run on tiny samples, and more accurate than traditional blood tests: "We spent many years redeveloping every test that is recognized by Medicare in the form of a CPT (Current Procedural Terminology) code to be able to run it on a tiny sample" . . . "we focused a great deal on these tests and validated and verified them over the years, building an infrastructure that was highly

---

[7] Joseph Rago, *Elizabeth Holmes: The Breakthrough of Instant Diagnosis*, Wall St, J. (Sept. 8, 2013) (Ex. 4).

[8] Press Release, Theranos, Inc., *Theranos Selects Walgreens as a Long-Term Partner Through Which to Offer Its New Clinical Laboratory Service* (Sept. 9, 2013) (Ex. 5).

[9] Press Release, Theranos, Inc., *Theranos and Walgreens Expand Diagnostic Lab Testing to the Phoenix Metropolitan Area; New Theranos™ Wellness Centers at Walgreens stores provide consumers with less invasive, fast, affordable testing on samples as small as a few drops of blood* (Nov. 13, 2013) (Ex. 6).

automated and standardized such that the quality of the data that we generate could be used in an actionable manner."[10]

46.     Balwani also publicly spread the misleading claims that Theranos testing, including Edison, was safe, reliable, and ready for use by the public.  In a presentation before the Arizona Senate Health and Human Services Committee on March 12, 2014, Balwani stated that Theranos was "able to provide a majority of the testing from only two or three drops of blood," and although those drops of blood could be taken from a traditional venipuncture, "most likely patients will prefer a simple finger stick, and we are able to do that."[11] Later in 2014, Balwani emphasized Theranos's supposedly ready and working technological advancement (i.e., Edison) in an interview with the *The New Yorker*, claiming that "[o]ur platform is about automation. . . We have automated the process from start to finish."[12]

47.     Based on such representations by Holmes, Balwani, Theranos, and Walgreens, and based on a pervasive joint-marketing campaign by Theranos and Walgreens discussed in detail below, people believed that Theranos testing was ready-for-market and that the Edison technology was a true disruptive technology breakthrough. Holmes was hailed as the next Steve Jobs, and by 2014, Theranos was valued at $9 billion—approximately the same as each of its two largest and long established competitors in the medical testing industry.[13]

48.     In reality, as described in further detail herein, none of the testing services that Theranos and Walgreens offered were reliable or certified, as each of the Defendants

[10] Eric J. Topol, M.D., *Creative Disruption? She's 29 and Set to Reboot Lab Medicine*, Medscape (Nov. 18, 2013), available at http://www.medscape.com/viewarticle/814233 (last visited Oct. 20, 2017).

[11] Presentation by Dr. Ramesh Balwani to Arizona Senate Health and Human Services Committee (Mar. 12, 2014), at 3:08-3:22, available at http://azleg.granicus.com/MediaPlayer.php?clip_id=13816 (last visited Oct. 20, 2017).

[12] Ken Auletta, *Blood, Simpler, supra* n.6.

[13] Steve Denning, *Is Theranos Too Good To Be True?*, Forbes (Feb. 13, 2016), available at http://www.forbes.com/sites/stevedenning/2016/02/13/is-theranos-too-good-to-be-true/#47de558857f8 (last visited Oct. 20, 2017).

had stated and suggested. With respect to the Edison technology in particular, the technology was simply not ready-for-market or anywhere near ready to serve the purpose of legitimate blood testing at any time the "tiny" blood draws were being administered. Walgreens and Theranos knew this, but nevertheless prematurely rushed the "tiny" blood "tests" to market to, *inter alia*: further the research and development of this as-yet undeveloped technology, promote the narrative that Edison was a "disruptive" technology, and to woo and/or satisfy investors, potential investors, and co-investors by making it appear that Edison was a market-ready, breakthrough technology and not, at best, an ambitious idea that was still-in-development.

## C.  **Theranos and Walgreens Join Forces**

49.     By 2011, Theranos was in talks with both Safeway and Walgreens to offer Theranos testing in their stores. In or around 2012, Theranos entered into a partnership agreement with Walgreens, under which Walgreens invested $140 million in Theranos, $100 million of which was characterized as an "Innovation Fee," and the two companies agreed to place and operate clinics, which it called "Wellness Centers," at Walgreens Pharmacies in Arizona and California. Following the launch of the partnership in 2013, Theranos and Walgreens planned to build Wellness Centers in Walgreens stores nationwide.[14]

50.     Under their partnership agreement, Theranos and Walgreens opened a total of 40 Wellness Centers within Walgreens pharmacy stores in Arizona, and one in a Walgreens pharmacy in California, to sell the majority of the "tests."[15]

51.     The agreement between Walgreens and Theranos ("Master Services Agreement" or "MSA") lists the two companies' respective tasks regarding the services offered to consumers in the Walgreens store locations. Among other tasks, the MSA

---

[14] *Theranos Selects Walgreens* Press Release (Ex. 5), *supra* n.8.

[15] James B. Stewart, *A Marriage Gone Bad: Walgreens Struggles to Shake Off Theranos*, N.Y. Times (Apr. 21, 2016), available at http://www.nytimes.com/2016/04/22/business/a-once-avid-ally-walgreens-is-struggling-to-shake-off-theranos.html (last visited Oct. 20, 2017).

provides that Walgreens personnel (called "Walgreen Technicians") were responsible for the following tasks:

> a. "handl[ing] the patients";
>
> b. physically administering the "tiny" blood draws (["Walgreen Technicians will draw blood using the finger stick technique"]);
>
> c. "collecting the proper other specimens according to directions provided by Theranos";
>
> d. collecting demographic and insurance information, and co-pays; and
>
> e. "properly stor[ing] and prepar[ing] the specimen for pick-up".[16]

52.    Pursuant to the MSA, Theranos's tasks included providing training and other assistance to the Walgreens personnel performing the "laboratory patient services," as well as testing the samples collected.[17]

53.    Jay Rosan, Senior Vice President of Health Innovation at Walgreens, explained that with respect to arrangements like the one with Theranos:

> We're focused on pharmacy innovation and health, healthcare services and e-commerce and it's led, we do the thing called co-production. . . We're co-producing things together.[18]

54.    At all times that Theranos testing services were being sold in Walgreens stores, Walgreens knew and/or should have known that the tests could not reasonably be relied on by consumers and their doctors in making health and treatment decisions. Walgreens was aware of numerous serious red flags about the tests that put it on notice about the unreliability of the tests, and deliberately chose to ignore, not follow up on, and conceal that information. With respect to the Edison technology, Walgreens knew that Edison was still in development, not ready-for-market, and not ready to serve the purpose

---

[16] Dkt. 123-1, Ex. A (MSA) at 9, ¶ 15.

[17] *Id*. at 8-9.

[18] Int'l Bus. Forum, *Walgreens Venture Capital Success* (Jay Rosen, presenting) (Feb. 7, 2014), available at https://www.youtube.com/watch?v=ZFjgqapXFQc&t=4s (last visited Oct. 20, 2017) (emphasis added).

of legitimate blood testing.  To the extent Walgreens lacked any more detailed knowledge, it was by virtue of its own deliberate decision to ignore and/or avoid such details.

55.     Walgreens' knowledge regarding these problems and regarding the unready state of Edison, was reinforced by complaints it received from customers who had blood draws at Walgreens stores and received "test results" that were significantly out-of-whack.

56.     Before entering into the partnership with Theranos, Walgreens' Chief Medical Officer neither reviewed Theranos's technology nor independently validated or verified the accuracy, reliability, or results of the tests.[19]  Nevertheless, and despite the fact that Walgreens executives had expressed doubts about the reliability of Theranos tests and the quality of its equipment and/or facilities, Walgreens reportedly said it was "confident in the quality of Theranos's services," in 2015.[20]

57.     In fact, although a Johns Hopkins University scientist had requested, on Walgreens' behalf, that Theranos provide his researchers with an Edison device so that they could verify the technology for Walgreens, and Holmes initially agreed to provide one, the device was never provided.[21]  Instead, Walgreens got a prototype which the Johns Hopkins team tried to evaluate, but the prototype was useless when evaluating the accuracy and reliability of the tests because it produced results such as "low" or "high" rather than numeric values that could be compared to other labs' tests.  As a result, there was no way to compare results from the prototype Edison device to the results of other commercially-available tests.[22]

58.     In the summer of 2011, just after Theranos and Walgreens signed an initial letter of agreement, Walgreens sent a delegation, including its finance chief, internal

---

[19] *Blood Sports, Pressure is Mounting on a Startup That Has Tried to Shake Up the Lab-Test Market,* The Economist (Apr. 23, 2016), available at https://www.economist.com/news/business/21697273-pressure-mounting-startup-has-tried-shake-up-lab-test-market-blood-sports (last visited Oct. 20, 2017).

[20] *Id.*

[21] Christopher Weaver and John Carreyrou, *Craving Growth, Walgreens Dismissed Its Doubts About Theranos*, Wall St. J. (May 25, 2016) (Ex. 7).

[22] *Id.*

auditor, and lab experts from a consulting firm called Colaborate, LLC, to a meeting at Theranos headquarters in Palo Alto, the purpose of which was to gain a firsthand view of the Theranos business and its capabilities.[23]

59.     At that meeting, however, the consulting lab experts were chaperoned during the entire visit, including during visits to the restroom, and were not allowed access to Theranos's lab area or Edison technology.  Despite the lack of access, Walgreens did discover problems with Theranos's information management systems meant to keep track of patients.[24]

60.     According to published reports, throughout the process, despite their concerns and the numerous red flags they identified, Walgreens executives nevertheless looked the other way.  They deliberately did not press for further verification, and instead went ahead with the Theranos partnership, despite their concerns and known problems about the reliability of Theranos's facilities and tests.  Walgreens apparently was afraid that Theranos would respond to its questions by choosing another retail chain to work with as a partner.[25]

61.     Later in 2011, Colaborate, LLC, issued a report concluding that Walgreens needed more information to assess the proposed partnership with Theranos.[26]

62.     Similarly, in October 2012, Walgreens sent two executives and a retired Quest Diagnostics Corp. executive to Theranos to review quality-control data.  According to reports, the retired Quest executive stated that they were not allowed inside Theranos's lab, and while they were led to believe the data they reviewed was from an Edison device, Theranos did not confirm that it was.[27]  Walgreens continued to work on the partnership

---

[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*

agreement despite the lack of access to the technology and despite its concerns about the reliability of Theranos's facilities and tests.

63. According to published reports, Walgreens executives were privy to information that Safeway, Inc. had also agreed to host Theranos testing sites at some of its stores. According to reports, Safeway dissolved its partnership with Theranos before it began hosting Theranos testing sites in Safeway stores due, in part, to its due diligence that raised questions about the accuracy of Theranos's testing. For example, the unreliability of Theranos tests became apparent after Safeway employees in Pleasanton, California had their blood tested by both Theranos and another conventional lab, and the test results differed significantly.[28]

64. In response to pressure from Theranos, despite its concerns and knowledge about problems, Walgreens ceded even more control to Theranos in the final agreement reached between Walgreens and Theranos, and Walgreens gave up the right to review Theranos's clinical data or financial records.

**D.     Defendants Intentionally Concealed the Truth From Consumers**

65. Theranos, Walgreens, Balwani, and Holmes each intentionally concealed known problems regarding Theranos testing equipment and facilities, and regarding the unreliability and un-readiness of Theranos testing. The information that each of the Defendants concealed was highly material information, and included information pertinent to both the Edison technology and non-Edison tests.

66. For example, each of the Defendants knew, but concealed, that: (a) Theranos's laboratories were not in compliance with federal guidelines; (b) Theranos's Edison device lacked regulatory approval; (c) with the exception of a single approved test, Theranos tests had not been approved by the FDA despite attempts to get such approval for more than 100 tests; (d) internal testing and data showed that Theranos's technology, including but not limited to Edison, was unreliable; (e) Theranos's testing equipment,

---

[28] John Carreyrou, *Safeway, Theranos Split After $350 Million Deal Fizzles*, Wall St. J. (Nov. 10, 2015) (Ex. 8).

including Edison, had failed proficiency testing and Theranos manipulated the testing

process in an attempt to cover that up; (f) for some tests that were to be conducted on

"tiny" blood samples, Theranos even went so far as to *dilute* the samples prior to

conducting the "tests"; (g) Theranos testing was not ready-for-market; (h) the Edison

technology was still in development and not nearly in a position to serve the purpose, and

not intended by Theranos and Walgreens to serve the purpose, of legitimate blood testing;

(i) the consumers subjected to the "tiny" blood draws were being used, in essence, to

experimentally beta test Edison and for other research and product development purposes;

(j) inspections by regulators had revealed a wide range of serious deficiencies at

Theranos; and (k) Walgreens had identified numerous red flags regarding the reliability of

Theranos testing, but had nevertheless gone ahead with offering the tests in its stores

while deliberately failing to conduct any meaningful investigation or to follow up

regarding the problems and concerns identified.

67.     With respect to the undisclosed material information, all such information

was known by Theranos.  Theranos knowingly engaged in and assisted the concealment of

material information as alleged herein.

68.     With respect to the undisclosed material information, all such information

was known by Walgreens and/or would have been known but for Walgreens' deliberate

choice to ignore and/or not obtain such information or conduct a reasonable investigation.

Walgreens knowingly engaged in and assisted the concealment of material information as

alleged herein.

69.     Holmes and Balwani were personally privy to the material undisclosed

information by virtue of their extensive, hands-on involvement in these matters and their

respective roles as leader and second in command, at Theranos.  Holmes and Balwani

knowingly engaged in and assisted the concealment of material information as alleged

herein.

70.     All of the Defendants went to great lengths to conceal the truth about

Theranos testing.  For example, Theranos refused to allow its Edison device to be

photographed; would not permit peer review of its testing or technology, even though that is customary in the medical testing and health care industry; and refused to even provide meaningful explanations when asked about how its technology worked. All of the Defendants affirmatively covered up reliability problems when they were identified internally, and concealed and downplayed the fact that Theranos and Walgreens had phased out, and then ultimately discontinued entirely in or around the summer of 2015, use of the "tiny" blood draws and Edison, a decision, on information and belief, that was related to increased regulatory scrutiny of the Edison technology.

71.     When the discontinuation of the Edison device occurred, Holmes, for example, misrepresented the reason.[29] Walgreens, via its divisional vice-president, Nimesh Jhaveri, told reporters: "TRUST me. If the results are not there we would hear."[30]

72.     When concerns were raised internally by Theranos employees, Theranos executives minimized, mocked, and threatened the employees.[31] And when media outlets began questioning things, Theranos and Holmes repeatedly attacked the sources and falsely denied there were any problems. For example, when the *Wall Street Journal* published a story raising alleged issues about Theranos testing in October 2015, Theranos responded by issuing a press release which stated, in part: "Today's Wall Street Journal story about Theranos is factually and scientifically erroneous and grounded in baseless assertions by inexperienced and disgruntled former employees and industry

---

[29] In an interview at Fortune's Global Forum on November 2, 2015, Holmes claimed she "was the person who chose, voluntarily, to stop using our nanotainer tubes" and that it was the "decision to transition our systems to the FDA framework, which led us right now, as of this moment, for the last few weeks only, to run just one test" using the finger-stick and nanotainer collection method. "Temporarily," she emphasized, "as we transition, which has now been just a few weeks, we would not be using that [nanotainer] tube to collect our samples." Recorded interview available at http://fortune.com/2015/11/02/theranos-elizabeth-holmes-fda/ (last visited Oct. 20, 2017).

[30] *Blood Sports*, *supra* n.19.

[31] John Carreyrou, *Theranos Whistleblower Shook the Company—And His Family*, Wall St. J., (Nov. 16, 2016.) (Ex. 9).

incumbents."[32]  On Twitter, Theranos and Holmes claimed: "We got FDA clearance of the exact system that @WSJ is questioning"; "3.5 million successful tests, tens of thousands of patients, 1 article w/ anonymous sources"; and "We offered to bring our technology to @WSJ offices… and they denied that request to show it to them."[33] Theranos further disseminated the following via Twitter:[34]





73.     Each of the Defendants intentionally concealed material information from Plaintiffs and the proposed Class members.

74.     Walgreens, Theranos, Holmes, and Balwani each had a duty to Plaintiffs and the proposed Class members, all of whom were consumers of Theranos "tests," to disclose material information concerning the unreliability of Theranos testing, the true state of Edison, and the true purposes of the "tiny" blood draws.  Defendants breached their duty.

---

[32] Press Release, Theranos, Inc., *Statement from Theranos* (Oct. 15, 2015) (Ex. 10).

[33] Archived Twitter page of Elizabeth Holmes, @*eholmes2003*, retweeting posts by Theranos (@*Theranos*) dated Oct. 15, 2015; Oct. 16, 2015, available at https://archive.is/iMEhb (last visited Oct. 20, 2017).

[34] Twitter, @Theranos, https://twitter.com/theranos (at Oct. 21-22, 2015) (last visited Oct. 10, 2017).

75.     The information Walgreens, Theranos, Holmes, and Balwani did not disclose was within the exclusive possession of Defendants, who were in a position of significantly far superior knowledge, particularly in light of their concealment of information.

76.     Moreover, the scientific and technical nature of blood and other clinical testing is such that each of the Defendants knew that consumers depended and relied on Defendants to provide accurate and complete material information for the consumers' use in making decisions.

77.     The Defendants' duties to disclose also arose from the fact that they made numerous misleading and/or partial statements to consumers and the public about and suggesting, *inter alia*, the readiness, quality, reliability, and regulatory approval and compliance of Theranos testing.  In promoting Theranos testing, Defendants (including Theranos, Walgreens, and Holmes and Balwani personally) repeatedly made statements, in marketing and elsewhere, suggesting that the testing was accurate, reliable, and of the highest-quality.  Each Defendant also expressly stated and implied that Theranos testing was validated by, and compliant with, federal regulations and guidelines.  Defendants had a duty to disclose material information regarding the unreliability of Theranos testing and the fact that such testing was not ready-for-market, because Defendants' affirmative representations were misleading and likely to deceive consumers in the absence of full disclosure.

78.     Defendants' duty to disclose also arose from the very nature of the information in question.  Given the critical role that blood testing and other clinical testing plays in monitoring one's health and in making health and treatment decisions, and the corresponding importance of consumers' ability to rely on their test results, Theranos, Walgreens, Holmes and Balwani each knew that the information not disclosed was highly material and that reasonable consumers would not have entered into the transactions in question, and would not have agreed to have their blood drawn and "tested" by Theranos or Walgreens, had the true information about Theranos testing been disclosed, and knew

that consumers submitting to Theranos blood testing were doing so based on mistaken facts, without material information and, in fact, with misleading information disseminated by Defendants.

**E.**   **Defendants Falsely Promoted Theranos Testing as Reliable and Made Other Affirmative Misrepresentations**

79.   Not only did Theranos, Walgreens, Holmes, and Balwani all conceal material information, but each of them made material affirmative misrepresentations as well.

80.   Leading up to and throughout the time blood draws were being administered at the Walgreens stores and other Wellness Centers, Theranos and Walgreens engaged in a pervasive marketing campaign promoting the testing services—including specifically promoting the "tiny" blood test technology throughout the time "tiny" blood draws were being administered—to consumers and medical professionals.  This broad marketing campaign, including the content thereof, was jointly designed, approved, and implemented by Theranos and Walgreens, such that the representations made pursuant to this broad campaign are appropriately attributable to both companies.

81.   This marketing was pervasive throughout the geographic areas where the Theranos testing services were offered, and included signs and materials in the Walgreens stores and Theranos Wellness Centers where the services were sold, prominent billboards, electronic advertisements, advertisements on the Theranos and Walgreens websites, television and social media-based commercials, and at the Phoenix Sky Harbor International Airport.[35]

82.   As a story in Newsweek summarized it:  "In 2015, advertisements for Theranos—which promised comprehensive biometric data using only a few drops of blood—were everywhere in Arizona. They were on television during commercial breaks and on billboards along Interstate 10 through Phoenix. They were above Phoenix Sky

---

[35] Seung Lee, *Arizona: Where Theranos Still Has a Friend*, Newsweek (June 14, 2016) (Ex. 11).

Harbor International Airport terminals and pharmacy aisles in Walgreens stores. They shared the message that Theranos was here to revolutionize medical lab tests and advocate on behalf of Arizonans' right to know their own bodies."[36]

83.     Theranos's and Walgreens' marketing campaign was so pervasive that all Plaintiffs and members of the proposed Class, and their medical providers, were exposed to them.  Walgreens and Theranos intended for consumers, the public at large, and medical providers, including in the pertinent geographic areas, to be exposed to this marketing and to rely on it.

84.     Plaintiffs and the Class were exposed to this marketing campaign and reasonably relied on it.

85.     Absolutely fundamental, at the very center of *all* of this broad marketing campaign (indeed, the ***entire premise*** of the marketing), was the portrayal—both explicitly and implicitly—of the "tiny" blood draws, and of the services generally, as being market-ready and for legitimate testing purposes.  Through this marketing, Theranos and Walgreens promoted the services as providing reliable test results, and encouraged consumers to have their blood drawn for that purpose.

86.     At the very least, with respect to the "tiny" blood draws and Edison, these representations and portrayals were untrue, and Theranos and Walgreens knew it, since Edison was still in-development and nowhere near ready to serve the purpose of legitimate blood testing.

87.     For example, during the time the "tiny" blood draws were being offered and administered, Theranos and Walgreens caused the following prominent billboards to be erected in high-visibility areas in Arizona:

---

[36] *Id.*







88.    During the time the "tiny" blood draws were being offered and administered, Theranos and Walgreens also disseminated mass advertising in the relevant geographic area, promoting the "tiny" blood "tests" through targeted online and mobile advertisements, including ads that provided consumers with the location of nearby Walgreens stores where they could get these blood "tests."  For example:





89.     Theranos and Walgreens broadly distributed leaflets in the pertinent geographic areas, prominently featuring the Walgreens logo, advertising "the blood tests that just need a tiny sample," and providing the location of the local Walgreens where consumers could get these services, where on arrival they should "Check in at the pharmacy at Walgreens."





90.    At the Walgreens stores and Theranos facilities where the services were being offered, Theranos and Walgreens hung large, highly visible signs promoting the "testing" services.  An example of one of these signs at a Walgreens store, typical of what was used throughout the time the services were being offered, is below.



91.    Customers who visited the Walgreens stores and Theranos Wellness Centers when the "tiny" blood draws were being offered, received a brochure provided by Walgreens and Theranos, stating the "blood tests that need just a tiny sample," and showing a picture of the nanotainer device:



92.     Throughout the time that the "tiny" blood "tests" were being offered in Walgreens stores, Walgreens' website promoted the "blood tests" that could be run on "just a tiny sample," alongside images of the "tiny" collection vials, and stating that the technology supported "better, more informed treatment."

93.     Walgreens' website further claimed, during this same time period, that Theranos's "high-complexity CLIA-certified laboratory can perform your tests quickly and accurately using tiny samples," and "can perform tests on any sample type, including blood, urine, and other samples. It's fast, easy, and the highest level of quality." Walgreens' website further touted that consumers could fit these "tests" into their "busy schedule" because they were available at local Walgreens' locations.



94.    On another advertisement on its website during this same time period, Walgreens stated that Theranos had "reinvented" testing with its technology, directly benefiting consumers of this testing by dramatically reducing the time it takes to analyze samples because its technology enabled a "more timely diagnosis to support better, more informed treatment."[37]

---

[37] Walgreens website, *Theranos, the Lab Test, Reinvented* (archive, Apr. 7, 2016), https://web.archive.org/web/20160407050109/http://www.walgreens.com/pharmacy/lab-testing/home.jsp (last visited Oct. 20, 2017).

95.    Other marketing materials by Theranos and Walgreens that appeared on the Theranos website, in the Walgreens stores and Theranos Wellness Centers, and elsewhere throughout the time the "tiny" blood draws were being administered, specifically highlighted the "tiny blood test" technology and described Theranos and Walgreens' offerings as "revolutionary" and a "new way" of testing.  For example:



96.    Similarly, according to reports, until at least October 2015, promotional materials from Theranos promised that "usually only three tiny micro vials" of blood would be collected "instead of the six or more large ones," because "many" of Theranos's tests required no more than "a few drops of blood."[38]  Theranos reportedly deleted the highlighted portions of the materials below in mid-2015 to supposedly improve its "marketing accuracy," after it moved away from Edison testing following a surprise inspection by the FDA:[39]

---

[38] John Carreyrou, *Hot Startup Theranos Dials Back Lab Tests at FDA's Behest*, Wall St. J. (Oct. 16, 2015) (Ex. 16).

[39] *Id.*

97.      Theranos and Walgreens also widely disseminated social media commercials and television commercials, directed at consumers in Arizona and California, during the time the "tiny" blood draws were being administered, promoting to consumers the "tiny" blood technology and the reliable blood tests that could be run using same. These commercials encouraged patients to rely on Theranos test results, including from "tiny" blood draws, to make decisions concerning their health, for example by suggesting that patients could get "the information that [they] needed to know what to do for [themselves] and for [their] bodies" from a finger-stick blood draw.[40]  The exact timing when these advertisements aired is within the knowledge of Theranos and Walgreens, but

---

[40] *See, e.g.*, Twitter @Theranos, "*Hear Channing talk about how her thyroid testing was expensive and difficult, and how we offer a better solution*" https://twitter.com/twitter/statuses/609464419811078144 (last visited Oct. 20, 2017) (demonstrating a tiny blood draw).

on information and belief they aired for at least a substantial portion of the time the "tiny" blood draws were being administered.

98.     In addition to the signs at the Walgreens stores and Theranos Wellness Centers, Walgreens and Theranos provided materials in the stores regarding the services that likewise clearly portrayed the services as being for legitimate and reliable testing purposes.  These materials are described in more detail below.

99.     In close proximity to their introduction of the "tiny" blood "testing" at the Walgreens stores, Theranos and Walgreens also issued joint press releases that were intended for mass distribution, and which received considerable general media coverage in the pertinent geographic areas and in the medical press.

100.    When the Theranos-Walgreens partnership was publicly announced in September 2013, a joint press release from Theranos and Walgreens stated that the deal would offer consumers access to "less invasive and more affordable clinician-directed lab-testing, from blood samples as small as a few drops, or 1/1000 the size of a typical blood draw."  The joint press release touted Theranos's "CLIA-certified laboratory services," and promised that its "proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results."

101.    It further stated, "[t]his is the next step in Walgreens' efforts to transform community pharmacy, giving our patients and customers convenient access to the comprehensive care they need, right in their communities."[41]

102.    In November 2013, Theranos and Walgreens issued another joint press release, announcing the opening of Theranos Wellness Centers in Walgreens stores in Arizona, which repeated the claims about "micro-samples, collected by certified phlebotomists or trained Walgreens technicians" would "enable[e] fast diagnoses to help make informed treatment choices."[42]

---

[41] *Id.*

[42] *Theranos and Walgreens Expand Diagnostic Lab Testing* (Ex. 6), *supra*, n.8.

103.    That same month, on or around November 27, 2013, in an interview by Fox Business News, which portrayed Theranos tests as "more efficient and more accurate" than other lab tests, and featured images of the "nanotainer" device, Holmes stated that Theranos was "able to make it possible to do any of our laboratory tests from a tiny droplet of blood . . . [and had] now changed the experience for people everywhere . . . ."[43]



104.    At the very least, the two companies' pervasive marketing campaign and other representations were false and misleading as to Edison and the "tiny" blood draws, given the true state of Edison and true intended purposes of these blood draws, as alleged herein.

105.    Additionally, for both Edison and non-Edison consumers, Theranos and Walgreens aggressively promoted Theranos testing services throughout the time the services were being offered, encouraging consumers and their doctors to rely on the test results in making critical health and treatment decisions.  In addition to the pervasive marketing and joint press releases and statements described in the above paragraphs, the

_____

[43] Fox Business News, *Betting Big on Lab Tests* (Nov. 27, 2013), available at http://video.foxbusiness.com/v/2874150095001/betting-big-on-lab-tests/ (last visited Oct. 20, 2017).

two companies made other pervasive representations designed to give the false impression to consumers and medical providers that Theranos testing was reliable and accurate, compliant with and certified by government guidelines, of the highest quality, and could and should be used in making health and treatment decisions.

106. These or similar representations were prominent and persisted throughout the time the testing services were offered by Theranos and Walgreens.

107. For example, in the following marketing that appeared on Theranos's website and in the Wellness Centers, Theranos and Walgreens touted that their testing services would help patients "evaluate" health issues and to screen for diseases:



108. Theranos's marketing further stated that "[w]e continuously conduct proficiency testing and participate in multiple proficiency testing programs," and that all "tests are developed and validated under and to the CLSI, FDA Centers for Disease Control, and World Health Organization guidelines."

109. On its website, Theranos advertised that Theranos testing was of "the highest levels of accuracy," and that the tests were "validated" under and in compliance with federal regulations and guidelines:



110.    Theranos's website also advertised that Theranos's test results could be relied on by consumers and their doctors in making health decisions, that they provided "actionable health information at the time it matters" to consumers, and that they "lead the industry in transparency and quality."



111.     Walgreens' website stated that the Theranos technology supported "better, more informed treatment."[44]  The Theranos website similarly claimed that Theranos's "laboratory can perform your tests quickly and accurately on samples as small as a single drop."

112.     Throughout its partnership with Theranos, Walgreens endorsed the information on Theranos's website, directing its customers to visit www.theranos.com for more information.[45]

113.     At Wellness Centers where Theranos tests were offered, including in Walgreens stores, Theranos and Walgreens prominently placed disclosures that touted that Theranos's "CLIA-certified laboratory can perform your tests quickly and accurately using tiny samples."

114.     Similar, additional representations were made by Theranos and Walgreens at the Wellness Centers to consumers at the point of purchase.  To obtain one or more of the testing services offered by Walgreens and Theranos, customers who did not have an order from their healthcare provider for laboratory tests needed to complete a one-page "Theranos direct testing order form."  (Ex. 11).  The testing services were marketed and sold directly to consumers, as explained in the pamphlet "a guide to direct testing."  (*Id.*).  The Theranos testing order form and guide to direct testing pamphlet both of which were approved by both Theranos and Walgreens, contained further representations and promises that Theranos tests were reliable and could and should be used in medical treatment decisions and other health decisions.  For example, the testing order form encouraged consumers to consult with their doctors for "interpretation of the test results."  The guide to direct testing touted that the Theranos tests would allow consumers to "own

---

[44] Walgreens website, *Theranos, the Lab Test, Reinvented* (archive, Mar. 30, 2014; Apr. 6, 2016), available at
https://web.archive.org/web/20140330223244/http://www.walgreens.com/pharmacy/lab-testing/home.jsp (last visited Oct. 20, 2017);
https://web.archive.org/web/20160407050109/http://www.walgreens.com/pharmacy/lab-testing/home.jsp (last visited Oct. 20, 2017).
[45] *Id.*

your own health like never before," allow consumers to "get vital information about their health when it matters most," allow them to "become better informed earlier" and enable them to "work with their physician to be proactive and address potential problems sooner." The guide also stated that consumers could use Theranos test results to monitor their vital health issues such as "monitor[ing their] thyroid, blood glucose, sexual health, and more," and directed consumers to consult with their physicians using the test results once they received them.

115. These same themes were advanced and highlighted in the joint press releases by Theranos and Walgreens and in other statements to mainstream and industry media by Theranos, Walgreens, Holmes, and Balwani, described above, including the theme that Theranos testing was government approved and reliable. By way of example only:

> a. *Theranos Files Comment In Support Of Food and Drug Administration Oversight Of Laboratory-Developed Tests* (Mar. 6, 2015) ("[We] believe that FDA oversight plays a critical role in ensuring that individuals and their physicians get the most accurate test results….there are limits on the adequacy of the peer review system….That is why we will continue to submit our work to the FDA and why we believe the decision to do so is essential in providing accurate results for individuals and patients.") (Ex. 13).
>
> b. Theranos receives FDA clearance and review and validation of revolutionary finger stick technology, test, and associated test system (July 2, 2015) (Ex. 14).
>
> c. *Theranos Receives CLIA Waiver, Paving the Way for Greater Accessibility of Health* Information *at the Time and Place it Matters* (July 16, 2015) ("FDA has concluded that the Theranos test and technology is eligible for waiver under CLIA. The waiver means FDA determined the Theranos test and technology is reliable and

accurate and can be used in a broader set of locations outside of a traditional CLIA certified laboratory, including Theranos Wellness Centers.") (Ex. 15).

    d.    Holmes told *The New Yorker* that Theranos "ha[s] data that show you can get a perfect correlation between a finger stick and a venipuncture for every test that we run."[46] Holmes knew that statement to be false and misleading when she made it.

    e.    Walgreens CFO, Wade Miquelon, told *The Arizona Republic* that Theranos could perform tests "more accurately" than traditional blood tests.[47]

116.    This advertising served another purpose as well: to lobby the State of Arizona to pass a law allowing consumers to purchase a blood test without a healthcare provider's order. Theranos's lobbying and advertising efforts were successful and the bill was signed in April 2015, despite opposition from the Arizona Medical Association. At the bill's signing, Holmes stated that "Theranos is about access—eliminating the need for painful needles and vials of blood, replacing that with tiny samples taken in convenient locations at convenient hours of operation, always for a fraction of the cost charged elsewhere—to build a health care system in which early detection and prevention become reality. That is why we worked to pass this law; it is why we believe Arizona's law can and should serve as a model for the nation for direct access testing."[48] The law also allowed laboratories to provide blood test results directly to patients, bypassing involvement by doctors, who are trained to question unusual results.

---

[46] Ken Auletta, *Blood, Simpler, supra* n.6.

[47] Ken Alltucker, *Get Your Blood Tested at the Store*, The Arizona Republic (Nov. 13, 2013), available at http://archive.azcentral.com/business/news/articles/20131113get-your-blood-tested-store.html (last visited Oct. 20, 2017).

[48] Press Release, Theranos, Inc., *Theranos Founder and CEO Elizabeth Holmes Speaks at Arizona Bill Signing*, (Apr. 6, 2015) (Ex. 17).

117. Walgreens and Theranos jointly marketed Theranos testing services to consumers. Decisions about the joint marketing campaign and about the other representations described herein were made by both Theranos and Walgreens.

118. Holmes and Balwani also knowingly engaged in, assisted the dissemination of, and were at all times aware of, false and misleading representations as alleged herein.

119. Walgreens and Theranos knew and intended for consumers to rely on their representations, knew that, by the very nature of blood tests and also based on their representations, consumers who purchased and submitted to the blood draws did so under the belief that such blood draws were for legitimate and reliable testing purposes and would reasonably expect the test results they received to be reliable. Further, Walgreens occupies a special position of trust as a well-established pharmacy entity, as CMO and Group VP of Walgreens Dr. Harry Leider observed in November of 2015: "Everybody knows Walgreens . . . We have 8,300 stores, 25,000 pharmacies, and over 1,000 nurse practitioners in our clinics."[49] Defendants accordingly knew that the Theranos partnership with Walgreens, the imprimatur of Walgreens including via the advertisements, and the presence of Wellness Centers in Walgreens stores, would further lead customers to believe that the Theranos tests were reliable and trustworthy.

## F.    Theranos Tests Were Unreliable and Dangerous

120. Theranos's and Walgreens' pervasive marketing and other representations described herein, including but not limited to: (a) their fundamental portrayal of the "tiny" blood draws as being for legitimate testing purposes; and (b) their representations and suggestions that Theranos tests were reliable and complaint with CLIA and other federal guidelines, were knowingly false and misleading.

121. In fact, each of the Defendants knew, at all relevant times, that: (a) the Edison technology was still in development and not ready-for-market, and not nearly in a

---

[49] Tom Salemi, *Walgreens: Investing in the Power of the Patient*, Healthegy.com (Nov. 11, 2015), available at https://www.healthegy.com/walgreens-investing-in-the-power-of-the-patient/ (last visited Oct. 20, 2017).

position to serve the purpose, and not intended by Walgreens and Theranos to serve the purpose, of providing reliable blood test results (i.e., "legitimate blood testing"); (b) the true essential nature and purpose of the "tiny" blood draws that subjects submitted to was not, and could not have been, legitimate blood testing; and (c) Theranos testing (including Edison and non-Edison) was decidedly unreliable and posed a serious danger to any consumer who might rely on it.

122.  Each of Walgreens, Theranos, Holmes, and Balwani knew this information to be the case at all relevant times, and yet represented otherwise to consumers and/or concealed that material information from consumers for years, as alleged herein.

123.  Theranos, Holmes, and Balwani also specifically concealed this information from regulatory authorities.  For example, in order to maintain CLIA certification, laboratories are required to administer "proficiency testing" of samples provided by CMS in order to prove that they can produce accurate results.  According to reports, Theranos split some of the proficiency-testing samples it got into two pieces: One was tested with Edison machines and the other with instruments from other companies.  When Theranos lab employees asked Balwani, by email, which results should be reported back to test administrators and the government, he replied, copying Holmes, that "samples should have never run on Edisons to begin with."[50]  Balwani reportedly ordered lab personnel to stop using Edison machines on any of the proficiency-testing samples and report only the results from instruments bought from other companies.  The former employees say they did what they were told but were concerned that the instructions violated federal rules, which state that a lab must handle "proficiency testing samples…in the same manner as it tests patient specimens" and by "using the laboratory's routine methods."[51]

124.  Throughout the more than one year that "tiny" blood draws were being administered in the Walgreens stores and Theranos facilities, the Edison technology was

---

[50] *Hot Startup Has Struggled* (Ex. 3), *supra* n.5.

[51] *Id.*

not yet beyond the prototype stage, was not ready-for-market, and was nowhere near in a position to serve the purpose of legitimate blood testing.

125.    Moreover, none of the Theranos tests (including non-Edison) were fit for their ordinary purposes and the purposes for which they were sold.

126.    Theranos tests were neither conducted in conformity with CLIA regulations, nor "validated" under or compliant with federal guidelines, as represented.

127.    Any consumer who had a Theranos test (including non-Edison) could not reasonably rely on the results of such test in light of the litany of problems that have now come to light.

128.    As Theranos, Holmes, and Balwani knew, and Walgreens knew and/or would have known at the time had it not deliberately ignored the details and conducted a reasonable inquiry, Theranos did not have the necessary FDA approval, known as a CLIA waiver, to use the Edison device for conducting on-site blood testing at the Wellness Centers, with the sole exception of a single test (Herpes Simplex HSV-1), for which Theranos obtained approval in July 2015.[52]  Theranos sought FDA approval for more than 120 of its tests, none of which have been approved at this time.[53]

129.    By the end of 2014, Theranos employees reported using the Edison device for only 15 out of 205 tests.[54] By or around the summer of 2015, Theranos and Walgreens stopped administering "tiny" blood draws altogether, a decision that, on information and belief, coincided with increased scrutiny by regulators of the unready Edison technology.[55]

---

[52] Press Release, Theranos, Inc., *Statement from Theranos* (Oct. 28, 2015) (Ex. 18); Lauren F. Friedman, *Controversial Multibillion-Dollar Health Startup Theranos Just Got a Huge Seal of Approval from the US Government* (July 2, 2015), available at http://www.businessinsider.com/theranos-gets-fda-approval-2015-7 (last visited Oct. 20, 2017).

[53] Roger Parloff, *A Second FDA Approval Frees Theranos to Do a Blood Test Outside Lab*, Fortune (July 16, 2015), available at http://fortune.com/2015/07/16/fda-clears-theranos-to-do-test-outside-lab/ (last visited Oct. 20, 2017).

[54] *Hot Startup Has Struggled* (Ex. 3), *supra* n.5.

[55] Beth Mole, *Theranos Throws in the Towel on Clinical Labs, Officially Pivots to*

*Footnote continued on next page*

130.     In a report detailing objectionable conditions at Theranos dated September 16, 2015, the FDA informed Theranos that, among other things, the agency considered the Edison devices to be uncleared medical devices being shipped in interstate commerce between California, Arizona, and Pennsylvania.[56]

131.     Because Theranos did not have FDA approval to conduct tests on the Edison device outside of a laboratory setting (with the limited exception for HSV-1 noted above, which approval did not even come until after or around the time Theranos and Walgreens stopped administering the "tiny" blood draws and using Edison), when Walgreens and Theranos drew "tiny" blood samples at the Wellness Centers, the samples obtained then had to be shipped to one of two centralized labs, either in Newark, California, or Scottsdale, Arizona.  The proprietary Edison devices were only located in the Newark laboratory.  Accordingly, on information and belief, all the finger stick blood samples were analyzed at the Newark facility, with the potential exception of a limited number of samples that Theranos may have, remarkably, *diluted*.[57]  In all, tens of thousands of "tiny" blood draws were conducted on consumers in the Walgreens and Theranos Wellness Centers before the "tiny" blood draws were discontinued in 2015.  The vast majority of these "tiny" blood draws occurred at Walgreens stores.

132.     The Scottsdale Lab only performed analyses on venipuncture tests. According to reports, over 90 percent of Theranos's testing was done at its Scottsdale lab. Of the universe of venipuncture tests, Theranos has also disclosed that it outsourced a limited number of "highly complex" tests to third-party, university-affiliated labs.

---

*Footnote continued from previous page*
*Devices*, Ars Technica (Oct. 5, 2016), available at http://arstechnica.com/science/2016/10/theranos-throws-in-the-towel-on-clinical-labs-officially-pivots-to-devices/ (last visited Oct. 20, 2017).

[56] Department of Health and Human Services, Form FDA-483 (Inspection Report) (Sept. 16, 2015), available at http://www.fda.gov/ucm/groups/fdagov-public/@fdagov-afda-orgs/documents/document/ucm469395.pdf (last visited Oct. 20, 2017).

[57] *Hot Startup Has Struggled* (Ex. 3), *supra* n.5.

133. In the context of a regulated laboratory, Theranos did not need FDA approval to perform testing using the Edison devices (because they were not selling the Edison devices), so long as Theranos's lab operations were in compliance with federal guidelines and met proficiency testing and other safeguards. However, the labs that Theranos used failed to comply with such testing and guidelines.

134. Statements by Walgreens, Theranos, Balwani, and Holmes—that testing was accomplished through proprietary analysis, which was accurate and compliant with federal regulations and guidelines—were false, both as to the Edison-device tests and the other tests. Simply put, the consumers who submitted to "tiny" blood draws did so under entirely false pretenses and mistaken as to the essential nature and purpose of what their blood draws were about, and no consumer who submitted to a Theranos blood draw (Edison or non-Edison) received what they paid for and what they reasonably expected. None of them could reasonably rely on the test results they received, in light of the litany of problems that have come to light.

## G. Defendants' Fraudulent Scheme Unravels

135. In March 2014, a former Theranos employee alleged to New York State's public-health lab that Theranos may have manipulated the proficiency testing process, in part by intentionally excluding data that showed Theranos's technology to be unreliable.[58] The New York State lab responded that the practices described would be a "violation of the state and federal requirements," and forwarded the allegations to the Centers for Medicare and Medicaid Services ("CMS").[59]

136. In April 2015, Arizona Department of Health Services inspectors identified multiple deficiencies at Theranos's Scottsdale laboratory, including serious issues with Theranos's proficiency testing.[60] For example, in the Scottsdale facility, regulators found

---

[58] *Whistleblower Shook the Company* (Ex. 9), *supra* n.31.

[59] *Hot Startup Has Struggled* (Ex. 3), *supra* n.5.

[60] Ken Alltucker, *Arizona Inspectors Find Theranos Lab Issues*, The Arizona Republic, (Nov. 30, 2015), available at http://www.azcentral.com/story/money/business/consumers/2015/11/27/arizona-

*Footnote continued on next page*

SECOND AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT
CASE NO. 2:16-CV-2138-HRH

that Theranos used mis-programmed machines to evaluate blood coagulation tests, failed to properly gauge water purity in machines it used, and failed to meet laboratory quality standards.

137. In September 2015, a former Theranos lab employee filed a complaint with CMS alleging that Theranos instructed lab employees to keep testing patients with the Edison devices despite indications of "major stability, precision and accuracy" problems with those devices.[61]

138. In October 2015 the FDA released inspection reports of Theranos declaring the nanotainer to be an "uncleared medical device." The investigation also found deficiencies in Theranos's processes for handling customer complaints, monitoring quality and vetting suppliers.[62]

139. In January 2016, CMS cited the Theranos Newark, California lab for multiple serious deficiencies. Among other things, the report stated that in October 2014, 29 percent of quality control checks performed on the Edison devices produced results outside the acceptable range, and that in February 2015, quality checks on an Edison test measuring a hormone affecting testosterone levels failed 87 percent of the time.

140. The letter from CMS, dated January 25, 2016, noted that, based on a December 2015 survey, Theranos was found to be out of compliance with five CLIA Condition-level requirements, at least one of which posed "immediate jeopardy to patient health and safety," meaning the condition had "already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or the health and safety of the general public."[63]

*Footnote continued from previous page*
inspectors-find-theranos-lab-issues/76021416/ (last visited Oct. 20, 2017).

[61] John Carreyrou, *U.S. Probes Theranos Complaints*, Wall St. J. (Dec. 20, 2015) (Ex. 19).

[62] *Id.*

[63] Carolyn Y. Johnson, *Deficiencies at Theranos 'Pose Immediate Jeopardy to Patient Health,'* Washington Post (Jan. 27, 2016), available at https://www.washingtonpost.com/news/wonk/wp/2016/01/27/regulators-find-deficiencies-at-theranos-that-pose-immediate-jeopardy-to-patient-health/ (last visited Oct. 20, 2017).

141. Inspection reports found that Edison devices in the lab often failed to meet even the Company's own accuracy requirements, including a test to detect prostate cancer. In one report, inspectors found that 81 of 81 final patient results of a blood clotting test reported to patients on the blood thinner Warfarin were not accurate.[64]

142. In addition, the FDA observed that there were no quality audits being performed at Theranos's Newark lab (where the Edison devices were located), in contravention of FDA regulations.[65]

143. At the very time that each of the Defendants were widely touting Theranos's compliance with federal regulations, Theranos had been repeatedly sanctioned by federal authorities for non-compliance, yet Defendants failed to disclose that fact and in fact continued to represent that there were no problems. After CMS issued findings regarding the Newark facility, Theranos made statements to reassure the public that its Scottsdale, Arizona facility was "not impacted" by the CMS findings and Theranos remained "open for business, confident in our technologies, and unwavering in our commitment to provide Arizonans with the care and service they deserve."[66]

144. On March 18, 2016, Theranos received another letter from CMS referenced, "RE: PROPOSED SANCTIONS - CONDITIONS NOT MET IMMEDIATE JEOPARDY," which stated that the Company had not remedied the deficiencies identified by CMS in its January letter. Outlining Theranos's failures to meet quality-control standards, such as improper freezer temperatures, lack of proper documentation, improper equipment calibration, and unqualified personnel, CMS notified Theranos that it was out

---

[64] Andrew Pollack, *Report Shows Theranos Testing Plagued by Problems,* N.Y. Times (Mar. 31, 2015), available at http://www.nytimes.com/2016/04/01/business/report-shows-theranos-testing-plagued-by-problems.html?_r=0 (last visited Oct. 20, 2017).

[65] Department of Health and Human Services, Form FDA-483 (Inspection Report) (Sept. 16, 2015), available at http://www.fda.gov/ucm/groups/fdagov-public/@fdagov-afda-orgs/documents/document/ucm469395.pdf (last visited Oct. 20, 2017).

[66] Geoff Weiss, *Walgreens Pumps the Brakes on Theranos Partnership Amid Problematic Lab Audit*, Entrepreneur (Jan. 28, 2016), available at https://www.entrepreneur.com/article/270154 (last visited Jan. Oct. 20, 2017).

of compliance with accepted clinical laboratory standards, still had not established compliance with the CLIA requirements previously identified, and had not demonstrated that the laboratory had "abated immediate jeopardy." Notice of Sanctions pursuant to the Clinical Laboratory Improvement Amendments of 1988 (CLIA) was provided.[67]

145.    As these reports indicate, Theranos's laboratory operations in both Scottsdale and Newark were found to be deeply flawed and deficient by government regulators. According to published reports, at Theranos's Scottsdale lab, the Company performed lab tests with certain Siemens lab equipment programmed to the wrong settings, and failed to adequately gauge the purity of the water input into Siemens lab equipment, which could affect the outcome of the results of testing run on such devices.

146.    The personnel in charge of operating Theranos's laboratories were dangerously underqualified. For example, the Director of Theranos's Newark laboratory was Dr. Sunil Dhawan, a dermatologist who had no prior experience running a blood lab.

147.    A peer-reviewed study published March 28, 2016 by researchers at the Icahn School of Medicine at Mount Sinai showed that results for cholesterol tests done by Theranos differed enough from the two largest laboratory companies that it could negatively impact patient care.

148.    Regardless, Defendants continued to conceal this critical information, to falsely market Theranos testing services as accurate and reliable, and to encourage consumers to use Theranos test results to make decisions about their health and treatment.

149.    In April 2016, Theranos revealed that it was under investigation by the U.S. Department of Justice as well as the Securities and Exchange Commission, and that the Department of Justice had requested documents. Walgreens and the New York State

---

[67] CMS, *Notice of Proposed Sanctions* (Mar. 18, 2016), available at http://www.wsj.com/public/resources/documents/hhslettertheranos.pdf (last visited Oct. 20, 2017).

Department of Health also received subpoenas. Investigators are also examining whether Theranos misled government officials.[68]

150. On June 30, 2016, members of the House Energy and Commerce Committee requested briefing from Theranos regarding Theranos's failure to comply with federal regulatory standards governing clinical laboratory testing, and the resulting impact on patients nationwide. The Committee expressed concern over "Theranos's disregard for patient safety and its failure to immediately address concerns by federal regulators," and requested "information about how company policies permitted systematic violations of federal law."[69]

151. On July 7, 2016, CMS issued a 33-page Notice to Theranos executives stating that it was revoking the CLIA certificate of Theranos's Newark laboratory and banning the owners and operator(s) of Theranos, including Holmes and Balwani, from owning or running a lab for at least two years. Citing deficiencies in Theranos's training of lab personnel, quality assurance, and procedures for assessing the "patient impact" of its proficiency testing, among other shortcomings, CMS also threatened to impose a monetary penalty of $10,000 per day for each day of non-compliance.[70]

152. As a result of revelations regarding problems with Theranos's technology and laboratory standards, Theranos test results have lost all credibility within the medical community. Dr. Geoffrey Baird, a pathology professor at the University of Washington, reportedly said about Theranos: "I'm incredibly confused by what these people [at

---

[68] Christopher Weaver, John Carreyrou, and Michael Siconolfi, *Theranos Is Subject of Criminal Probe by U.S.*, Wall St. J. (Apr. 18, 2016) (Ex. 20).

[69] Press Release, Committee on Energy & Commerce Democrats, *Democratic Committee Leaders Request Information from FDA and CMS on Theranos' Inaccurate Blood Tests* (July 26, 2016), available at http://democrats-energycommerce.house.gov/newsroom/press-releases/democratic-committee-leaders-request-information-from-fda-and-cms-on (last visited Oct. 20, 2017).

[70] CMS, *Notice of Imposition of Sanctions* (July 7, 2016), available at http://online.wsj.com/public/resources/documents/r_Theranos_Inc_CMS_07-07-2016_Letter.pdf (last visited Oct. 20, 2017).

Theranos] are doing.  No lab is run like this."[71]  Tim Hamill, medical director of UC San

Francisco's clinical labs at China Basin and Parnassus reportedly stated: "The fact that

there are so many [deficiencies identified by CMS] gives me the impression that these

guys don't know what they're doing."[72]  Other doctors "stopped steering patients to

Theranos because of results they didn't trust."[73]  In the words of one Forbes reporter, "If

there is working technology at Theranos . . . you wouldn't be able to tell."[74]

153.    In 2016, Theranos whistleblower Tyler Schultz stepped forward to provide a

disturbing, detailed account of his experience as a Theranos employee.  Mr. Schultz was

reportedly the first to report Defendants' fraudulent conduct to state regulators.[75]

154.    Mr. Schultz was employed by Theranos as an assay validation team member

and was responsible for verifying and documenting the accuracy of tests run on Edison

devices before they were deployed in the lab for use with patients.

155.    Mr. Schultz stated that he found the results varied widely when tests were

rerun with the same blood samples.  In order to reduce this variability, he states that

Theranos routinely discarded outlying values from validation reports it compiled.

156.    For example, one validation report about an Edison test to detect a sexually-

transmitted infectious disease said the test was sensitive enough to detect the disease 95%

of the time.  But when Mr. Shultz looked at the two sets of experiments from which the

report was compiled, they showed sensitivities of 65% and 80%.  Thus, if 100 people

[71] Matthew Herper, *Something May Be Working At Theranos, But You Don't Know What It Is*, Forbes (June 17, 2016), available at
http://www.forbes.com/sites/matthewherper/2016/06/17/something-may-be-working-at-theranos-but-you-dont-know-what-it-is/#42ced77176a8 (last visited Oct. 20, 2017).

[72] Nick Stockton, *Theranos's Lab Problems Go Way Deeper Than Its Secret Tech*, Wired (Apr. 27, 2016), available at https://www.wired.com/2016/04/theranos-lab-problems-go-way-deeper-secret-tech/ (last visited Oct. 20, 2017).

[73] *Hot Startup Has Struggled* (Ex. 3), *supra* n.5.

[74] Matthew Herper, *Something May Be Working At Theranos, But You Don't Know What It Is*, Forbes (June 17, 2016), available at
http://www.forbes.com/sites/matthewherper/2016/06/17/something-may-be-working-at-theranos-but-you-dont-know-what-it-is/#42ced77176a8 (last visited Oct. 20, 2017).

[75] *Whistleblower Shook the Company* (Ex. 9), *supra* n.31.

infected with the disease were tested only with the Edison device, as many as 35 of them would likely incorrectly get a result concluding they were disease-free.

157.    Mr. Schultz then moved to Theranos's production team, where he was responsible for quantifying how much patient tests should be allowed to vary during daily quality-control checks.  Labs are permitted to set those parameters subject to them being within the bounds of accepted industry guidelines.

158.    Mr. Schultz observed that the Edison devices often failed Theranos's own quality-control standards.  Mr. Schultz further stated that Balwani, the No. 2 executive at Theranos under Holmes, pressured lab employees to ignore the failures and run blood tests on the devices anyway, contrary to accepted lab practices.

159.    Mr. Schultz also states that he informed Holmes of his concerns in early 2014.

160.    Unsatisfied with the actions that Balwani and Holmes had taken, Mr. Schultz states that he anonymously emailed his complaint to New York officials who administered a proficiency-testing program in which Theranos was enrolled.

161.    In April 2014, Mr. Schultz again informed Holmes of the quality-control failures.  A few days later, Balwani responded to Mr. Schultz with the following email:

> We saw your email to Elizabeth.  Before I get into specifics, let me share with you that had this email come from anyone else in the company, I would have already held them accountable for the arrogant and patronizing tone and reckless comments.[76]

162.    Mr. Schultz resigned from his position with Theranos shortly thereafter.

163.    In a recent interview with Forbes magazine, Mr. Schultz summarized his experience with Theranos as follows: "everyone kind of knew that this thing didn't actually live up to what we were claiming."[77]

---

[76] *Whistleblower Shook the Company* (Ex. 9), *supra* n.31.

[77] Ellie Kincaid, *After Blowing The Whistle On Theranos, Tyler Shultz Is Going Back Into Medical Testing*, Forbes (Oct. 3, 2017), available at https://www.forbes.com/sites/elliekincaid/2017/10/03/after-blowing-the-whistle-on-

*Footnote continued on next page*

164. On November 8, 2016, Walgreens filed a lawsuit against Theranos in federal court the District of Delaware, alleging that Theranos breached its contractual obligations by, *inter alia*, providing testing services to Walgreens customers that Theranos knew lacked accuracy or reliability, and by misrepresenting that its testing, including Edison, was ready-for-market, reliable and accurate and concealing that the opposite was true.[78]

165. Partner Fund Management, which invested $96.1 million in Theranos in early 2014, filed a shareholder suit on October 10, 2016. The lawsuit names Holmes, Balwani, and Theranos and alleges that the three engaged in securities fraud, negligent misrepresentation and violations of the Delaware deceptive trade practices act, among other things, including in particular by hiding, and misleading investors and others regarding, the true state of the Edison technology.[79]

166. On November 28, 2016, a second Theranos investor filed a putative class action against Theranos, Holmes, and Balwani with similar allegations, including *inter alia*, that they concealed material information about reliability problems and concerns with Theranos tests, and affirmatively misrepresented that the Edison technology was ready-for-market and reliable.[80]

167. In January 2017, it was reported that Theranos's Scottsdale, Arizona laboratory, where the majority of (non-Edison) Theranos tests were conducted, had failed a September 2016 inspection by CMS, thus subjecting Theranos to a new round of potential sanctions. According to reports, Theranos responded to the inspection findings

---

*Footnote continued from previous page*
theranos-tyler-shultz-is-going-back-into-diagnostic-testing/#7e33a054575a (last visited Oct. 20, 2017).

[78] Case No. 1:16-cv-01040-SLR (D. Del.), Amended Complaint, Dkt. 14.

[79] Reed Abelson and Katie Benner, *Theranos Sued by Investor Who Accuses It of Securities Fraud*, N.Y. Times (Oct. 10, 2016), available at http://www.nytimes.com/2016/10/11/business/theranos-sued-by-investor-who-accuses-it-of-securities-fraud.html (last visited Oct. 20, 2017).

[80] Case No. 5:16-cv-06822-NC (N.D. Cal.), Complaint, Dkt. 1.

with a plan to correct the deficiencies found, but CMS rejected the plan as deficient.[81] Defendants failed to disclose any of these developments.

168.     In May 2016, as its scheme was collapsing, Theranos announced that it had voided *all* blood tests conducted on its Edison device in 2014 and 2015 (which consisted of tens of thousands of tests), and had belatedly "corrected" thousands of other test results it had provided to consumers.  In December 2016, Theranos further voided and/or belatedly "corrected" numerous additional test results for tests conducted at its Scottsdale, Arizona laboratory.  Defendants have failed to provide adequate notice or disclosure regarding the nature and extent of the tests it has already voided or belatedly "corrected," leaving consumers in the dark.  Based on the limited information disclosed, however, it is apparent that a very substantial portion of the tests have already been voided or belatedly "corrected."  For example, the complaint in Walgreens' action against Theranos indicates that the voided Edison-device "tests" represented some 10% or more of the overall blood draws conducted at Walgreens stores.  That does not include the thousands of others that have been, and continue to be, voided and/or belatedly "corrected."

## H.     Defendants Continue to Fail to Protect Customers

169.     Defendants' misrepresentations, omissions, and fraudulent conduct alleged herein persisted from before the tests were first offered to the public all the way through the present.

170.     Even after the highly damning CMS report became public in January 2016, Defendants still did not take immediate steps to protect the consumers who obtained testing services from Theranos.  Walgreens, for its part, failed to take immediate action even at this stage and instead gave Theranos 30 days to resolve the critical issues CMS identified at the Newark lab, and closed only a single Wellness Center.  Not only did Walgreens permit the remaining 40 Wellness Centers to remain open at that time, it made no effort to notify prospective patients about potential concerns about the reliability of

---

[81] Christopher Weaver and John Carreyrou, *Second Theranos Lab Failed U.S. Inspection*, Wall St. J. (Jan. 17, 2017) (Ex. 21).

Theranos's testing, or that the Edison "tiny" blood "tests" were not truly for testing purposes. Nor did Walgreens notify patients who had previously received Theranos's tests at the Wellness Centers that their test results may not have been accurate or reliable.

171. Because it had no choice due to regulatory action, Theranos has now completely voided and belatedly "corrected" many thousands of its tests results. In many cases, it took months (or even a year or more) to inform customers and their doctors that the test results should not be relied on.

172. The belated "correction" of test results, long after Theranos and Walgreens even had access to the blood samples in question, is inconsistent with industry standards. The Wall Street Journal reported on Theranos sending so-called "corrected results" to some patients. Disturbingly, in some instances, the "corrected" results were even more inaccurate than the initial inaccurate and unreliable results Theranos provided.[82]

173. Even beyond the many thousands of tests that have already been completely voided and belatedly "corrected," no consumer who had a Theranos test could reasonably rely on the results they received given the sweeping litany of compliance issues and the extensive list of other accuracy and reliability problems that have come to light, a list that seems to be expanding even after these lawsuits were filed.

174. Defendants have failed to keep customers informed and notified, including but not limited to by: failing to inform customers about the numerous problems when Defendants were aware of them; failing to inform "tiny" blood draw subjects that the true purpose of their blood draws was not legitimate blood testing and concealing the true purposes; pervasively misrepresenting that Theranos tests could and should be trusted when they knew that was not the case; and failing to promptly and properly notify customers about voided and belatedly "corrected" tests results. Even after their scheme began collapsing under its own weight, Theranos, Walgreens, Holmes, and Balwani

---

[82] Christopher Weaver, *Agony, Alarm and Anger for People Hurt by Theranos's Botched Blood Tests*, Wall St. J. (Oct. 20, 2016) (Ex. 22).

1  continued to engage in a pattern of denying and downplaying the problems, further

2  leaving customers in the dark.

3  175.  It was not until June 14, 2016, almost six months after CMS's report first

4  became public, and years after Walgreens, Theranos, Balwani, and Holmes were aware of

5  reliability problems across the Theranos testing spectrum, that Walgreens announced it

6  was ending its relationship with Theranos.[83]  Days later, Theranos sent letters to providers

7  encouraging them to direct patients to one of the Theranos-operated Wellness Centers.

8  The letters assured providers that Theranos was "*open for business*, confident in our

9  technologies, and steadfast in our commitment to make lab tests fast, convenient, and

10  affordable for everyone." (emphasis in original).  The letters did not disclose, among other

11  things, CMS's sanctions, that Edison was not market-ready when the "tiny" blood draws

12  had been conducted and that Theranos and Walgreens had discontinued using the Edison

13  device and finger prick draws due to scrutiny by regulators of the unready technology, the

14  numerous other problems identified with both the Newark and Scottsdale testing facilities,

15  that it had voided all Edison tests performed, as well as other tests, or that the tests were

16  unreliable.  To the contrary, Theranos continued to suggest that its tests were accurate and

17  reliable.  In the provider letters, Theranos also directed providers and their patients to

18  Theranos's website, which also concealed the material information omitted from the

19  provider letters.

20  176.  On July 19, 2016, Theranos issued a statement on the CMS findings that

21  included further misleading statements and falsehoods:

22  Q: What practices do you undertake to ensure that your test results are accurate?

23  What processes do you use to ensure compliance and quality results?

24  A: We undertake quality and compliance measures including the following that

25  ensures:

26  o  Our laboratory leadership, including our lab director and testing

27  ───────────────

[83] Michael Siconolfi, Christopher Weaver, and John Carreyrou, *Walgreen Terminates Partnership with Blood-Testing Firm Theranos*, Wall St. J. (June 13, 2016) (Ex. 23).

1        personnel, are highly qualified and well trained

2        o   Processes are properly reviewed and maintained

3        o   Quality control and quality assessment programs are followed

4        o   Lab processes, including assay verification, calibration, equipment

5            maintenance and environmental controls, are followed[84]

6        177.    Given, *inter alia*, the lack of transparency and outright fraud from the

7    Defendants, the fundamental and sweeping nature of the numerous deficiencies that have

8    been identified regarding Theranos testing, and the fact that both the list of serious

9    deficiencies made public and the list of tests that have been voided and belatedly

10   "corrected" have continued to expand with no apparent end in sight, the only reasonable

11   conclusion for any Plaintiff or Class member here to reach is that they cannot and should

12   not be relying on the results of their Theranos tests.

13       178.    Theranos has apparently not learned its lesson, despite endangering the

14   health and lives of thousands of patients.  CMS banned Holmes and Balwani from owning

15   or operating a blood-testing business for at least two years and revoked Theranos's license

16   to operate a lab in California.[85]  Yet Theranos and Holmes, apparently undeterred, are

17   now working on developing a "miniLab" to run diagnostic tests on small amounts of

18   blood.  One doctor, after watching Holmes's presentation at the annual meeting of the

19   American Association for Clinical Chemistry, noted that it was not clear how the Edison

20   and miniLab differed, and that Holmes had not actually shown that the device could

21   perform a large number of tests on a single drop of blood.[86]  Theranos's deception and

---

[84] Press Release, Theranos, Inc., *Theranos Statement and Q&A on CMS Findings* (July 19, 2016) (Ex. 24).

[85] John Carreyrou, Michael Siconolfi, and Christopher Weaver, *Theranos Dealt Sharp Blow as Elizabeth Holmes is Banned From Operating Labs*, Wall St. J. (July 8, 2016) (Ex. 25).

[86] Abigail Tracy, *The Medical Community Isn't Letting Theranos Off the Hook*, Vanity Fair (Aug. 4, 2016), available at http://www.vanityfair.com/news/2016/08/theranos-interview-what-went-wrong (last visited Oct. 20, 2017).

secrecy continues; the miniLab has not been evaluated by a third party and lacks FDA approval.

## I.  The Members of the Edison Subclass Were Subjected to Battery

179.  The tens of thousands of members of the Edison Subclass, as defined herein, including Plaintiffs B.P., R.C., and S.J., were all subject to one or more so-called "tiny" blood draws.  For all of these "tiny" blood draws, a needle was stuck into the subject's finger, penetrating their skin and tissue, and blood was drawn from their body.

180.  The vast majority of these "tiny" blood draws were administered at Walgreens stores, with a small portion administered at Theranos Wellness Centers.

181.  For the "tiny" blood draws that were conducted at Walgreens stores, Plaintiffs allege—including based on the MSA between Theranos and Walgreens, which expressly provides that Walgreens Technicians would "draw blood using the finger stick technique," the fact that the draws were conducted by personnel working in a Walgreens store, and based on Plaintiffs' experiences—these blood draws were administered by a Walgreens employee or an individual working for both Walgreens and Theranos, often with the assistance and in the presence of a Theranos employee.  In all such cases, ***both*** Walgreens ***and*** Theranos did acts that resulted in the blood draws and that encouraged the blood draws—including, but not limited to, through their pervasive marketing of same, through their provision of the space, infrastructure, personnel, and equipment used for same, and through their direct assistance and involvement with the blood draws and in-store interactions with the subjects.  Both Defendants, including through their respective employees, caused these touchings.

182.  For the "tiny" blood draws that were conducted at Theranos Wellness Centers, Plaintiffs allege—including based on the fact that the draws were conducted by personnel working at a Theranos facility—the blood draws were administered by a Theranos employee.

183. The subjects submitted to the "tiny" blood draws under false pretenses, and the touchings that resulted were physically harmful, an affront to their human dignity, and would be viewed by a reasonable person as offensive under the true circumstances.

184. Walgreens and Theranos intentionally misled Plaintiff B.P., R.C., and S.J., and the Edison Subclass about the essential nature and purpose of the blood draws to which they submitted. In permitting Walgreens and Theranos to engage in the procedure of drawing blood from their bodies, Plaintiffs B.P., R.C., and S.J., and the Edison Subclass were mistaken and misinformed about the essential nature and purpose of such procedure and thus they did not provide, and could not have provided, consent for such procedure and intrusion.

185. While not disclosed to consumers, the medical field, or otherwise, the Edison technology was still in development and not ready-for-market throughout the time the "tiny" blood tests were offered. By testing their services on many thousands of unwitting customers who thought they were purchasing a ready-for-market service, Theranos and Walgreens intended to develop their product so that it might compete with more established laboratories. In essence, though not disclosed to consumers and indeed represented very differently, Defendants' Wellness Centers, at least throughout the time the "tiny" blood draws were being conducted, were used to gather blood samples and other data for use in Defendants' research and product development.

186. Theranos and Walgreens concealed from consumers that Edison was still in-development and not ready-for-market, and in fact affirmatively misled them to believe such services were ready-for-market and that the corresponding "test results" could and should be relied upon in making health and treatment decisions, as alleged herein. Theranos and Walgreens misrepresented and falsely portrayed the purpose of these blood draws and did not disclose to Plaintiffs B.P., R.C., and S.J., and the Edison Subclass that the purpose of the blood draws to which they were submitting was for Defendants' use in research and product development.

187. Plaintiffs B.P., R.C., and S.J. and the other members of the Edison Subclass reasonably believed, when they agreed to submit to their "tiny" blood draws, that the essential nature and purpose of such blood draws was legitimate blood testing.

188. In fact, the essential nature and purpose of their "tiny" blood draws was not legitimate blood testing and, indeed, could not have been legitimate blood testing given that, as alleged herein and unbeknownst to the subjects at the time they agreed to submit to the draws, the Edison "tiny" technology was still in development, still in prototype, not ready-for-market, and nowhere near in a position to serve the purpose of legitimate blood testing. Theranos, Walgreens, Balwani, and Holmes each knew this to be the case throughout the entire time "tiny" blood draws were being administered at Walgreens stores and Theranos Wellness Centers. To the extent Walgreens lacked any more detailed knowledge, it was by virtue of its own deliberate choices to ignore and/or avoid such details.

189. Simply put, the "tiny" blood draws were not intended by Walgreens and Theranos to serve the purpose, and could not have served the purpose of, providing reliable blood testing results (i.e., "legitimate blood testing").

190. Unbeknownst to the Edison Subclass members, the essential nature and purposes of the "tiny" blood draws were: to help research and development of the as-yet-undeveloped Edison technology that both Theranos and Walgreens had an interest in; to expedite and advance the narrative that the "disruptive" Edison technology had "revolutionized" the medical testing industry; and to woo and placate investors, potential investors, and co-investors by giving the (false) impression that they had a market-ready, breakthrough technology and service.[87]

191. Theranos, Walgreens, Balwani, and Holmes each knew contemporaneously that Plaintiffs B.P., R.C., and S.J. and the other members of the Edison Subclass were operating under a substantial mistaken belief regarding the essential nature and purpose of

---

[87] Discovery in this case may reveal other undisclosed purposes of the "tiny" blood draws.

the "tiny" blood draws when they agreed to submit to them, and that any consent the subjects provided was made pursuant to that mistaken belief.

192.    Theranos's and Walgreens' concealments and affirmative misrepresentations substantially contributed to the Edison Subclass members' mistaken belief about the essential nature and purpose of their "tiny" blood draws.  As alleged herein, both companies each concealed substantial, material information from the subjects, their medical providers, and the public regarding the true state and readiness of the Edison technology and the "tiny" blood testing, including that Edison was still in development and not ready-for-market.  *See, e.g.,* ¶¶ 65-78.  Moreover, both Theranos and Walgreens knowingly and pervasively made affirmative misrepresentations—including through a broad marketing campaign—clearly portraying the "tiny" blood technology as market-ready and the "tiny" blood draws consumers were encouraged to submit to as being for legitimate and reliable blood testing.  Indeed, that was the entire fundamental premise of Defendants' advertising campaign regarding the services.  That was the only purpose suggested for these blood draws, and there was no indication at all, in any of this marketing or elsewhere, that the Edison technology was not market-ready and could not actually serve the purpose of legitimate blood testing.  *See, e.g.,* ¶¶ 80-119.

193.    Moreover, the very context, nature, design, and infrastructure of the Walgreens and Theranos Wellness Centers in which the "tiny" blood draws were conducted, were intended by Theranos and Walgreens—both of which designed and set up the Wellness Centers in the Walgreens facilities—to give the clear impression, and did give the clear impression, to consumers that all of the blood draws being conducted there were for legitimate blood testing purposes.  Again, there was no indication anywhere that the Edison technology was not market-ready and was not intended by Theranos and Walgreens to, and could not actually, serve the purpose of providing reliable blood test results, or that there was some different purpose for the "tiny" blood draws besides legitimate blood testing.  To the contrary, in addition to the media marketing, the testing order forms, signage, and other disclosures and materials in the Wellness Centers all

clearly reinforced to consumers that the blood draws conducted therein, including the "tiny" blood draws, were about legitimate blood testing.

194.    The very notion of offering the "tiny" blood "tests" in the market created and reinforced the belief that these tests were market-ready.  The fact that the vast majority of these "tiny" blood draws occurred in a Walgreens pharmacy, further reinforced to the subjects that the services were market-ready and the purpose was legitimate blood testing and not product development, "keeping up appearances" for investors and co-investors, or some other undisclosed purpose, given Walgreens' prominence and the nature of its business.

195.    Though Walgreens and Theranos, and their personnel present in the store, knew the "tiny" blood draw subjects reasonably believed the purpose was legitimate blood testing, by design and as a matter of policy and practice they said nothing to correct that mistaken belief and, to the contrary, reinforced that belief as alleged herein.

196.    Plaintiffs B.P., R.C., and S.J., and the Edison Subclass would not have agreed to submit to the "tiny" blood draws had they known they were not, in fact, for legitimate blood testing purposes.

197.    In furtherance of this scheme by Defendants, Theranos also provided the "tiny" blood draw subjects with reports that took the form of test results.  However, these reports were not, in fact, legitimate test results that could be relied upon, but rather were used to perpetuated the false impression and belief—among the subjects, potential subjects, investors, and the public—that these "tiny" blood draws were about legitimate blood testing.  Every single one of the Edison test results has been voided.

198.    By procuring "tiny" blood samples from thousands of unwitting consumers, who mistakenly thought they were submitting to the draws for legitimate testing purposes, Theranos and Walgreens intended to use these samples to help try to develop (or "co-produce" to use Walgreens' term) the Edison technology which had been in development for years and, to the Defendants' frustration, was still not ready.  Both Theranos and

1  Walgreens hoped that, someday, the Edison technology might allow them to compete with
2  more established laboratories.

3      199.   Offering "tiny" blood tests to the general public enabled Theranos and
4  Walgreens to collect "tiny" blood samples from human subjects without sacrificing the
5  time and money necessary to recruit and pay volunteers for formal clinical trials.  Indeed,
6  by procuring thousands of "tiny" blood samples in this manner, they were able to avoid
7  the costs associated with alternative methods for obtaining blood samples for research,
8  such as to purchase the samples (which would be provided without personal identifying
9  information about the subject) from facilities that have obtained research approval from
10 ethical review boards.  On information and belief, because most samples available for
11 research are collected through venous draws, samples taken with a finger-stick method
12 (the type most important to the development of Edison) were particularly costly and
13 difficult to obtain.  By disguising their product development and research agenda and
14 activity as a legitimate, ready-for-market testing service, Theranos and Walgreens not
15 only were able to avoid these costs, *but were actually able to get thousands of unwitting*
16 *consumers to pay them* for the "tiny" blood draws.

17      200.   The Wellness Center pretense also helped Theranos evade regulatory
18 scrutiny and in particular the additional regulatory scrutiny that accompanies human
19 testing, such as the requirement to obtain approval for such research by an Institutional
20 Review Board (IRB) in order to protect patient safety.

21      201.   Theranos's disregard for IRB standards and patient safety is well-
22 established.  For example, in 2016 it was revealed that Theranos had conducted a study on
23 a blood test for the Zika virus using data that was collected from human test subjects
24 without any IRB approval.[88]

25

26
   _____
27 [88] Carolyn Y. Johnson, *Theranos withdraws Zika test after regulators flag problems*, L.A.
   Times (Aug. 31, 2016), available at http://www.latimes.com/business/la-fi-theranos-zika-
28 20160831-snap-story.html (last visited Oct. 20, 2017).

202. According to reports, Holmes has claimed that Theranos possesses "data that show you can get a perfect correlation between a finger stick and a venipuncture for every test that we run."[89] Theranos has refused to identify publically how these comparison test results were obtained, except to say that "[t]he clinical tests were conducted by a combination of Theranos and external labs."[90] The fact that Theranos has belatedly "corrected" test results several months (and even years) after taking customers' blood samples indicates that customers' blood samples, submitted at Wellness Centers, were likely used in generating that data.

203. There is additional evidence that Theranos and Walgreens were using these blood draws for research and development purposes. For example, in the case of Plaintiff B.P., Walgreens and Theranos sometimes took blood using *both* finger stick and traditional methods, and sometimes used only one method or the other—for the same panel of tests. On information and belief, Walgreens and Theranos took multiple samples in different ways to facilitate analysis of the results obtained by Theranos technology using a variety of sample types, to generate more data correlating the results of finger stick tests and venous draws, and thereby further efforts to develop Edison.

204. Relatedly, Theranos used these blood draws to collect and analyze highly confidential health data about large numbers of people. Like other Silicon Valley companies that collect and analyze "big data," Theranos recognized that sufficiently numerous blood samples, if combined with biographical and other information, could reveal patterns that could help Theranos to develop lucrative products. On information and belief, data analysis at Theranos was overseen by Balwani who reportedly said about his decision to join the Company: "When I saw what they were doing at Theranos, [] I thought this will be a really good application for machine learning,[91] because we are going

---

[89] Ken Auletta, *Blood, Simpler, supra* n.6.

[90] *Id.*

[91] Machine learning is a branch of artificial intelligence through which machines, such as laboratory testing equipment, are exposed to enormous data sets and use statistical analysis and predictive analytics to draw inferences, identify patterns, and generate

*Footnote continued on next page*

to generate a lot of data, and we'll be able to do some interesting work around that."[92]  On

information and belief, the most direct way for Theranos to obtain a data set sufficiently

large to support a machine learning application was to convince, by deception, many

thousands of people to submit to blood draws and provide blood samples and other

valuable personal information.

205.    According to the Wall Street Journal, when a Theranos employee emailed

Holmes in April 2014 to voice his concerns about quality control failures at Theranos, she

forwarded the internal inquiry to Balwani, who—contrary to his representations to

Arizona's Senate Health and Human Services Committee just weeks before—responded

to the employee that the failures were due to the "newness of some of our processes,

which we are improving every day."  "**This is product development**," he continued, "this

is how startups are built."[93]

206.    Theranos and Walgreens also prematurely rushed Edison and the "tiny"

blood draws to market in order to create the public misimpression that Edison was a

market-ready technology.  Frustrated by the slow progress in developing Edison and the

corresponding inability to capitalize on the unready technology, Theranos and Walgreens

prematurely rushed Edison to market in order to expedite the narrative of Edison as

"disrupting" the market and to thereby try to improve their chances of capitalizing upon

the market for medical laboratory testing, a highly competitive and fast-growing market

estimated to be worth $198.5 billion by 2024.[94]  They also hoped it would woo and

---

*Footnote continued from previous page*
predictions.

[92] Roger Parloff, *Theranos Resignation Is a Major Bid for Atonement*, Fortune (May 12, 2016), available at http://fortune.com/2016/05/12/presidents-departure-atonement/ (last visited Oct. 20, 2017).

[93] John Carreyrou, *At Theranos, Many Strategies and Snags*, Wall St. J. (Dec. 27, 2015) (Ex. 26).

[94] Press Release, Grand View Research, Inc., *Clinical Laboratory Tests Market Size Worth USD 198.5 Billion by 2024* (Dec. 2016), available at https://www.grandviewresearch.com/press-release/global-clinical-laboratory-tests-market (last visited Oct. 20, 2017).

appease investors, potential investors, and co-investors, to whom they urgently wanted to demonstrate they had a working, viable breakthrough technology.

207. In summary, any consent provided by Plaintiffs B.P., R.C., and S.J. and the other Edison Subclass members, to have their blood drawn pursuant to the "tiny" blood draws, was obtained under false pretenses. They agreed to submit to these blood draws operating under a substantial mistake (which Theranos and Walgreens had contemporaneous knowledge of) regarding the essential nature and purpose of these blood draws, and their consent was obtained through fraud, concealment, and substantial misrepresentation by Theranos and Walgreens, as alleged herein. Unbeknownst to them, they were essentially used as human guinea pigs for beta testing and Defendants' product development efforts and as pawns to promote the public impression that Defendants had a working, ready technology. None of the Edison Subclass members knew or could have known the truth. Had they known the truth they would not have consented to the "tiny" blood draws. Any consent they provided for the "tiny" blood draws is vitiated and not effective.

## J. Defendants' Misconduct Has Significantly Harmed Consumers

208. As a direct result of Defendants' misconduct alleged herein, Plaintiffs and the other consumers who comprise the proposed Class and Subclasses in this case have been harmed in numerous respects, including but not limited to: (a) paying—out-of-pocket, through health insurance, or through another collateral source—for Theranos tests that they cannot reasonably rely upon, that unknown to them were experimental in nature, and that in some cases have already been voided or belatedly "corrected"; (b) paying for subsequent replacement testing services from other companies; (c) paying additional money to doctors or other health professionals as a result of the inaccurate and unreliable Theranos tests; (d) being subject to unnecessary or potentially harmful treatments, and/or being denied the opportunity to seek treatment for a treatable condition; (e) harm to their health, injury, and/or death, and corresponding monetary and other damages; (f) invasion of privacy and bodily integrity without their consent, and corresponding damages

therefrom; (g) violation of their human dignity for the Edison Subclass members and the corresponding damages therefrom; and (h) severe emotional stress and anxiety.

209.    Defendants have all benefited, financially and otherwise, from their misconduct alleged herein, including but not limited to from revenue that all of the Defendants have received for Plaintiffs' and the Class members' tests, from the development of their products through research Plaintiffs and the Class members were unwittingly being used for, and additional business that Walgreens has generated as a result of having the Wellness Centers in its retail stores.  Theranos and Walgreens shared the revenues received associated with the testing services at the Walgreens facilities.  On information and belief, Holmes and Balwani, respectively, have each personally received millions of dollars as a direct result of their misconduct alleged herein.

**K.    Factual Allegations Regarding Plaintiffs**

*Plaintiff A.R.*

210.    On or around June 19, 2015, Plaintiff A.R. purchased Theranos blood tests at a Walgreens Pharmacy in Palo Alto, California.  His blood was drawn at this Walgreens store.  The tests that he purchased included tests regarding protein, blood sugar, cholesterol, and vitamin levels.  A.R. purchased Theranos tests to get accurate and reliable results about his health.  He trusted Theranos and Walgreens to provide accurate and reliable test results.

211.    A.R. had received orders from his medical care provider to have blood testing performed.  A.R. was referred to Theranos by his medical care provider.  In choosing to have his blood tested by Theranos, he relied on marketing by Theranos and Walgreens regarding the reliability of their services, including, he specifically recalls, leaflets that he had seen in the Walgreens store before having his blood drawn.  He also expected tests conducted at Walgreens to be trustworthy and reliable.

212.    A.R. paid approximately $41.79 out of pocket for the Theranos tests.

213.    When he purchased Theranos tests, one or more vials of blood were drawn from a vein in A.R.'s arm.  A.R. did not know that Defendants drew his blood for the

purpose of research and product development and he did not consent to such procedure for such purpose. He believed that the purpose of the blood draws he submitted to was legitimate blood testing.

214. A.R. believed that Defendants' services were ready-for-market and reliable. He had no contemporaneous knowledge about the unreliability and litany of problems with Theranos testing, facilities, and equipment, alleged herein. He relied on the Defendants' omissions in this respect. Had he known of this concealed information, he would not have submitted to this testing.

215. Having been led to believe the Theranos results were reliable, A.R. relied on them, using the results to make decisions concerning his health.

216. Approximately one year before having his blood tested by Theranos, A.R. had his blood tested by another company, and the results showed that A.R.'s blood contained a normal level of Vitamin D. His Theranos tests indicated that his Vitamin D levels were low, his blood sugar was high, and his LDL (cholesterol) level was high, and medication was prescribed for him as a result. The medication that A.R.'s doctor prescribed to supplement his Vitamin D levels caused excess absorption and buildup of calcium in A.R.'s blood, and caused pain and other adverse effects to A.R.

217. The Theranos tests that A.R. purchased were unreliable and/or inaccurate.

218. After learning that his Theranos tests were unreliable and/or inaccurate, he revisited his doctor, and had his blood tested by another company. The results reflected that he is healthier than the Theranos tests had indicated.

219. Plaintiff A.R. would not have purchased any Theranos tests if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable. Plaintiff A.R. would not have submitted to Theranos tests if he had known that Walgreens and Theranos were using his blood tests for research and product development.

220. Plaintiff A.R. was injured, damaged and harmed by Defendants' misconduct.

221.    Plaintiff A.R. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

222.    In addition to the other harm described herein, Plaintiff A.R. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased and the invasion of his body under false pretenses and without his consent.

223.    Any purported consent by A.R. to have his blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

### Plaintiff B.B.

224.    On or around October 3, 2014, Plaintiff B.B. purchased eight Theranos blood tests at a Walgreens Pharmacy in Gilbert, Arizona.  Her blood was drawn at a Walgreens store.  The tests that she purchased included tests regarding her thyroid.  B.B. purchased Theranos tests to get accurate and reliable results about her health.  She trusted Theranos and Walgreens to provide accurate and reliable test results.

225.    B.B. had received orders from her medical care provider to have blood testing performed.  B.B. was informed by her medical care provider that Theranos was the least invasive alternative for blood testing, and also that Theranos tests were cheaper and that the Walgreens locations provided extended hours for her to get tested.  In choosing to have her blood tested by Theranos, she relied on marketing by Theranos and Walgreens regarding the reliability of their services, including, she specifically recalls, on the Theranos and Walgreens websites and press releases which she read before visiting the Walgreens store.  B.B. specifically recalls visiting and viewing Walgreens advertisements and representations on both companies' websites in or around early October 2014.  She also expected tests conducted at Walgreens to be trustworthy and reliable.

226.    B.B. paid approximately $81.04 out of pocket for the Theranos tests.

227.    When she purchased Theranos tests, one or more vials of blood were drawn from a vein in B.B.'s arm.  B.B did not know that Defendants drew her blood for the purpose of research and product development and she did not consent to such procedure for such purpose.

228. B.B. believed that Defendants' services were ready-for-market and reliable. She had no contemporaneous knowledge about the unreliability and litany of problems with Theranos testing, facilities, and equipment, alleged herein. She relied on the Defendants' omissions in this respect. Had she known of this concealed information, she would not have submitted to this testing.

229. On information and belief, B.B.'s tests were conducted at Theranos's Newark, California facility.

230. Having been led to believe the results were reliable, B.B. relied on them, using the results to make decisions concerning her health.

231. The Theranos tests that B.B. purchased were unreliable and/or inaccurate.

232. After learning that her Theranos tests were unreliable and/or inaccurate, she had her blood retested multiple times by another company.

233. Plaintiff B.B. would not have purchased any Theranos test if she had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable. Plaintiff B.B. would not have submitted to Theranos tests if she had known that Walgreens and Theranos were using her blood tests for research and product development.

234. Plaintiff B.B. was injured, damaged and harmed by Defendants' misconduct.

235. Plaintiff B.B. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

236. In addition to the other harm described herein, Plaintiff B.B. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests she purchased and the invasion of her body under false pretenses and without her consent.

237. Any purported consent by B.B. to have her blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

***Plaintiff B.P.***

2     238.   Beginning approximately in early 2014, Plaintiff B.P. purchased Theranos

3 blood tests several times at a Walgreens Pharmacy in Ahwatukee Village, Phoenix,

4 Arizona. In all of these instances, he had his blood drawn at this Walgreens store. The

5 tests that he purchased included tests regarding diabetes and cholesterol. B.P. purchased

6 Theranos tests to get accurate and reliable results about his health. He trusted Theranos

7 and Walgreens to provide accurate and reliable test results.

8     239.   B.P. had received orders from his medical care provider to have blood

9 testing performed. B.P. was informed by his physician that Theranos was the cheapest

10 and least invasive alternative for the tests. In choosing to have his blood tested by

11 Theranos, he relied on marketing by Theranos and Walgreens regarding the nature and

12 reliability of their services, including, he specifically recalls, materials that he saw at the

13 Walgreens store before getting his blood drawn which portrayed and gave the clear

14 impression that the services being advertised were ready, reliable, and for legitimate

15 testing purposes. He also expected tests conducted at Walgreens to be trustworthy and

16 reliable.

17     240.   B.P. paid hundreds of dollars out of pocket for the Theranos tests.

18     241.   The first several times that B.P. had his blood drawn at the Walgreens store,

19 it was exclusively via "tiny" blood draws (between one and three "tiny" blood draws were

20 taken per visit). In each case, a needle was stuck into his finger, penetrating his skin and

21 tissue, and blood was drawn from his body. In each case, the blood draws were

22 administered by an individual who B.P. understood to be and who B.P. alleges to be a

23 Walgreens employee, who worked at the Walgreens store, approached B.P. from behind

24 the Walgreens pharmacy counter and was wearing a Walgreens smock. In each case, a

25 second individual, who B.P. understood to be and who B.P. alleges to be a Theranos

26 employee, was also present at, and assisted with and observed, the blood draws.

27     242.   Starting in or around mid-2015 and through around late 2015, each time he

28 visited the Walgreens store for these services, he was subject to both "tiny" blood draws

and to larger blood draws whereby one or more larger vials of blood were drawn from a vein in B.P.'s arm. For each "tiny" blood draw, a needle was stuck into his finger, penetrating his skin and tissue, and blood was drawn from his body. During this time, except perhaps as noted below, the "tiny" blood draws were again administered by an individual who B.P. understood to be and who B.P. alleges to be a Walgreens employee, and the venous blood draws were administered by an individual who B.P. understood to be a Theranos employee. For the "tiny" blood draws, again an individual who B.P. understood to be and who B.P. alleges to be a Theranos employee was also present at, and assisted with and observed, the blood draws. On one occasion during this period, B.P. recalls that one "tiny" blood draw was administered by an individual who was working at the Walgreens store, and who identified himself as being affiliated with Theranos testing. Plaintiff B.P. alleges that this individual was a Walgreens employee or worked for both Walgreens and Theranos.

243. Starting in around early 2016 and through the last time he had his blood drawn at the Walgreens store, B.P.'s blood draws were only via venous blood draws. In each case, these venous blood draws were performed by an individual B.P. understood to be a Theranos employee.

244. Throughout his visits to the Walgreens store, and throughout the process of preparing for and having his blood drawn, he was consistently led to believe that the blood draws were for legitimate blood testing purposes. No suggestion was made to the contrary.

245. When B.P. agreed to submit to the "tiny" blood draws (and to the venous blood draws), he understood and believed that the purpose of the blood draws was legitimate blood testing. His consent to these draws was based on this belief. This belief was based on, among other things, marketing from Walgreens and Theranos that he saw before getting his blood drawn, including, he specifically recalls, at the Walgreens store, which clearly portrayed and gave the impression that the services were market-ready and reliable, and the blood draws he was submitting to as being for legitimate testing

purposes. This belief was also based on the design and nature of, and the infrastructure and signage at, the Wellness Centers where his blood draws were conducted, which gave the definitive, if not obvious, impression that the purpose of the blood draws he was submitting to was legitimate blood testing. The fact that these services were being offered at a Walgreens store, given its prominence and the nature of its business as a pharmacy, reinforced his belief that the service was market-ready and for legitimate testing purposes. He was also told by an individual he believed to be a Walgreens or Theranos employee, during one or more of these visits and before his blood was drawn, that they would only take the amount of blood necessary to run the tests necessary, unlike other blood testing laboratories, which the representative said took far more blood than they required for the tests.

246. As alleged herein, the essential nature and purpose of the "tiny" blood draws B.P. submitted to was not legitimate blood testing, and indeed could not have been given the decidedly unready state of Edison. B.P. agreed to submit to the "tiny" blood draws under false pretenses and under a substantial mistaken belief as to the essential nature and purpose of the draws.

247. B.P. had no contemporaneous knowledge that the Edison technology was still in-development, not market-ready, and not in a position to serve the purpose of blood testing, nor did he have contemporaneous knowledge that the "tiny" blood draws he was submitting to had a nature or purpose other than legitimate blood testing. This information was concealed from him and he relied on Defendants' omissions in this respect. Had he known the truth, he would not have consented to "tiny" blood draws.

248. B.P. did not know that Defendants drew his blood for the purpose of research and product development and he did not consent to such procedure for such purpose. He believed that the purpose of all of the blood draws he submitted to was legitimate blood testing.

249. B.P. believed that all of the Defendants' services he got were ready-for-market and reliable. He had no contemporaneous knowledge about the unreliability and

litany of problems with Theranos testing, facilities, and equipment, alleged herein. He relied on the Defendants' omissions in this respect. Had he known of this concealed information, he would not have submitted to any of this "testing."

250. On information and belief, B.P.'s "tiny" blood samples were utilized at Theranos's Newark, California laboratory.

251. Having been led to believe all of the "test" results were reliable, B.P. relied on them, using the results to make decisions concerning his health.

252. Based on his Theranos test results, his doctor diagnosed him with diabetes and high cholesterol, and prescribed certain medications.

253. The Theranos tests that B.P. purchased were unreliable and/or inaccurate.

254. Subsequently, as alleged above, Theranos voided the results of all of the Edison blood tests, including B.P.'s "tiny" blood tests.

255. After learning that his Theranos tests were unreliable and/or inaccurate, he had his blood tested by another company. The results reflected that he is healthier than the Theranos tests had indicated.

256. Plaintiff B.P. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable. Plaintiff B.P. would not have submitted to Theranos tests if he had known that Walgreens and Theranos were using his blood tests for research and product development.

257. Plaintiff B.P. was battered, injured, damaged and harmed by Defendants' misconduct.

258. Plaintiff B.P. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

259. In addition to the other harm described herein, Plaintiff B.P. suffered pain, emotional distress, stress, anxiety as a result of the unreliable Theranos blood tests he purchased and the invasion of his body under false pretenses and without his consent, and harm to his human dignity connected to being subjected to battery.

260. Any purported consent by B.P. to have his blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

***Plaintiff D.L.***

261. On or around June 1, 2015, and December 14, 2015, Plaintiff D.L. purchased Theranos blood tests at a Walgreens Pharmacy in Chandler, Arizona. In both cases, her blood was drawn at this Walgreens store. D.L. purchased Theranos tests to get accurate and reliable results about her health. She trusted Theranos and Walgreens to provide accurate and reliable test results.

262. D.L. had received orders from her medical care provider to have blood testing performed. D.L. was informed by her physician that Theranos was the quickest and cheapest alternative for the tests. In choosing to have her blood tested by Theranos, she relied on marketing by Theranos and Walgreens regarding the reliability of their services, including, she specifically recalls, signage at the Walgreens store that she saw before having her blood drawn and representations on the Theranos website in or around June and December of 2015. D.L. expected tests conducted at Walgreens to be trustworthy and reliable.

263. D.L. paid for the Theranos tests out of pocket and/or through her health insurer.

264. Each time she purchased a Theranos test, one or more vials of blood were drawn from a vein in D.L.'s arm. D.L. did not know that Walgreens drew her blood for the purpose of research and product development and she did not consent to such procedure for such purpose. She believed that the purpose of the blood draws she submitted to was legitimate blood testing.

265. D.L. believed that Defendants' services were ready-for-market and reliable. She had no contemporaneous knowledge about the unreliability and litany of problems with Theranos testing, facilities, and equipment, alleged herein. She relied on the Defendants' omissions in this respect. Had she known of this concealed information, she would not have submitted to this testing.

266. On information and belief, tests of D.L. were conducted at Theranos's Newark, California and Scottsdale, Arizona laboratories.

267. Having been led to believe the results were reliable, D.L. relied on them, using the results to make decisions concerning her health.

268. Based on the results of her Theranos tests, D.L. tested positive for Sjogrens syndrome, which required her to seek treatment from her doctor, to be tested for food allergies, and to spend considerable time learning about Sjogrens syndrome and the impact her diagnosis would have on her lifestyle.

269. The Theranos tests that D.L. purchased were unreliable and/or inaccurate.

270. After learning that her Theranos tests were unreliable and/or inaccurate, she had her blood tested by another company and consulted with her doctor, who after reviewing the new test results has now confirmed that she does not have Sjogrens syndrome.

271. Plaintiff D.L. would not have purchased any Theranos test if she had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable. Plaintiff D.L. would not have submitted to Theranos tests if she had known that Walgreens and Theranos were using her blood tests for research and product development.

272. Plaintiff D.L. was injured, damaged and harmed by Defendants' misconduct.

273. Plaintiff D.L. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

274. In addition to the other harm described herein, Plaintiff D.L. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests she purchased and the invasion of her body under false pretenses and without her consent.

275. Any purported consent by D.L. to have her blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

*Plaintiff L.M.*

276.     On or around October 5, 2015, Plaintiff L.M. purchased Theranos blood tests at a Walgreens Pharmacy in Chandler, Arizona.  She had her blood drawn at this Walgreens store.  The tests that she purchased included tests regarding her thyroid.  L.M. purchased Theranos tests to get accurate and reliable results about her health.  She trusted Theranos and Walgreens to provide accurate and reliable test results.

277.     L.M. had received orders from her medical care provider to have blood testing performed.  L.M. was informed by her physician that Theranos was the cheapest alternative for the tests.  In choosing to have her blood tested by Theranos, she relied on marketing by Theranos and Walgreens regarding the reliability of their services.  She also expected tests conducted at Walgreens to be trustworthy and reliable.

278.     L.M. paid approximately $59.34 out of pocket for the Theranos tests.

279.     L.M.'s best recollection is that when she purchased Theranos tests, one or more vials of blood were drawn from a vein in L.M.'s arm.  L.M. did not know that Defendants drew her blood for the purpose of research and product development and she did not consent to such procedure for such purpose.

280.     L.M. believed that Defendants' services were ready-for-market and reliable. She had no contemporaneous knowledge about the unreliability and litany of problems with Theranos testing, facilities, and equipment, alleged herein.  She relied on the Defendants' omissions in this respect.  Had she known of this concealed information, she would not have submitted to this testing.

281.     Having been led to believe the results were reliable, L.M. relied on them, using the results to make decisions concerning her health.

282.     Based on the results of her Theranos tests, L.M. was diagnosed by her physician as having Hashimoto's Disease, which was devastating to her and required lifestyle changes, medical appointments, and taking unnecessary medication.

283.     The Theranos tests that L.M. purchased were unreliable and/or inaccurate.

284. In approximately March 2016, at her physician's direction, L.M. had her blood re-tested by a different testing company, repeating the same tests that Theranos had conducted. These results were dramatically different than the Theranos test results, and as per her physician invalidated the diagnosis of Hashimoto's Disease, meaning L.M. had been needlessly pursuing a course of treatment for a condition she did not have.

285. Plaintiff L.M. would not have purchased any Theranos test if she had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable. Plaintiff L.M. would not have submitted to Theranos tests if she had known that Defendants were using her blood tests for research and product development.

286. Plaintiff L.M. was injured, damaged and harmed by Defendants' misconduct.

287. Plaintiff L.M. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

288. In addition to the other harm described herein, Plaintiff L.M. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests she purchased and the invasion of her body under false pretenses and without her consent.

289. Any purported consent by L.M. to have her blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

### Plaintiff M.P.

290. On or around November 2015, Plaintiff M.P. purchased Theranos blood tests at a Walgreens Pharmacy in Tempe, Arizona. He had his blood drawn at this Walgreens store. The tests that he purchased included STI panels. M.P. purchased Theranos tests to get accurate and reliable results about his health. He trusted Theranos and Walgreens to provide reliable test results.

291. In choosing to have his blood tested by Theranos, M.P. relied on marketing by Theranos and Walgreens regarding the reliability of their services, including, he specifically recalls, on the Theranos website that he viewed on or around November 2015

before visiting the Walgreens store, and at the Walgreens store. He also expected tests conducted at Walgreens to be trustworthy and reliable.

292. M.P.'s best recollection is that when he purchased Theranos tests, he had one or more vials of blood drawn from a vein in his arm. M.P. did not know that Defendants drew his blood for the purpose of research and product development and he did not consent to such procedure for such purpose.

293. M.P. believed that Defendants' services were ready-for-market and reliable. He had no contemporaneous knowledge about the unreliability and litany of problems with Theranos testing, facilities, and equipment, alleged herein. He relied on the Defendants' omissions in this respect. Had he known of this concealed information, he would not have submitted to this testing.

294. M.P. paid for the Theranos tests out-of-pocket.

295. The tests that M.P. purchased were unreliable and/or inaccurate.

296. M.P. paid out-of-pocket to be retested with STI panels after learning that the Theranos tests were unreliable and/or inaccurate.

297. Plaintiff M.P. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable. Plaintiff M.P. would not have submitted to Theranos tests if he had known that Defendants were using his blood tests for research and product development.

298. Plaintiff M.P. was injured, damaged and harmed by Defendants' misconduct.

299. Plaintiff M.P. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

300. In addition to the other harm described herein, Plaintiff M.P. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased and the invasion of his body under false pretenses and without his consent.

301.    Any purported consent by M.P. to have his blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

### Plaintiff R.C.

302.    On or around February 2015, Plaintiff R.C. purchased Theranos blood tests at a Walgreens Pharmacy in Sun City West, Arizona.  He had his blood drawn at this Walgreens store.  The tests that he purchased included tests regarding his heart health. R.C. purchased Theranos tests to get accurate and reliable results about his health.  He trusted Theranos and Walgreens to provide accurate and reliable test results.

303.    R.C. had received orders from his medical care provider to have blood testing performed to monitor his heart health.  In choosing to have his blood tested by Theranos, he relied on marketing by Theranos and Walgreens regarding the nature and reliability of their services, including, he specifically recalls, a television commercial he saw before visiting the Walgreens store, and at the Walgreens store before having his blood drawn, all of which portrayed and gave the clear impression that the services being advertised were ready, reliable, and for legitimate testing purposes.  He also expected tests conducted at Walgreens to be trustworthy and reliable.

304.    R.C. paid for the Theranos tests through Medicare.

305.    When R.C. had his blood drawn at the Walgreens store, it was via "tiny" blood draws.  Pursuant to this, a first needle was stuck into his finger, penetrating his skin and tissue, and blood was drawn from his body.  The process was painful and was not quick as advertised.  The individual administering the draw struggled to secure enough blood from R.C.'s finger and had to repeat the painful process several times before collecting enough to test.  In each case, a needle was stuck into his finger, penetrating his skin and tissue, and blood was drawn from his body.  For each of these "tiny" blood draws, the blood draws were administered by an individual who worked at the Walgreens store, and who identified themselves as being affiliated with Theranos testing.  Plaintiff R.C. alleges that this individual was a Walgreens employee or worked for both Walgreens and Theranos.

306. Throughout his visits to the Walgreens store, and throughout the process of preparing for and having his blood drawn, he was consistently led to believe that the blood draws were for legitimate blood testing purposes. No suggestion was made to the contrary.

307. When R.C. agreed to submit to the "tiny" blood draws, he understood and believed that the purpose of the blood draws was legitimate blood testing. His consent to these draws was based on this belief. This belief was based on, among other things, marketing from Walgreens and Theranos that he saw, including a television commercial and at the Walgreens store before having his blood drawn, which clearly portrayed and gave the impression that the services were market-ready and reliable, and the blood draws he was submitting to as being for legitimate testing purposes. This belief was also based on the design and nature of, and the infrastructure and signage at, the Wellness Centers where his blood draws were conducted, which gave the definitive, if not obvious, impression that the purpose of the blood draws he was submitting to was legitimate blood testing. The fact that these services were being offered at a Walgreens store, given its prominence and the nature of its business as a pharmacy, reinforced his belief that the service was market-ready and for legitimate testing purposes.

308. As alleged herein, the essential nature and purpose of the "tiny" blood draws R.C. submitted to was not legitimate blood testing, and indeed could not have been given the decidedly unready state of Edison. R.C. agreed to submit to the "tiny" blood draws under false pretenses and under a substantial mistaken belief as to the essential nature and purpose of the draws.

309. R.C. had no contemporaneous knowledge that the Edison technology was still in-development, not market-ready, and not in a position to serve the purpose of blood testing, nor did he have contemporaneous knowledge that the "tiny" blood draws he was submitting to had a nature or purpose other than legitimate blood testing. This information was concealed from him and he relied on Defendants' omissions in this respect. Had he known the truth, he would not have consented to "tiny" blood draws.

310.	R.C. did not know that Defendants drew his blood for the purpose of research and product development and he did not consent to such procedure for such purpose.

311.	R.C. believed that the services he got were ready-for-market and reliable. He had no contemporaneous knowledge about the unreliability and litany of problems with Theranos testing, facilities, and equipment, alleged herein. He relied on the Defendants' omissions in this respect. Had he known of this concealed information, he would not have submitted to this "testing."

312.	On information and belief, R.C.'s "tiny" blood samples were utilized at Theranos's Newark, California laboratory.

313.	Having been led to believe the "test" results were reliable, R.C. relied on them, using the results to make decisions concerning his health.

314.	The results from his Theranos tests indicated that R.C. was in good health. Based on these results, his doctor recommended that R.C. maintain his current medication regimen and to return in one year for repeat testing, and R.C. believed his current lifestyle and medication regimen was working for him and that he had been successful in getting his heart health under control.

315.	The Theranos tests that R.C. purchased were unreliable and/or inaccurate.

316.	Less than one month later, R.C. suffered a heart attack. R.C. was admitted to the hospital, had two stents placed, and had numerous follow up medical appointments. R.C. and his cardiologist were particularly concerned that R.C. had suffered a heart attack given that his blood panels came back clear (from his Theranos tests) less than a month prior. Additional blood work performed during his hospitalization strongly suggested that the near-contemporaneous Theranos blood tests were inaccurate.

317.	Subsequently, as alleged above, Theranos voided the results of all of the "tiny" blood tests, including R.C.'s "tests."

318.	Since his 2015 heart attack, R.C. has been receiving medical care using traditional blood testing procedures from companies other than Theranos.

319.    Plaintiff R.C. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.  Plaintiff R.C. would not have submitted to Theranos tests if he had known that Walgreens and Theranos were using his blood tests for research and product development.

320.    Plaintiff R.C. was battered, injured, damaged and harmed by Defendants' misconduct.

321.    Plaintiff R.C. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

322.    In addition to the other harm described herein, Plaintiff R.C. suffered pain, emotional distress, stress, anxiety as a result of the unreliable Theranos blood tests he purchased and the invasion of his body under false pretenses and without his consent, and harm to his human dignity connected to being subjected to battery.

323.    Any purported consent by R.C. to have his blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

**Plaintiff R.G.**

324.    On or around September 10, 2015, Plaintiff R.G. purchased Theranos blood tests at a Walgreens Pharmacy in Gilbert, Arizona.  He had his blood drawn at this Walgreens store.  The tests that he purchased included tests regarding his sexual health.  R.G. purchased Theranos tests to get accurate and reliable results about his health.  He trusted Theranos and Walgreens to provide accurate and reliable test results.

325.    R.G. had seen and heard advertisements for Theranos that caused him to believe it was a revolutionary technology and market-ready.  R.G. specifically recalls hearing advertisements for Theranos on the radio prior to September 2015, and viewing advertisements on multiple occasions in 2015 at the baggage claim carousal of the Phoenix International Airport.  In choosing to have his blood tested by Theranos, he relied on marketing by Theranos and Walgreens regarding the reliability of their services,

including as specified above. He also expected tests conducted at Walgreens to be trustworthy and reliable.

326. R.G. paid approximately $121.63 out of pocket for the Theranos tests.

327. When he purchased Theranos tests, one or more vials of blood were drawn from a vein in R.G.'s arm. R.G. did not know that Defendants drew his blood for the purpose of research and product development and he did not consent to such procedure for such purpose.

328. R.G. believed that Defendants' services were ready-for-market and reliable. He had no contemporaneous knowledge about the unreliability and litany of problems with Theranos testing, facilities, and equipment, alleged herein. He relied on the Defendants' omissions in this respect. Had he known of this concealed information, he would not have submitted to this testing.

329. On information and belief, one or more of R.G.'s tests were conducted at Theranos's Newark, California laboratory.

330. Having been led to believe the results were reliable, R.G. relied on them, using the results to make decisions concerning his health.

331. The results from his Theranos tests indicated that he had tested positive for HIV (specifically, the HIV 1+2 Antigen/Antibody Combo was "reactive").

332. After receiving the test results from Theranos, R.G., he was extremely concerned and visited his physician, began doing research about HIV/AIDS, and had his blood re-tested by two different companies. These test results came back negative.

333. The Theranos tests that R.G. purchased were unreliable and/or inaccurate.

334. Plaintiff R.G. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable. Plaintiff R.G. would not have submitted to Theranos tests if he had known that Walgreens and Theranos were using his blood tests for research and product development.

335. Plaintiff R.G. was injured, damaged and harmed by Defendants' misconduct.

336. Plaintiff R.G. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

337. In addition to the other harm described herein, Plaintiff R.G. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased and the invasion of his body under false pretenses and without his consent.

338. Any purported consent by R.G. to have his blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

### Plaintiff S.J.

339. In or around July 2015, Plaintiff S.J. purchased her first Theranos blood test and urinalysis at a Theranos Wellness Center located at a Walgreens retail store in Mesa, Arizona. She had her blood drawn and urine sample taken at this Walgreens store. The tests that she purchased were for a routine health check including diabetes and triglyceride levels. S.J. purchased Theranos tests to get accurate and reliable results about her health. She trusted Theranos and Walgreens to provide accurate and reliable test results.

340. S.J. was referred to Theranos by her physician, based on her financial needs and Theranos's reputation for affordable testing. In choosing to have her blood tested by Theranos, S.J. relied on marketing by Theranos and Walgreens regarding the nature and reliability of their services, including, she specifically recalls, in materials that she saw at the Walgreens store, before having her blood drawn, which portrayed and gave the clear impression that the services being advertised were ready, reliable, and for legitimate testing purposes. She also expected tests conducted at Walgreens to be trustworthy and reliable.

341. To the best of her recollection, the first time S.J. had her blood drawn at the Walgreens store, it was via "tiny" blood draws. Pursuant to this, a needle was stuck into her finger, penetrating her skin and tissue, and blood was drawn from her body. The "tiny" blood draw was administered by an individual who worked at the Walgreens store

1    and who identified themselves as being affiliated with Theranos testing. Plaintiff S.J.

2    alleges that this individual was a Walgreens employee or worked for both Walgreens and

3    Theranos.

4        342.    As discussed below, S.J. also purchased Theranos tests during a second visit

5    to the same Walgreens store, in or around November 2015. Her best recollection is that

6    during this second visit, one or more vials of blood were drawn from a vein in her arm.

7        343.    Throughout her visits to the Walgreens store, and throughout the process of

8    preparing for and having her blood drawn, S.J. was consistently led to believe that the

9    blood draws were for legitimate blood testing purposes. No suggestion was made to the

10   contrary.

11       344.    When S.J. agreed to submit to the "tiny" blood draw (and to the venous

12   blood draw as well), she understood and believed that the purpose of the blood draws was

13   legitimate blood testing. Her consent to these draws was based on this belief. This belief

14   was based on, among other things, marketing from Walgreens and Theranos that she saw

15   at the Walgreens stores before getting her blood drawn, which clearly portrayed and gave

16   the impression that the services were market-ready and reliable, and the blood draws he

17   was submitting to as being for legitimate testing purposes. This belief was also based on

18   the design and nature of, and the infrastructure and signage at, the Wellness Centers where

19   her blood draws were conducted, which gave the definitive, if not obvious, impression

20   that the purpose of the blood draws she was submitting to was legitimate blood testing.

21   The fact that these services were being offered at a Walgreens store, given its prominence

22   and the nature of its business as a pharmacy, reinforced her belief that the service was

23   market-ready and for legitimate testing purposes.

24       345.    As alleged herein, the essential nature and purpose of the "tiny" blood draw

25   S.J. submitted to was not legitimate blood testing, and indeed could not have been given

26   the decidedly unready state of Edison. S.J. agreed to submit to the "tiny" blood draw

27   under false pretenses and under a substantial mistaken belief as to the essential nature and

28   purpose of the draw.

346. S.J. had no contemporaneous knowledge that the Edison technology was still in-development, not market-ready, and not in a position to serve the purpose of blood testing, nor did she have contemporaneous knowledge that the "tiny" blood draw she was submitting to had a nature or purpose other than legitimate blood testing. This information was concealed from her and she relied on Defendants' omissions in this respect. Had she known the truth, she would not have consented to "tiny" blood draw.

347. S.J. did not know that Defendants drew her blood for the purpose of research and product development and she did not consent to such procedure for such purpose.

348. S.J. believed that the services she got were ready-for-market and reliable. She had no contemporaneous knowledge about the unreliability and litany of problems with Theranos testing, facilities, and equipment, alleged herein. She relied on the Defendants' omissions in this respect. Had she known of this concealed information, she would not have submitted to this "testing."

349. On information and belief, S.J.'s "tiny" blood samples were utilized at Theranos's Newark, California laboratory.

350. S.J.'s results from her first Theranos "test" indicated that she had diabetes, and S.J.'s physician immediately ordered her to be placed on diabetic medications.

351. S.J. firmly believed she did not have diabetes and obtained a re-test. For the re-test, she went back to the same Theranos Wellness Center located at a Walgreens retail store in Mesa, Arizona. Again, she had her blood drawn at this Walgreens store.

352. S.J. paid for her Theranos tests through Medicare.

353. Having been led to believe the "test" results were reliable, and following two similarly reported Theranos tests, S.J. and her physician relied on the results to make decisions concerning her health, including a course of medications which ultimately made S.J. very ill. S.J. became so ill that she was treated at urgent care where she made the decision to cease all medications prescribed for diabetes.

354. Following her reaction to the diabetes medication, along with her original belief that she did not have diabetes, S.J. began seeing another physician who ordered repeat lab testing to be done at a non-Theranos facility. The results confirmed that S.J. did not have diabetes, and had been improperly diagnosed and treated based on the Theranos test results.

355. The Theranos tests that S.J. purchased were unreliable and/or inaccurate.

356. Subsequently, as alleged above, Theranos voided the results of all of the "tiny" blood tests, including S.J.'s "tiny" "tests."

357. Plaintiff S.J. would not have purchased any Theranos test if she had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable. Plaintiff S.J. would not have submitted to Theranos tests if she had known that Walgreens and Theranos were using her blood and urine tests for research and product development.

358. Plaintiff S.J. was battered, injured, damaged and harmed by Defendants' misconduct.

359. Plaintiff S.J. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

360. In addition to the other harm described herein, Plaintiff S.J. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos tests she purchased and the invasion of her body under false pretenses and without her consent, and harm to her human dignity connected to being subjected to battery.

361. Any purported consent by S.J. to have her blood drawn or her urine collected by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

**Plaintiff S.L.**

362. On or about February 19, 2015, and October 5, 2015, Plaintiff S.L. purchased Theranos blood tests at a Walgreens Pharmacy in Chandler, Arizona. In both instances, he had his blood drawn at this Walgreens store. The tests that he purchased

included tests regarding diabetes and his liver. S.L. purchased Theranos tests to get accurate and reliable results about his health. He trusted Theranos and Walgreens to provide accurate and reliable test results.

363. Prior to each visit, S.L. had seen and heard advertisements for Theranos that caused him to believe that Theranos test results would be as reliable as other labs' results, and that Theranos was the cheapest and least invasive alternative option for blood testing. S.L. specifically recalls seeing a pamphlet advertisement and visiting the Theranos website in or around January and October 2015 and viewing representations to the effect that Theranos was "as reliable" as other laboratories. In choosing to have his blood tested by Theranos, he relied on marketing from Theranos and Walgreens regarding the reliability of their services, including as specified above. He also expected tests conducted at Walgreens to be trustworthy and reliable.

364. S.L. paid approximately $100 out of pocket for the Theranos tests.

365. When he purchased Theranos tests, one or more vials of blood were drawn from a vein in S.L.'s arm. S.L. did not know that Defendants drew his blood for the purpose of research and product development and he did not consent to such procedure for such purpose.

366. S.L. believed that Defendants' services were ready-for-market and reliable. He had no contemporaneous knowledge about the unreliability and litany of problems with Theranos testing, facilities, and equipment, alleged herein. He relied on the Defendants' omissions in this respect. Had he known of this concealed information, he would not have submitted to this testing.

367. Having been led to believe the results were reliable, S.L. relied on them, using the results to make decisions concerning his health.

368. The results from his Theranos test indicated certain levels that were elevated from the prior year and that he was diabetic. His doctor ordered an ultrasound of the liver, and he took medication for diabetics.

369. The Theranos tests that S.L. purchased were unreliable and/or inaccurate.

370. At his doctor's direction, S.L. had his blood re-tested by another company and his results were in the normal range, including showing he was pre-diabetic, significantly different from his Theranos tests.

371. Plaintiff S.L. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable. Plaintiff S.L would not have submitted to Theranos tests if he had known that Walgreens and Theranos were using his blood tests for research and product development.

372. Plaintiff S.L. was injured, damaged and harmed by Defendants' misconduct.

373. Plaintiff S.L. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

374. In addition to the other harm described herein, Plaintiff S.L. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased and the invasion of his body under false pretenses and without his consent.

375. Any purported consent by S.L. to have his blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

## V. CLASS ACTION ALLEGATIONS

376. Plaintiffs bring this action on behalf of themselves and proposed the Class and Subclasses, pursuant to Federal Rules of Civil Procedure Rule 23, defined as follows:

> **Class**:  All purchasers of Theranos testing services, including consumers who paid out-of-pocket, through health insurance, or through any other collateral source (collectively, "purchasers").

> **Arizona Subclass**:  All purchasers of Theranos testing services in Arizona.

> **California Subclass:**  All purchasers of Theranos testing services in California.

> **Edison Subclass:**  All purchasers of Theranos testing services who were subjected to "tiny" blood draws.

377.    This action is brought as a class action and may properly be so maintained pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs reserve the right to amend or modify the Class and Subclass descriptions with greater specificity or further division into subclasses or limitation to particular issues, based on the results of discovery.  Excluded from the Class and Subclasses are Defendants, their affiliates, employees, officers and directors, persons or entities, and the Judge(s) assigned to this case.

378.    **Numerosity** – The members of the Class and Subclasses are so numerous that their individual joinder is impracticable.  On information and belief, there are at least thousands of members in each Class/Subclass.  The membership of the Class and Subclasses are determinable by objective criteria using Defendants' own records.

379.    **Common Question of Fact and Law** – There are questions of law and fact common to the Class and Subclasses.  These questions predominate over any questions affecting only individual Class members.  These common legal and factual issues include, but are not limited to:

    a.    Whether Defendants intentionally concealed material information about the reliability of Theranos test results and/or about the compliance of Theranos's testing facilities and/or equipment;

    b.    Whether Defendants had a duty to disclose to Plaintiffs and the Class material information regarding the reliability of Theranos's testing services;

    c.    Whether Theranos and/or Walgreens had contractual obligations with Plaintiffs and the Class regarding Theranos's testing services;

    d.    Whether Theranos and Walgreens were obligated to provide testing services and test results that were reliable;

    e.    Whether Defendants together constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c);

| | |
|---|---|
| 1 | f.      Whether Theranos and Walgreens concealed, falsely portrayed and/or |
| 2 | misrepresented the state of the Edison technology and the purpose of |
| 3 | the "tiny" blood draws; |
| 4 | g.      Whether legitimate blood testing was the essential nature and purpose |
| 5 | of the "tiny" blood draws; |
| 6 | h.      Whether Defendants' conduct violates the laws as set forth in the |
| 7 | causes of action; |
| 8 | i.      Whether Plaintiffs and the Class have been harmed as a result of |
| 9 | Defendants' conduct alleged herein; and |
| 10 | j.      Whether Defendants have been unjustly enriched as a result of their |
| 11 | conduct alleged herein. |

380.   **Typicality** – The claims of the representative Plaintiffs are typical of the claims of the Class and corresponding Subclasses. Plaintiffs and the Class and Subclasses were subject to the same common pattern of conduct by Defendants, and the Plaintiffs, like the other members of the Class and Subclasses, have sustained damages arising from Defendants' violations of the law, as alleged herein.

381.   **Adequacy** – The representative Plaintiffs will fairly and adequately represent and protect the interests of the Class and Subclass members and have retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation. There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class and Subclasses that would make class certification inappropriate. Counsel for the classes will vigorously assert the claims of all Class and Subclass members.

382.   **Predominance and Superiority** – This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class and Subclasses predominate over the questions affecting only individual members, and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by individual Class and

Subclass members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendants' conduct. Further, it would be virtually impossible for each of the Class members to individually redress effectively the wrongs done to them. Even if Class members themselves could afford such individual litigation, the court system could not. In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Plaintiffs anticipate no unusual difficulties in managing this class action.

383.    Plaintiffs contemplate the eventual issuance of notice to the proposed Class and Subclass members setting forth the subject and nature of the instant action. On information and belief, Defendants' own business records and electronic media can be utilized for the contemplated notice. To the extent that any further notice may be required, Plaintiffs would contemplate the use of additional media and/or mailings.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*)**Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

385.    To the extent this claim is based directly on affirmative misrepresentations, it is brought by Plaintiffs on behalf of themselves and the Arizona Subclass against Defendants Theranos and Walgreens. Otherwise, Plaintiffs bring this claim on behalf of themselves and the Arizona Subclass against all Defendants.

1    386.   Walgreens, Theranos, Holmes, and Balwani are "persons" within the

2    meaning of A.R.S. § 44-1521(6).

3    387.   Theranos lab panels and blood and other clinical tests sold in Arizona are

4    "merchandise" within the meaning of A.R.S. § 44-1521(5).

5    388.   As alleged herein, Walgreens, Theranos, Holmes, and Balwani have

6    engaged in deception, unfair acts or practices, fraud, false pretenses, false promises,

7    misrepresentation, concealment, suppression and omission of material facts, as prohibited

8    by A.R.S. § 44-1522(A).

9    389.   Throughout the relevant time period, Walgreens and Theranos marketed and

10   sold unreliable Theranos testing services that they knew to be unreliable and/or which

11   they failed to take sufficient steps to ensure the reliability of, and encouraged consumers

12   to rely on such tests to make decisions about their health and treatment.

13   390.   Throughout the relevant time period, Walgreens and Theranos marketed

14   Theranos testing services as being ready-for-market, when they knew such testing was not

15   ready for market.

16   391.   Throughout the time that "tiny" blood draws were being administered, and

17   in the time leading up to same, Walgreens and Theranos pervasively advertised and

18   portrayed, expressly and by clear implication, the Edison technology as being market-

19   ready and reliable, and the "tiny" blood draws as being for blood testing purposes, when

20   none of that was true.

21   392.   Throughout the relevant time period, Walgreens and Theranos concealed the

22   truth about the unready, still-in-development state of the Edison technology and the true

23   essential nature and purposes of the "tiny" blood draws.

24   393.   Walgreens and Theranos owed a duty to the Edison Subclass to tell them

25   this material information about Edison and the "tiny" blood draws.

26   394.   Walgreens, Theranos, Holmes, and Balwani each knew that Plaintiffs and

27   the Arizona Subclass would reasonably expect Theranos tests to be reliable, given, *inter*

28

*alia,* the nature and importance of blood and other clinical testing, Defendants'
representations, and the involvement of Walgreens.

395. Walgreens and Theranos made affirmative misrepresentations, as alleged
herein, including:

      a.    False and misleading statements that Theranos tests were reliable,
CLIA-certified, and validated and compliant with federal guidelines;

      b.    False and misleading statements that Theranos's testing facilities and
equipment were compliant with laws and regulations;

      c.    False and misleading statements that Theranos's testing services were
industry leading in quality;

      d.    False and misleading statements that Theranos's testing services were
ready-for-market;

      e.    False and misleading statements portraying, expressly and by clear
implication, the Edison technology as being market-ready and
reliable, and the "tiny" blood draws as being for blood testing
purposes, when none of that was true.

396. Theranos's and Walgreens' affirmative misrepresentations were pervasive,
and included their broad marketing campaign, as described herein, which was intended to
broadly reach consumers throughout the pertinent geographic areas and their medical
providers. Plaintiffs and the Class were exposed to this broad marketing campaign.

397. Although not the direct basis for their liability under this claim, Holmes and
Balwani also knowingly made certain false and misleading statements regarding Theranos
testing as alleged herein.

398. Throughout the relevant time period, Theranos, Walgreens, Holmes and
Balwani concealed material information from Plaintiffs and the Arizona Subclass, as
alleged herein, including:

      a.    Failure to disclose and intentional concealment of known material
information about the unreliability of Theranos's testing services;

1           b.    Failure to disclose and intentional concealment of known material

2                 information about deficiencies and non-compliance of Theranos's

3                 testing facilities and/or equipment;

4           c.    Failure to disclose and intentional concealment of the fact that

5                 Theranos's testing services were not ready-for-market and that

6                 Theranos and Walgreens were using the tests conducted on

7                 consumers for research and product development;

8           d.    Failure to disclose and intentional concealment of the fact that

9                 Walgreens had agreed not to require or obtain objective proof that

10              Theranos's testing services were reliable despite the fact that it had

11              identified numerous red flags and concerns that put it on notice of the

12              problems;

13           e.    Failure to disclose and intentional concealment of the fact that

14              Walgreens had agreed to conduct no oversight of Theranos's

15              laboratory testing practices despite the fact that it had identified

16              numerous red flags and concerns that put it on notice of the problems;

17           f.    Failure to disclose and intentional concealment of the fact that

18              Theranos employees were not adequately trained to perform their job

19              functions without endangering patients, including as described in

20              letters from CMS;

21           g.    Failure to disclose and intentional concealment of the fact that

22              Theranos manipulated its internal proficiency testing process and

23              covered up known reliability problems; and

24           h.    Failure to disclose and intentional concealment of the fact that

25              Theranos's internal validation tests showed that Theranos testing was

26              unreliable.

27

28

1     i. Failure to disclose and intentional concealment of the truth about the

2       unready, still-in-development state of the Edison technology and the

3       true essential nature and purposes of the "tiny" blood draws.

4   399. Walgreens and Theranos, Holmes, and Balwani knew that their promises

5 and representations were false and misleading and material, and that the facts they failed

6 to disclose and concealed were material.

7   400. Walgreens, Theranos, Holmes, and Balwani owed a duty to Plaintiffs and

8 the Arizona Subclass to provide them material information about the unreliability of

9 Theranos tests, including but not limited to because they had exclusive and far superior

10 knowledge regarding the material information, because of the nature of the information in

11 question, because they knew that customers would rely on them to provide accurate and

12 complete material information about the reliability and readiness of the tests, and because

13 they had disseminated pervasive false and/or partial representations about Theranos

14 testing that were misleading absent full disclosure.

15   401. Walgreens, Theranos, Holmes, and Balwani's respective misrepresentations

16 and omissions, alleged herein, were likely to deceive and had a tendency to deceive

17 reasonable consumers, and have deceived Plaintiffs and the Arizona Subclass. The facts

18 misrepresented and concealed by Walgreens, Theranos, Holmes, and Balwani would be

19 material to a reasonable consumer. Defendants' misrepresentations and omissions were

20 pervasive.

21   402. Walgreens, Theranos, Holmes, and Balwani intended for Plaintiffs and

22 Arizona Subclass members to rely on their misrepresentations, false promises, and

23 omissions concerning Theranos testing.

24   403. Plaintiffs and the Arizona Subclass members have reasonably relied on the

25 false promises, material misrepresentations and omissions made by Defendants, including

26 but not limited to by paying (out-of-pocket and/or through health insurance or another

27 collateral source) for Theranos testing services, permitting Defendants to take blood

28

samples from them under false pretenses, and relying on unreliable Theranos test results to make decisions about their health.

404.    Defendants' conduct was wanton and reckless, and Defendants demonstrated reckless indifference to the rights, health, and safety of Plaintiffs and members of the Arizona Subclass.

405.    As a result of the A.R.S. § 44-1522(A) violations described above, Plaintiffs and each and every Arizona Subclass member have suffered actual damages.

406.    On behalf of themselves and Arizona Subclass members, Plaintiffs seek relief as prayed for below.

## SECOND CAUSE OF ACTION
### (Fraud)

407.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

408.    To the extent this claim is based directly on affirmative misrepresentations, it is brought by Plaintiffs on behalf of themselves and the Class against Defendants Theranos and Walgreens.  Otherwise, Plaintiffs bring this claim on behalf of themselves and the Class against all Defendants.

409.    Throughout the relevant time period, Walgreens and Theranos marketed and sold unreliable Theranos testing services that they knew to be unreliable and/or which they failed to take sufficient steps to ensure the reliability of, and encouraged consumers to rely on such tests to make decisions about their health and treatment.

410.    Throughout the relevant time period, Walgreens and Theranos marketed Theranos testing services as being ready-for-market when they knew such testing was not ready for market.

411.    Throughout the time that "tiny" blood draws were being administered, and in the time leading up to same, Walgreens and Theranos pervasively advertised and portrayed, expressly and by clear implication, the Edison technology as being market-

ready and reliable, and the "tiny" blood draws as being for blood testing purposes, when none of that was true.

412.     Throughout the relevant time period, Walgreens and Theranos concealed the truth about the unready, still-in-development state of the Edison technology and the true essential nature and purposes of the "tiny" blood draws.

413.     Walgreens and Theranos owed a duty to the Edison Subclass to tell them this material information about Edison and the "tiny" blood draws.

414.     Walgreens, Theranos, Holmes, and Balwani each knew that Plaintiffs and the Class would reasonably expect Theranos tests to be reliable, given, *inter alia,* the nature and importance of blood and other clinical testing, Defendants' representations, and the involvement of Walgreens.

415.     Walgreens and Theranos made affirmative misrepresentations, as alleged herein, including as summarized in the prior cause of action and described above.

416.     Theranos's and Walgreens' affirmative misrepresentations were pervasive, and included their broad marketing campaign, as described herein, which was intended to broadly reach consumers throughout the pertinent geographic areas and their medical providers.  Plaintiffs and the Class were exposed to this broad marketing campaign.

417.     Although not the direct basis for their liability for this claim, Holmes and Balwani also knowingly made certain false and misleading statements regarding Theranos testing as alleged herein.

418.     Throughout the relevant time period, Theranos Walgreens, Holmes and Balwani concealed material information from Plaintiffs and the Class, as alleged herein, including as summarized in the prior cause of action and described above.

419.     Walgreens, Theranos, Holmes, and Balwani knew that their promises and representations were false and misleading and material, and that the facts they failed to disclose and concealed were material.

420.     Walgreens, Theranos, Holmes, and Balwani owed a duty to Plaintiffs and the Class to provide them material information about the unreliability of Theranos tests,

including but not limited to because of the reasons summarized in the prior cause of action and described above.

421. Walgreens, Theranos, Holmes, and Balwani's respective misrepresentations and omissions, alleged herein, were likely to deceive and had a tendency to deceive reasonable consumers, and have deceived Plaintiffs and the Class. The facts misrepresented and concealed by Walgreens, Theranos, Holmes, and Balwani would be material to a reasonable consumer. Defendants' misrepresentations and omissions were pervasive.

422. Walgreens, Theranos, Holmes, and Balwani intended for Plaintiffs and Class members to rely on their misrepresentations, false promises, and omissions concerning Theranos testing.

423. Walgreens, Theranos, Holmes and Balwani, who had superior knowledge regarding Theranos testing, were in a unique position to prevent harm to their customers. Instead, Walgreens, Theranos, Holmes and Balwani made false and misleading representations to Plaintiffs and the Class about Theranos tests and the accuracy and reliability of same, and concealed material information from them regarding the true nature of Theranos tests and Theranos's facilities and equipment, as alleged herein.

424. At all relevant times, Walgreens, Theranos, Holmes and Balwani had a duty to disclose all facts material to Plaintiffs' and the Class members' submission to Theranos testing, purchase of Theranos testing, and reliance upon Theranos test results.

425. Walgreens also deliberately ignored and intentionally remained ignorant of details concerning the unreliability of Theranos testing.

426. Plaintiffs and the Class members have reasonably relied on the false promises, material misrepresentations and omissions made by Defendants. Plaintiffs and the Class were actually misled and deceived. As a direct result of conduct by Walgreens, Theranos, Holmes and Balwani, they were induced to undergo blood draws they would not have undergone, to pay for Theranos products and/or services that they would not have purchased (out-of-pocket and/or through health insurance or another collateral

source), and to rely on unreliable Theranos test results they would not have relied upon had they known the truth, to make decisions concerning their health.

427. As a foreseeable and natural consequence of conduct by Walgreens, Theranos, Holmes and Balwani, Plaintiffs and the Class have suffered actual damages.

428. Defendants' misconduct alleged herein was intentional, deliberate, and willful.

429. On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## THIRD CAUSE OF ACTION
### (Battery)

430. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

431. Plaintiffs B.P., R.C., and S.J. bring this claim on behalf of themselves and the Edison Subclass against Defendants Walgreens and Theranos.

432. Defendants Walgreens and Theranos both engaged in acts that resulted in harmful and offensive contact with Plaintiffs B.P., R.C., and S.J., and the members of the Edison Subclass.

433. Plaintiffs B.P., R.C., and S.J., and all of the Edison Subclass members each submitted to one or more so-called "tiny" blood draws at the Wellness Centers. Pursuant to these blood draws, a needle was stuck into their bodies, penetrating their skin and tissue, and blood was drawn from their bodies.

434. The vast majority of these "tiny" blood draws occurred in Walgreens stores, and a small portion of them occurred in Theranos Wellness Centers.

435. For the Edison Subclass member "tiny" blood draws that were conducted at Walgreens stores, the blood draws were administered by a Walgreens employee or an individual working for both Walgreens and Theranos, often with the assistance and in the presence of a Theranos employee. In all such cases, *both* Walgreens *and* Theranos did acts that resulted in the blood draws and that encouraged the blood draws—including, but

SECOND AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT
CASE NO. 2:16-CV-2138-HRH

not limited to, through their pervasive marketing and encouragement of same, through their provision of the space, infrastructure, support, personnel, and equipment used for the blood draws and related services, and through their direct assistance and involvement with the blood draws and their in-store interactions with the subjects. Both Walgreens and Theranos, including through their respective employees, did acts that caused the harmful and offensive touching of each of these subjects, and both companies caused each of these touchings to occur.

436. For the "tiny" blood draws that were conducted at Theranos Wellness Centers, the blood draws were administered by Theranos employees.

437. The acts engaged in by Walgreens and Theranos that caused the "tiny" blood draws, were all done intentionally, and also with the intent and knowledge that they would result in harmful and offensive contact.

438. The touchings (i.e., the "tiny" blood draws) that Plaintiffs B.P., R.C., and S.J., and the Edison Subclass were subjected to were harmful and offensive. A reasonable person in their situation would have been offended by the touchings under the circumstances.

439. Plaintiffs B.P., R.C., and S.J., and the Edison Subclass members did not consent to these touchings. Any ostensible "consent" they provided was vitiated under the circumstances and not effective.

440. Plaintiffs B.P., R.C., and S.J., and the Edison Subclass members agreed to submit to these "tiny" blood draws," but, as alleged herein, they each did so under false pretenses and under a substantial mistaken belief as to the essential nature and purpose of the blood draws. Moreover, as alleged herein, their consent was procured by fraud, misrepresentations, and material omissions by Theranos and Walgreens.

441. Plaintiffs B.P., R.C., and S.J., and the Edison Subclass members reasonably believed, contemporaneously when they agreed to submit to their "tiny" blood draws, that the essential nature and purpose of such blood draws was legitimate blood testing.

442. Theranos and Walgreens both knew contemporaneously that Plaintiffs B.P., R.C., and S.J., and the Edison Subclass members agreed to submit to the "tiny" blood draws under a substantial mistaken belief as to essential nature and purpose of such blood draws. Theranos and Walgreens both knew that these consumers mistakenly and reasonably believed that the essential nature and purpose of these "tiny" blood draws was legitimate blood testing.

443. As alleged herein, pervasive affirmative misrepresentations by Theranos and Walgreens, in the time leading up to and throughout the time the "tiny" blood draws were being administered, substantially contributed to Plaintiffs B.P., R.C., and S.J.'s, and the Edison Subclass members' mistaken belief regarding the essential nature and purpose of their "tiny" blood draws. This included a pervasive joint marketing campaign carried out by Theranos and Walgreens throughout the relevant time period, that encouraged consumers to pay for and submit to "tiny" blood draws for the very purpose of blood testing. The fundamental premise of this campaign was the portrayal of the "tiny" blood draws and Edison, and of the services generally, as market-ready and reliable and being for legitimate blood testing purposes.

444. As alleged herein, also substantially contributing to Plaintiffs' B.P., R.C., and S.J.'s, and the Edison Subclass members' mistaken belief regarding the essential nature and purpose of their "tiny" blood draws was the entire context, nature, design, and infrastructure of the Wellness Centers in which the "tiny" blood draws were conducted, which both Theranos and Walgreens designed, and which were intentionally designed by Theranos and Walgreens to give the impression, and which did give the clear impression to consumers, that the blood draws being conducted there were for legitimate blood testing purposes.

445. As alleged herein, the concealment of material information by Theranos and Walgreens also substantially contributed to the Edison Subclass members' mistaken belief regarding the essential nature and purpose of their "tiny" blood draws. Throughout the relevant time period, even though both Walgreens and Theranos knew that the subjects of

these "tiny" blood draws were agreeing to submit to them under a substantial mistaken belief as to the essential nature and purpose of the blood draws, and were thus going to be touched in a harmful and offensive way, neither Walgreens nor Theranos took any steps to correct this mistaken belief or to avoid the harmful and offensive contact. To the contrary, both companies intentionally concealed material information about Edison and the "tiny" blood draws, and actively encouraged, caused, and assisted the contact.

446. Both Walgreens and Theranos intentionally concealed and failed to disclose, *inter alia*: the truth about the unready Edison technology; that the essential nature and purpose of the "tiny" blood draws was not, and could not have been, legitimate blood testing; and the true essential nature and purposes of the "tiny" blood draws.

447. The "tiny" blood draws were not intended by Walgreens and Theranos to provide reliable blood test results (i.e., "legitimate blood testing").

448. The essential nature and purpose of the "tiny" blood draws was not legitimate blood testing and, indeed, could not have been legitimate blood testing because, as alleged herein and unbeknownst to the subjects at the time they gave their consent, the Edison technology was still in development, still in prototype, not ready-for-market, and nowhere near in a position to serve that purpose. Theranos and Walgreens each knew this to be the case throughout the entire time "tiny" blood draws were being conducted at Walgreens and Theranos facilities. To the extent Walgreens lacked any more detailed knowledge, it was by virtue of its own deliberate choices to ignore and/or avoid such details.

449. As alleged in more detail herein, the true essential nature and purposes of the "tiny" blood draws was to assist efforts to research and develop the still-in-development Edison technology, expedite the narrative of Edison as a "disruptive" technology in the industry, and woo and appease investors, potential investors, and co-investors by creating the false impression that Edison was a market-ready, breakthrough technology.

450.    Theranos and Walgreens knew, but Plaintiffs B.P., R.C., and S.J., and the Edison Subclass members could not reasonably have known, the true nature and purposes of the "tiny" blood draws.

451.    Any purported consent that Plaintiffs B.P., R.C., and S.J. and the Edison Subclass members gave for the "tiny" blood draws, was given under a substantial mistake as to the essential nature and purpose of the draws, was induced by fraud, concealment, and misrepresentations, and was not effective.

452.    Plaintiffs B.P., R.C., and S.J., and Edison Subclass members did not consent to be subjects for experimentation, research, product development, or other undisclosed objectives.

453.    Theranos and Walgreens willfully and tortiously battered B.P., R.C., and S.J., and the Edison Subclass members.

454.    Moreover, Theranos and Walgreens each aided and abetted the other in committing the battery through their conduct alleged herein.  Both had actual knowledge of the harmful and offensive, non-consensual contact that was occurring, and both took steps that enabled, substantially assisted, encouraged, and were a substantial factor in, the other carrying out the touching and causing the touching to occur.  Both Theranos and Walgreens are directly liable for battery as to the Edison Subclass members, and are also liable as aiders and abettors.

455.    Theranos and Walgreens knew or should have known that their conduct alleged herein regarding the "tiny" blood draws, including but not limited to sticking them with needles, drawing their blood, and willfully experimenting upon Plaintiffs and the Edison Subclass under false pretenses and without obtaining their consent, would be an affront to the dignity of Plaintiffs B.P., R.C., S.J., and the Edison Subclass members as human beings.

456.    Theranos's and Walgreens' misconduct alleged herein was intentional, deliberate, and willful.

457. Plaintiffs B.P., R.C., and S.J., and the members of the Edison Subclass were harmed and injured by this harmful and offensive touching.

458. As a foreseeable, proximate, and direct result of Theranos's and Walgreens' conduct, Plaintiffs B.P., R.C., and S.J. and the Edison Subclass members each have suffered a battery and have been damaged, including as otherwise set forth in this Complaint, and by invasion of their privacy and bodily integrity without their consent, severe emotional stress and anxiety, and harm to their human dignity and corresponding damages therefrom.

459. On behalf of themselves and the Edison Subclass, Plaintiffs B.P., R.C., and S.J. seek relief as prayed for below.

## FOURTH CAUSE OF ACTION
### (Negligence)

460. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

461. Plaintiffs bring this claim on behalf of themselves and the Class against Defendants Walgreens and Theranos, and as appropriate bring this claim in the alternative.

462. Walgreens and Theranos owed a duty of care to Plaintiffs and the Class, to provide testing services that were safe, reliable, and compliant with applicable laws and regulations. Such duty arose from, *inter alia*, the nature of their relationship to, and bargain with, the consumers, the medical related nature of the services at issue, and the special position of trust occupied by Theranos and Walgreens in the context of blood and clinical testing.

463. Walgreens and Theranos both breached their duty of care by designing and/or selling services that were unreliable, not ready-for-market, not safe for consumers to rely on, conducted in a manner that did not satisfy applicable laws, regulations, and/or standards for quality control, conducted in laboratories that did not meet applicable laws,

regulations, and/or standards for safety and training, and conducted on inadequately maintained and calibrated equipment.

464.    Theranos additionally breached these duties by conducting "tests" on known unready technology, and in a manner that did not satisfy applicable laws, regulations, and/or standards for quality control, in laboratories that did not meet applicable laws, regulations, and/or standards for safety and training, and on inadequately maintained and calibrated equipment.

465.    At all relevant times, Walgreens additionally had a duty to Plaintiffs and the Class to take reasonable steps to ensure that Theranos testing was reliable and safe prior to offering Theranos services for sale in its stores.

466.    Walgreens breached this duty and acted unreasonably by deliberately ignoring and intentionally remaining ignorant of material facts about Theranos testing, despite the fact that it had identified numerous red flags and concerns that put it on notice of the problems, without requiring objective evidence from Theranos that the tests were reliable, and while deliberately and knowingly maintaining no oversight of Theranos's testing services.

467.    With full knowledge that consumers would rely on its endorsement of Theranos, Walgreens failed to take reasonable steps to prevent consumers from submitting to, paying for, and relying upon unreliable and unsafe Theranos testing services.

468.    By permitting Theranos tests to be conducted in Walgreens stores, despite identifying numerous red flags and concerns that put it on notice about the unreliability of Theranos tests, and when it had knowledge that the tests were in fact unreliable, Walgreens acted unreasonably under the circumstances.

469.    Plaintiffs and the Class were damaged as a direct and proximate result of Walgreens' and Theranos's negligent conduct.

470.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

# FIFTH CAUSE OF ACTION
## (Negligent Misrepresentation)

471. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

472. Plaintiffs bring this claim on behalf of themselves and the Class against Defendants Walgreens and Theranos, and as appropriate bring this claim in the alternative to their claims alleging affirmative misrepresentations.

473. Walgreens and Theranos each made false statements of fact and provided false information to Plaintiffs and the Class regarding Theranos testing, including as summarized in the First Cause of Action and as described above. These false statements and false information included pervasive marketing by both companies which falsely portrayed Edison and the "tiny" blood draws as being market-ready and for legitimate blood testing purposes, as well as pervasive marketing which falsely characterized Theranos testing as reliable and certified by and compliant with government and industry standards.

474. These false statements and false information were provided in the context of a business transaction—namely, to induce Plaintiffs and the Class to purchase testing services.

475. Theranos and Walgreens knew that Plaintiffs and the Class would rely on these false statements and false information, and intended for them to do so.

476. Theranos and Walgreens failed to exercise reasonable care in obtaining and communicating the false statements and false information.

477. At all relevant times, Walgreens and Theranos had a duty to disclose all facts material to Plaintiffs' and the Class members' submission to Theranos testing, purchase of Theranos testing, and reliance upon Theranos test results.

478. Walgreens and Theranos specifically and expressly misrepresented material facts to Plaintiffs and the Class, as alleged herein, including by, *inter alia,* promoting and selling as safe and reliable, tests that were unreliable, not ready-for-market, not safe for

consumers to rely on, conducted in a manner that did not satisfy applicable laws, regulations, and/or standards for quality control, conducted in laboratories that did not meet applicable laws, regulations, and/or standards for safety and training, and conducted on inadequately maintained and calibrated equipment.

479.    Walgreens and Theranos knew, or in the exercise of reasonable diligence should have known, that their express representations regarding Theranos testing were false and misleading.  Walgreens and Theranos made such statements without reasonable grounds for believing them to be true.

480.    The misrepresentations made by Walgreens and Theranos were pervasive.

481.    The misrepresentations made by Walgreens and Theranos were likely to deceive and had a tendency to deceive reasonable consumers, and have deceived Plaintiffs and the Class.  The facts misrepresented by Walgreens and Theranos would be material to a reasonable consumer.

482.    Plaintiffs and the Class reasonably and justifiably relied on Walgreens' and Theranos's false statements and false information, in purchasing and submitting to Theranos testing.

483.    As a result of Walgreens' and Theranos's conduct, Plaintiffs and the Class have suffered actual damages.

484.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

### SIXTH CAUSE OF ACTION
### (Breach of Contract)

485.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

486.    Plaintiffs bring this claim on behalf of themselves and the Class against Defendants Walgreens and Theranos.

487.    To Plaintiffs and the Class, Walgreens and Theranos offered to provide reliable, ready-for-market testing services in exchange for submission to blood draws and

other clinical procedures and payment of financial compensation, paid out-of-pocket by the consumer and/or paid through the consumer's health insurance or other collateral sources.

488. The promises and obligations by Walgreens and Theranos were set forth in pervasive marketing materials disseminated by Walgreens and Theranos regarding Theranos's testing services, as alleged herein. Moreover, the direct testing order forms and guide to direct testing (Ex. 11) that some Class members (whose test orders did not come directly from a physician (including Plaintiffs M.P. and R.G.)) received and submitted at the Wellness Centers reinforced some of these assurances, including that blood samples were collected "for the purpose of clinical laboratory tests," in order to "get vital information about [patients'] health when it matters most," among other things.

489. Each Plaintiff and Class member accepted Theranos's and Walgreens' offer for services, and thereby formed an express and/or implied contract. For those who purchased services at a Walgreens store, their acceptance formed an express and/or implied contract between themselves and both Walgreens and Theranos. For those who purchased services at a Theranos-owned facility, their acceptance formed an express and/or implied contract between themselves and Theranos.

490. In the context of consumer purchases of blood and clinical testing services, even if Walgreens and Theranos had not represented and promised that their testing services were ready-for-market and reliable (which they did), such attributes are implied terms of the purchase contract. A reasonable consumer would not purchase blood or clinical testing services unless such services were expected to be reliable.

491. Plaintiffs and the Class relied on Theranos's and Walgreens' promises and covenants regarding Theranos testing services in agreeing to have their blood and urine tested by Theranos.

492. Plaintiffs and the Class performed all of their obligations under their contracts with Theranos and/or Walgreens. They each submitted to blood draws and/or other clinical procedures. They each paid money for the services, either out of pocket or

through their health insurance or other collateral sources.  Revenue from services

purchased at Walgreens stores were divided between Walgreens and Theranos.

493.    Walgreens and Theranos breached their respective contracts with Plaintiffs

and the Class by, *inter alia*:  (1) failing to deliver testing services that were ready-for-

market or, at least in some cases, even for legitimate testing purposes; (2) failing to

deliver testing services and test results that were reliable or of the quality promised; (3)

not ensuring that Theranos's equipment met its own and/or reasonable quality standards;

(4) not ensuring that their services were tendered with reasonable care and workmanlike

effort, including by failing to comply with applicable laws, regulations, and standards for

laboratory testing services; and (5) failing to timely notify customers of the test results'

unreliability and known inaccuracies.

494.    Each Class member did not receive the benefit of their bargain—including

reliable test results.

495.    As a result of Defendants' breaches described above, Plaintiffs and the Class

have suffered damages.

496.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for

below.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

497.    Plaintiffs incorporate the substantive allegations contained in all prior and

succeeding paragraphs as if fully set forth herein.

498.    Plaintiffs bring this claim on behalf of themselves and the Class against all

Defendants, and as appropriate bring this claim in the alternative to their legal claims.

499.    Plaintiffs lost money as a result of Defendants' conduct alleged herein.

500.    Walgreens, Theranos, Balwani and Holmes were each unjustly enriched by

their conduct alleged herein, including but not limited through revenues received in

connection with Plaintiffs' and the Class members' Theranos tests, through development

of their products, accumulation and storage of valuable patient information and usable

blood samples, and through additional business and revenues that Walgreens received by virtue of having Wellness Centers in their stores.

501.    All Defendants were unjustly enriched, including Holmes and Balwani, who on information and belief personally received at least millions of dollars each as a direct result of their personal conduct alleged herein, which conduct constituted a fundamental part of Theranos's operations and business.

502.    It would be inequitable and unjust for any of Walgreens, Theranos, Holmes, or Balwani to retain the money that they have received by their conduct.

503.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## EIGHTH CAUSE OF ACTION
### (Aiding and Abetting Fraud)

504.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

505.    Plaintiffs bring this claim on behalf of themselves and the Class against Defendant Walgreens.

506.    Theranos, Holmes, and Balwani committed fraud resulting in injury to Plaintiffs and the Class, as alleged herein.  Walgreens' conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in, the commission of such fraud.

507.    Walgreens knew that Theranos testing was not reliable and that consumers should not be relying on Theranos testing in making health and treatment decisions.

508.    Walgreens knew that the Edison technology was still-in-development and not market-ready throughout the time the "tiny" blood draws were being administered.

509.    Walgreens identified numerous red flags and concerns about Theranos testing that put it on notice of the problems, but nevertheless made the deliberate choice to partner with Theranos, offer Theranos testing to customers at its stores, administer blood

draws, and facilitate the transfer of blood samples and other clinical samples from Walgreens customers to Theranos for use in research and product development.

510.     Walgreens had actual knowledge of the truth and had access to more than sufficient information to understand that Theranos tests were not reliable and were unsafe for consumers, and that the purpose of the "tiny" blood draws was not and could not have been legitimate blood testing.  To the extent Walgreens lacked any more detailed knowledge, it was by virtue of Walgreens' own deliberate choices and conduct in ignoring the problems it identified, deliberately failing to follow up on the concerns and information it had, and ceding to Theranos's requests to carry on without further information being provided.

511.     Walgreens had actual knowledge of measures that it could have taken to prevent Walgreens clinics and marketing from being used to perpetrate fraud, to provide consumers with accurate information, and to reduce the reach of Theranos's, Holmes' and Balwani's fraudulent conduct, but nevertheless knowingly and deliberately decided not to adopt such measures, and instead chose to maintain policies and practices that enabled and assisted the fraud.

512.     Before and during the commission of the fraud, Walgreens intended to aid and abet, and did substantially assist, Theranos, Holmes, and Balwani in fraud perpetrated on Plaintiffs and the Class members by, *inter alia*, marketing, promoting, and otherwise treating Theranos testing as reliable and compliant with applicable laws and standards, and portraying Edison and the "tiny" blood tests as market-ready, although Walgreens knew and/or knowingly and deliberately failed to discover that this information was false, by concealing material information about the reliability and safety of Theranos tests and the unready state of Edison, by allowing Theranos tests to be sold and conducted in its pharmacies, by administering blood draws, and by making available Walgreens employees to facilitate the sale and conducting of Theranos testing services, and transmission of blood samples from Walgreens customers to Theranos for use in research and product development.

513.    Walgreens' conduct alleged herein was knowing and intentional, and was carried out by Walgreens in order to benefit Walgreens, including in the form of ill-gotten revenues.  Walgreens received revenue from assisting in the perpetration of fraud by Theranos, Holmes and Balwani, including through sales of Theranos tests and through increased sales of other Walgreens products to new and existing customers.  Walgreens also benefited financially and reputationally as a result of being the first national retail store to provide direct-to-consumer testing services.

514.    Plaintiffs and the Class suffered actual damages as a result of Walgreens' conduct in aiding and abetting fraud.

515.    Walgreens' misconduct alleged herein was intentional, deliberate, and willful.

516.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## NINTH CAUSE OF ACTION
### (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c))

517.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

518.    Plaintiffs bring this claim on behalf of themselves and the Class against Defendants Walgreens, Theranos, Balwani and Holmes.

519.    18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

520.    Theranos, Walgreens, Holmes, and Balwani are "persons" within the meaning of 18 U.S.C. § 1961(3).

521.    Theranos, Walgreens, Holmes, and Balwani together constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and will be referred to herein as the "Clinic RICO Enterprise."

522. The Clinic RICO Enterprise engaged in and affected interstate commerce within the meaning of 18 U.S.C. § 1962(c), including but not limited to commerce on the internet, and between residents of California, Arizona, and Pennsylvania.

523. The Clinic RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities. For example: Theranos concealed material information from consumers and advertised Theranos testing services as revolutionary, ready-for-market, for legitimate testing purposes, and reliable, when in fact its laboratories were staffed by inadequately trained personnel, used improperly calibrated equipment, at least some of the "tests" were not for legitimate testing purposes, and its test results were unreliable. Walgreens concealed material information from consumers, promoted and agreed to assist in promoting Theranos testing services to consumers, agreed to refrain from conducting any oversight or rigorous investigation regarding Theranos or its facilities and equipment, agreed to provide space for Theranos inside its stores to drive retail consumers toward its services and administer blood draws, and agreed to make available Walgreens employees who would facilitate the sale and performance of Theranos testing services. Holmes agreed to falsely promote Theranos testing as reliable, ready-for-market, and for legitimate blood testing purposes, and compliant with applicable laws and regulations, to cover up internally known problems, to conceal material information from consumers, and to dismiss, deny and downplay reported problems once Defendants' scheme began to collapse. Balwani agreed to use consumer tests that were being falsely marketed as being ready-for-market, in order to conduct research and product development and for other undisclosed purposes, cover up internally known problems, conceal material information from consumers, spread, repeat, and otherwise reinforce misleading representations and omissions about Theranos testing, cover up quality control failures and falsify information submitted to regulatory authorities, and to make every effort to prevent Defendants' scheme from being reported by employees or otherwise discovered.

524.    At all relevant times, Defendants operated, controlled, or managed the Clinic RICO Enterprise, and profited from the Clinic RICO Enterprise.  Defendants were responsible for the content of all marketing, advertisements, and other public-facing representations regarding Theranos, and for the material omissions alleged herein.

525.    The Clinic RICO Enterprise has had a common purpose: to perpetrate fraud, and in particular to market and sell testing services that were unreliable and not ready-for-market to unwitting consumers, obtain under false pretenses blood and other clinical samples for research and product development purposes, and assure customers and the public that the tests were reliable—thereby becoming the primary participants in the new, profitable, national market for direct-to-consumer testing services—while concealing that Theranos's testing services were unreliable, unsafe, at least in some cases not for legitimate testing purposes, and should not be used by consumers to make decisions about their health.

526.    Defendants conducted and participated in the conduct of the affairs of the Clinic RICO Enterprise through a pattern of racketeering activity, beginning at the latest in 2013, and continuing until at least 2016, and consisting of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.  Violations of the federal mail and wire fraud included, but were not limited to, to:  (a) the specific false statements in press releases and other media statements alleged herein (the time and place of which are identified herein); (b) the other specific, pervasive misrepresentations, alleged herein, that Walgreens and Theranos made on their respective websites and in electronic advertisements leading up to and during the time the services were being offered; and (c) the transmission of purported Edison "test results," which were used to perpetuate the mistaken belief that the "tiny" blood draws were for legitimate testing purposes.

527.    All Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and caused to be transmitted, by means of mail and wire

communications traveling in interstate commerce, writing(s), and/or signal(s), including the Walgreens and Theranos websites, online, mailed, televised, or other advertising, press releases, and Theranos "test results."

528. The conduct alleged herein was part of a scheme that Walgreens, Theranos, Balwani and Holmes formulated to defraud Plaintiffs and the Class, to receive financial and other benefits, and to make Theranos and Walgreens the primary participants in the new, profitable, national market for direct-to-consumer testing services. Defendants perpetrated this scheme with the specific intent to deceive and defraud Plaintiffs and the Class, and Defendants did deceive and defraud Plaintiffs and the Class.

529. These acts of racketeering spanned at least three years and are not isolated or long-ago completed events. Through the conduct of the Clinic RICO Enterprise, Defendants have fraudulently sold at least many thousands of unreliable and dangerous Theranos tests to consumers.

530. As a foreseeable and natural consequence of Defendants' scheme, Defendants injured Plaintiffs and the Class, including but not limited to in the form of their submission to and payment, out-of-pocket and/or through their health insurance or other collateral sources, for testing services that were unreliable, did not hold the promised value and were dangerous when used for their advertised purposes, and in the form of steps taken and not taken by Plaintiffs and the Class in reliance upon the test results and the corresponding monetary and other damages therefrom.

531. Defendants' acts also present a threat of continued racketeering activity, including but not limited to insofar as the Clinic RICO Enterprise has not issued formal invalidation notices for all Theranos test results.

532. On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

# TENTH CAUSE OF ACTION

## (Violation of California Business & Professions Code §§ 17200, *et seq.*)

533. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

534. To the extent this claim is based directly on affirmative misrepresentations, it is brought by Plaintiff A.R. on behalf of himself and the California Subclass against Defendants Theranos and Walgreens. Otherwise, Plaintiff A.R. brings this claim on behalf of himself and the California Subclass against all Defendants.

535. California's Unfair Competition Law ("UCL") defines unfair business competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.

536. Defendants' respective unlawful, unfair, and fraudulent business acts and practices are described throughout this Complaint and include, but are not limited to: (a) Theranos and Walgreens making affirmative misrepresentations as summarized in the First Cause of Action and described above; (b) all Defendants concealing material information as summarized in the First Cause of Action and described above; and (c) all Defendants marketing and selling unreliable Theranos tests that they knew to be unreliable and/or which they failed to take sufficient steps to ensure the reliability of, and encouraging consumers to rely on such tests to make decisions about their health and treatment.

537. Defendants' conduct alleged herein constitutes unlawful, unfair, and fraudulent business practices.

538. Walgreens, Theranos, Balwani and Holmes have violated the "fraudulent" prong of the UCL through their respective conduct, misrepresentations, and omissions alleged herein. These Defendants' misrepresentations and omissions were pervasive. Their respective misrepresentations and omissions are likely to deceive and have a tendency to deceive reasonable consumers, and have deceived Plaintiff A.R. and the California Subclass. The facts misrepresented and concealed by Walgreens, Theranos, Balwani and Holmes would be material to a reasonable consumer.

539.    Walgreens, Theranos, Balwani and Holmes had exclusive and superior knowledge regarding the material information that they concealed.

540.    Plaintiff A.R. and the California Subclass reasonably relied upon Walgreens' and Theranos's misrepresentations and on all of the Defendants' omissions to their detriment.

541.    Plaintiff A.R. specifically relied on the omissions by Walgreens, Theranos, Holmes, and Balwani alleged herein.  Had he known the information that was concealed, he would not have submitted to Theranos testing.

542.    All of the Defendants have also violated the "unfair" prong of the UCL through their misconduct alleged herein, under both the *Cel-Tech* "tethering" test[95] and "balancing" test.

543.    Defendants' conduct alleged herein violates California public policy, including but not limited to as such policy is reflected in California's Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*), Cal. Civ. Code § 1710, Cal. Comm. Code §§ 2314-2315, and in California common law.

544.    Defendants' conduct alleged herein is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.  Defendants have engaged in a years-long, pervasive scheme of: (a) marketing and selling unreliable Theranos tests and encouraging consumers to rely on those tests in making decisions about their health; (b) misrepresenting the reliability and other details about Theranos testing services, including that they were ready-for-market when that was not the case; and (c) concealing from consumers material information about the reliability of Theranos tests and the compliance of Theranos testing with applicable laws and standards.  This conduct is immoral, unethical, and unscrupulous.  Moreover, Defendants' conduct is oppressive and substantially injurious to consumers.  Among other things, as a direct result of Defendants' conduct alleged herein, Plaintiff A.R. and the California Subclass have paid

---

[95] *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999).

money and submitted to Theranos testing that was not only unreliable, but put their health and lives at risk. There is no countervailing utility to Defendants' conduct, and certainly none that outweighs the substantial detriment to Plaintiff A.R. and the California Subclass.

545. Defendants' conduct is also unlawful in that it violates Civil RICO; California's False Advertising Law, (Cal. Bus. & Prof. Code §§ 17500, *et seq.*), California's Consumer Legal Remedies Act, (Cal. Civ. Code § 1750, *et seq.*), statutory deceit, (Cal. Civ. Code § 1710), the Arizona Racketeering Act, (A.R.S. §§ 13-2301-04), and common law fraud, battery, medical battery, negligence, and negligent misrepresentation, which not only result in liability as to the individual causes of action, they also provide a basis for a finding of liability under the UCL.

546. Furthermore, Defendants' conduct violates declared legislative policies as set forth by the federal government in 40 C.F.R. § 600.307(a)(ii)(A); 40 C.F.R. § 600.302-08(b)(4) and 16 C.F.R. § 259.2(a).

547. As a result of Defendants' violations of California's Unfair Competition Law, Plaintiff A.R. and the California Subclass have suffered actual damages, including the loss of money and/or property in exchange for testing they would not, with knowledge of the truth, have allowed to be performed, and which is unreliable, not worth the promised value, and dangerous, and other money they have spent out-of-pocket as a result of the unreliable test results they received.

548. Pursuant to California Business and Professions Code §§ 17200 and 17203, on behalf of himself and the California Subclass, Plaintiff A.R. seeks relief as prayed for below.

**ELEVENTH CAUSE OF ACTION**
**(Violation of California Business & Professions Code §§ 17500, *et seq.*)**

549. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

550.     To the extent this claim is based directly on affirmative misrepresentations, it is brought by Plaintiff A.R. on behalf of himself and the California Subclass against Defendants Theranos and Walgreens.  Otherwise, Plaintiff A.R. brings this claim on behalf of himself and the California Subclass against all Defendants.

551.     California Bus. & Prof. Code § 17500 (the "FAL") states:  "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

552.     Defendants have committed acts of untrue and misleading advertising by disseminating materially misleading and deceptive information (Theranos and Walgreens), and omitting material information (all Defendants), as alleged herein, for purposes of inducing consumers to purchase and submit to Theranos testing services.

553.     Defendants' misrepresentations and omissions were pervasive.

554.     Defendants' respective misrepresentations and omissions are likely to deceive and have a tendency to deceive reasonable consumers, and have deceived Plaintiff A.R. and the California Subclass.  The facts misrepresented and concealed by Walgreens, Theranos, Balwani and Holmes would be material to a reasonable consumer.  A reasonable person would attach importance to them and would be induced to act on the information in making decisions.

555.     The Defendants had exclusive and superior knowledge regarding the material information that they concealed.

556.     Plaintiff A.R. and the California Subclass reasonably relied on Walgreens' and Theranos's misrepresentations and on all of the Defendants' omissions to their detriment.

557.    Plaintiff A.R. specifically relied on the omissions by Walgreens, Theranos, Holmes, and Balwani alleged herein.  Had he known the information that was concealed, he would not have submitted to Theranos testing.

558.    As a result of Defendants' violations, Plaintiff A.R. and the California Subclass have suffered actual damages, including the loss of money and/or property, received by the Defendants, in exchange for testing they would not, with knowledge of the truth, have allowed to be performed, and which is unreliable and dangerous, and other money they have spent out-of-pocket as a result of the unreliable test results they received.

559.    On behalf of himself and the California Subclass, Plaintiff A.R. seeks relief as prayed for below.

### TWELFTH CAUSE OF ACTION
**(Violation of California Civil Code §§ 1750 *et seq.*)**

560.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

561.    To the extent this claim is based directly on affirmative misrepresentations, it is brought by Plaintiff A.R. on behalf of himself and the California Subclass against Defendants Theranos and Walgreens.  Otherwise, Plaintiff A.R. brings this claim on behalf of himself and the California Subclass against all Defendants.

562.    Walgreens, Theranos, Holmes, and Balwani are "persons" under Cal. Civ. Code § 1761(c).

563.    Plaintiff A.R. and the members of the California Subclass are "consumers" under Cal. Civ. Code § 1761(d).

564.    Plaintiff A.R. and each California Subclass member's purchase of Theranos tests constitute "transactions" under Cal. Civ. Code § 1761(e).

565.    Theranos tests are "goods" and/or "services" under Cal. Civ. Code § 1761 (a-b).

566.     Plaintiff A.R. and the California Subclass members purchased Theranos tests for personal, family, and household purposes within the meaning of California Civil Code § 1761(d).

567.     As alleged herein, Walgreens and Theranos have engaged in unfair or deceptive acts or practices that violated California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.* by, among other things, representing that Theranos testing services have characteristics, uses, benefits, and qualities which they do not have; representing that Theranos testing services are of a particular standard, quality, and grade when they are not; and advertising Theranos testing services with the intent not to sell them as advertised.  Cal Civ. Code § 1770 (5), (7), and (9).

568.     Moreover, Walgreens, Theranos, Holmes, and Balwani actively failed to disclose and concealed material facts about Theranos tests, and otherwise engaged in activities with a tendency or capacity to deceive, as described herein.

569.     Defendants' misrepresentations and omissions were pervasive.

570.     Defendants' CLRA violations materially affected the decisions of Plaintiff A.R. and the California Subclass members.  Plaintiff A.R. and the California Subclass members reasonably relied upon Defendants' respective material misrepresentations and omissions, and would not have purchased Theranos tests or submitted their blood for testing to Defendants had they known the truth.

571.     Plaintiff A.R. specifically relied on the omissions by Walgreens, Theranos, Holmes, and Balwani alleged herein.  Had he known the information that was concealed, he would not have submitted to Theranos testing.

572.     As a result of the CLRA violations described herein, Plaintiff A.R. and the California Subclass have suffered actual damages.

573.     On behalf of himself and the California Subclass, Plaintiff A.R. seeks attorneys' fees and costs.

574.     In accordance with California Civil Code § 1782(a), Theranos, Walgreens (including Walgreen Arizona Drug Company), Balwani, and Holmes were sent notice of

their CLRA violations by certified mail, return receipt requested. (*See* Ex. 27 hereto). Each of these Defendants has failed to provide appropriate relief for their CLRA violations within 30 days of these notification letters. On behalf of himself and the California Subclass, Plaintiff seeks actual and punitive damages for the CLRA violations alleged herein.

575. Venue is proper under California Civil Code § 1780(d) because Defendants do business in this county and a substantial portion of the transactions at issue occurred in this county. Plaintiffs' declaration establishing that this Court has proper venue for this action was attached as Exhibit Q to Plaintiffs' Consolidated Class Action Complaint (Dkt. 88).

## THIRTEENTH CAUSE OF ACTION
### (California Civil Code §§ 1709-1710 - Deceit)

576. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

577. To the extent this claim is based directly on affirmative misrepresentations, it is brought by Plaintiff A.R. on behalf of himself and the California Subclass against Defendants Theranos and Walgreens. Otherwise, Plaintiff A.R. brings this claim on behalf of himself and the California Subclass against all Defendants.

578. California Civil Code § 1709 provides that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

579. California Civil Code § 1710 defines "deceit" as (1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, (4) A promise, made without any intention of performing it.

580.   The material misrepresentations by Theranos and Walgreens and the omissions by Walgreens, Theranos, Holmes, and Balwani alleged herein constitute deceit under California Civil Code § 1710.  Defendants' misrepresentations and omissions were pervasive.  Plaintiff A.R. and the California Subclass have reasonably relied on the material misrepresentations and omissions made by Defendants.  As a result, Plaintiff A.R. and the California Subclass have suffered actual damages.

581.   Plaintiff A.R. specifically relied on the omissions by Walgreens, Theranos, Holmes, and Balwani alleged herein.  Had he known the information that was concealed, he would not have submitted to Theranos testing.

582.   Each Defendant's misconduct alleged herein was intentional, deliberate, and willful, and was perpetrated by the Defendants with the intent to, *inter alia*, cause Plaintiff A.R. and the California Subclass to rely on Theranos's unreliable test results in making decisions about their health and treatment.

583.   On behalf of himself and the California Subclass, Plaintiff A.R. seeks relief as prayed for below.

## FOURTEENTH CAUSE OF ACTION
### (Medical Battery)

584.   Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

585.   Plaintiffs B.P., R.C., and S.J. bring this claim on behalf of themselves and the Edison Subclass against Defendants Walgreens and Theranos.

586.   Walgreens and Theranos are, and acted as, medical providers in conducting, overseeing, and assisting with the administration of the "tiny" blood draws and "tests" conducted on Plaintiffs B.P., R.C., and S.J. and the Edison Subclass.

587.   The "tiny" blood draws conducted on Plaintiffs B.P., R.C., and S.J. and the Edison Subclass, and research and experimentation conducted of the samples collected, constitute medical procedures.

SECOND AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT
CASE NO. 2:16-CV-2138-HRH

588. Defendants Walgreens and Theranos both engaged in non-consensual medical procedures, as alleged herein, that resulted in harmful and offensive contact with Plaintiffs B.P., R.C., and S.J., and the members of the Edison Subclass.

589. Plaintiffs B.P., R.C., and S.J., and all of the Edison Subclass members each submitted to one or more so-called "tiny" blood draws at the Wellness Centers. Pursuant to these blood draws, a needle was stuck into their bodies, penetrating their skin and tissue, and blood was drawn from their bodies.

590. The vast majority of these "tiny" blood draws occurred in Walgreens stores, and a small portion of them occurred in Theranos Wellness Centers.

591. For the Edison Subclass member "tiny" blood draws that were conducted at Walgreens stores, the blood draws were administered by a Walgreens employee or an individual working for both Walgreens and Theranos, often with the assistance and in the presence of a Theranos employee. In all such cases, ***both*** Walgreens ***and*** Theranos did acts that resulted in the blood draws and that encouraged the blood draws—including, but not limited to, through their pervasive marketing and encouragement of same, through their provision of the space, infrastructure, support, personnel, and equipment used for the blood draws and related services, and through their direct assistance and involvement with the blood draws and their in-store interactions with the subjects. Both Walgreens and Theranos, including through their respective employees, did acts that caused the non-consensual "tiny" procedures on each of these subjects, and both companies caused each to occur.

592. For the "tiny" blood draws that were conducted at Theranos Wellness Centers, the blood draws were administered by Theranos employees.

593. The acts engaged in by Walgreens and Theranos that caused the non-consensual "tiny" procedures were all done intentionally, and also with the intent and knowledge that they would result in harmful and offensive contact.

594.     The non-consensual "tiny" procedures alleged herein that Plaintiffs B.P.,
R.C., and S.J., and the Edison Subclass were subjected to were harmful and offensive.  A
reasonable person in their situation would have been offended under the circumstances.

595.     Plaintiffs B.P., R.C., and S.J., and the Edison Subclass members did not
consent to these procedures.  Any ostensible "consent" they provided was vitiated under
the circumstances and not effective.

596.     Plaintiffs B.P., R.C., and S.J., and the Edison Subclass members agreed to
submit to these procedures but, as alleged herein, they each did so under false pretenses
and under a substantial mistaken belief as to the essential nature and purpose of these
procedures.  Moreover, as alleged herein, their consent was procured by fraud,
misrepresentations, and material omissions by Theranos and Walgreens.

597.     Plaintiffs B.P., R.C., and S.J., and the Edison Subclass members reasonably
believed, contemporaneously when they agreed to submit to these "tiny" procedures, that
the essential nature and purpose of such procedures was legitimate blood testing.

598.     Theranos and Walgreens both knew contemporaneously that Plaintiffs B.P.,
R.C., and S.J.'s, and the Edison Subclass members agreed to submit to these procedures
under a substantial mistaken belief as to their essential nature and purpose.  Theranos and
Walgreens both knew that these consumers mistakenly and reasonably believed that the
essential nature and purpose of these "tiny" procedures was legitimate blood testing.

599.     As alleged herein, pervasive affirmative misrepresentations by Theranos and
Walgreens, in the time leading up to and throughout the time these "tiny" procedures were
being administered, substantially contributed to Plaintiffs B.P., R.C., and S.J., and the
Edison Subclass members' mistaken belief regarding the essential nature and purpose.
This included a pervasive joint marketing campaign carried out by Theranos and
Walgreens throughout the relevant time period, that encouraged consumers to pay for and
submit to "tiny" blood draws for the very purpose of blood testing.  The fundamental
premise of this campaign was the portrayal of the "tiny" blood draws and Edison, and of

the services generally, as market-ready and reliable and being for legitimate blood testing purposes.

600. As alleged herein, also substantially contributing to Plaintiffs' B.P., R.C., and S.J., and the Edison Subclass members' mistaken belief regarding the essential nature and purpose of these "tiny" procedures was the entire context, nature, design, and infrastructure of the Wellness Centers in which the "tiny" blood draws were conducted, which both Theranos and Walgreens designed, and which were intentionally designed by Theranos and Walgreens to give the impression, and which did give the clear impression to consumers, that the blood draws being conducted there were for legitimate blood testing purposes.

601. As alleged herein, the concealment of material information by Theranos and Walgreens also substantially contributed to the Edison Subclass members' mistaken belief regarding the essential nature and purpose of these "tiny" procedures. Throughout the relevant time period, even though both Walgreens and Theranos knew that the subjects of these "tiny" blood draws were agreeing to submit to them under a substantial mistaken belief as to the essential nature and purpose, and were thus going to be subject to non-consensual medical procedures in a harmful and offensive way, neither Walgreens nor Theranos took any steps to correct this mistaken belief or to avoid the harmful and offensive contact. To the contrary, both companies intentionally concealed material information about Edison and the "tiny" blood draws, and actively encouraged, caused, and assisted these procedures.

602. Both Walgreens and Theranos intentionally concealed and failed to disclose, *inter alia*: the truth about the unready Edison technology; that the essential nature and purpose of the "tiny" blood draws was not, and could not have been, legitimate blood testing; and the true essential nature and purposes of the "tiny" blood draws.

603. The "tiny" blood draws were not intended by Walgreens and Theranos to provide reliable blood test results (i.e., "legitimate blood testing").

604. The essential nature and purpose of the "tiny" blood draws was not legitimate blood testing and, indeed, could not have been legitimate blood testing because, as alleged herein and unbeknownst to the subjects at the time they gave their consent, the Edison technology was still in development, still in prototype, not ready-for-market, and nowhere near in a position to serve that purpose. Theranos and Walgreens each knew this to be the case throughout the entire time "tiny" blood draws were being conducted at Walgreens and Theranos facilities. To the extent Walgreens lacked any more detailed knowledge, it was by virtue of its own deliberate choices to ignore and/or avoid such details.

605. As alleged in more detail herein, the true essential nature and purposes of the "tiny" blood draws was to assist efforts to research and develop the still-in-development Edison technology, expedite the narrative of Edison as a "disruptive" technology in the industry, and woo and appease investors, potential investors, and co-investors by creating the false impression that Edison was a market-ready, breakthrough technology.

606. Theranos and Walgreens knew, but Plaintiffs B.P., R.C., and S.J., and the Edison Subclass members could not reasonably have known, the true nature and purposes of these "tiny" procedures.

607. Any purported consent that Plaintiffs B.P., R.C., and S.J. and the Edison Subclass members gave for these procedures was given under a substantial mistake as to their essential nature and purpose, was induced by fraud, concealment, and misrepresentations, and was not effective.

608. Plaintiffs B.P., R.C., and S.J., and Edison Subclass members did not consent to be subjects for experimentation, research, product development, or other undisclosed objectives.

609. Theranos and Walgreens willfully and tortiously battered Plaintiffs B.P., R.C., and S.J., and the Edison Subclass members.

610. Theranos and Walgreens willfully and tortiously experimented on Plaintiffs B.P., R.C., and S.J., and the Edison Subclass members.

611. Moreover, Theranos and Walgreens each aided and abetted the other in committing the medical battery through their conduct alleged herein. Both had actual knowledge of the harmful and offensive "tiny" procedures that were occurring, and both took steps that enabled, substantially assisted, encouraged, and were a substantial factor in, the other carrying out these procedures and causing these procedures to occur. Both Theranos and Walgreens are directly liable for medical battery as to the Edison Subclass members, and are also liable as aiders and abettors.

612. Theranos and Walgreens knew or should have known that their conduct alleged herein regarding the "tiny" blood draws, including but not limited to sticking them with needles, drawing their blood, and willfully experimenting upon Plaintiffs and the Edison Subclass under false pretenses and without obtaining their consent, would be an affront to the dignity of Plaintiffs B.P., R.C., S.J., and the Edison Subclass members as human beings.

613. Theranos's and Walgreens' misconduct alleged herein was intentional, deliberate, and willful.

614. Plaintiffs B.P., R.C., and S.J., and the members of the Edison Subclass were harmed and injured by this conduct.

615. As a foreseeable, proximate, and direct result of Theranos's and Walgreens' conduct, Plaintiffs B.P., R.C., and S.J. and the Edison Subclass members each have suffered a medical battery and have been damaged, including as otherwise set forth in this Complaint, and by invasion of their privacy and bodily integrity without their consent, severe emotional stress and anxiety, and harm to their human dignity and corresponding damages therefrom.

616. On behalf of themselves and the Edison Subclass, Plaintiffs B.P., R.C., and S.J. seek relief as prayed for below.

# VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the Class and Subclasses, demand judgment against and general and special relief from Defendants as follows:

1.      An order certifying that the action may be maintained as a class action under Federal Rule of Civil Procedure 23 as defined herein and appointing Plaintiffs and Interim Co-Lead Counsel to represent the defined Class and Subclasses;

2.      An order requiring Defendants to promptly and adequately notify absent Class members regarding the problems with, and unreliability of, their Theranos tests;

3.      An order awarding Plaintiffs and the Class damages, special damages, general damages, and restitution;

4.      An order requiring Defendants to disgorge all profits and compensation improperly obtained by Defendants as a result of such acts and practices declared by this Court to be an unlawful;

5.      An order requiring Defendants to pay punitive, exemplary, and treble damages;

6.      An order requiring Defendants to pay attorneys' fees, costs, and expenses;

7.      An order requiring Defendants to pay pre-judgment and post-judgment interest; and

8.      Such other and further relief as the Court deems appropriate.

# VIII.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all claims so triable.

DATED this 20th day of October, 2017.

By: *s/ Roger N. Heller*

Michael Walter Sobol (*pro hac vice*)
Roger N. Heller (*pro hac vice*)
Melissa Gardner (*pro hac vice*)
LIEFF CABRASER HEIMANN
& BERNSTEIN LLP
Embarcadero Ctr West
275 Battery St, 29th Floor
San Francisco, CA 94111
Telephone (415) 956-1000
Facsimile: (415) 956-1008
Email: msobol@lchb.com
Email: rheller@lchb.com
Email: mgardner@lchb.com

Mark D. Samson
Christopher Graver
KELLER ROHRBACK LLP
3101 North Central Ave., Suite 1400
Phoenix, AZ 85012
Telephone: (601) 248-0088
Facsimile: (602) 248-2822
Email: msamson@kellerrohrback.com

Lynn Lincoln Sarko (*pro hac vice*)
T. David Copley
Gretchen Freeman Cappio (*pro hac vice*)
KELLER ROHRBACK LLP
1201 3rd Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Email: lsarko@kellerrohrback.com
Email: dcopley@kellerrohrback.com
Email: gcappio@kellerrohrback.com

*Interim Co-Lead Plaintiffs' Counsel*

Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
MCCUNEWRIGHT LLP
555 Lancaster Avenue
Berwyn, PA 19312
Telephone: (610) 200-0580
Email: jgs@mccunewright.com
Email: mds@mccunewright.com
Email: jbk@mccunewright.com

Laurence D. King
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, CA 94104
Phone: 415-772-4700
Fax: 415-772-4707
Email: lking@kaplanfox.com

*Additional Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2017, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

By:  *s/ Roger N. Heller*
 Roger N. Heller

1376272.4